IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

RAMOT AT TEL AVIV UNIVERSITY LTD.,

*Plaintiff-Appellant*,

v.

CISCO SYSTEMS, INC., ACACIA COMMUNICATIONS, INC.

*Defendants-Appellees*,

On Appeal from the United States District Court
for the District of Delaware
Nos. 1:22-cv-00674, 1:21-cv-01365, Judge Gregory B. Williams

### NON-CONFIDENTIAL OPENING BRIEF FOR
### PLAINTIFF-APPELLANT RAMOT AT TEL AVIV UNIVERSITY LTD.

| | |
|---|---|
| Denise Marie De Mory | Jeffrey A. Lamken |
| Richard Cheng-Hong Lin | Rayiner Hashem |
| Michael E. Flynn-O'Brien | Lidiya Mishchenko |
| BUNSOW DE MORY LLP | MOLOLAMKEN LLP |
| 701 El Camino Real | The Watergate, Suite 500 |
| Redwood City, CA 94063 | 600 New Hampshire Avenue, N.W. |
| (650) 351-7241 | Washington, D.C. 20037 |
| ddemory@bdiplaw.com | (202) 556-2000 |
| | jlamken@mololamken.com |
| | |
| Bonnie K. St. Charles | Ryan Baldwin |
| MOLOLAMKEN LLP | MOLOLAMKEN LLP |
| 300 North LaSalle Street | 430 Park Avenue |
| Chicago, IL 60654 | New York, NY 10022 |
| (312) 450-6706 | (212) 607-8173 |

*Counsel for Plaintiff-Appellant Ramot at Tel Aviv University Ltd.*

# EXEMPLARY PATENT CLAIMS AT ISSUE ON APPEAL

## U.S. Patent No. 11,133,872, Claim 1

[pre]   A modulation system, the system comprising:

[a]   an input for a plurality of N digital input data bits;

[b]   an optical signal source for providing an input optical signal;

[c]   a modulator for modulating the input optical signal to output a modulation of the power of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and

[d]   a converter for:

[e]   converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and

[f]   providing the M drive voltage values to the modulator for the modulating,

[g]   wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.

## U.S. Patent No. 11,342,998, Claim 1

[pre]  An optical modulation system, the system comprising:

[a]  an input for a plurality of N digital input data bits;

[b]  an input optical signal;

[c]  a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and

[d]  wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values;

[e]  wherein the input optical signal is modulated based on the plurality of voltage values;

[f]  wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values;

[g]  wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease; and

[h]  wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1277, 26-1280

**Short Case Caption** Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.

**Filing Party/Entity** Ramot at Tel Aviv University Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/22/2026

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Ramot at Tel Aviv University Ltd. | | Tel Aviv University |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**CERTIFICATE OF INTEREST**
**Addendum to Question 4**

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

The following counsel appeared for Appellant in the originating court:

**BUNSOW DE MORY**
Brenda Entzminger
Wayne M. Helge
Corey Johanningmeier
Robin King Curtis
James T. Wilson


**ASHBY & GEDDES**
Brian A. Biggs
Andrew Colin Mayo
John G. Day

The following counsel appeared for Appellees in the originating court:

**DUANE MORRIS**
Holly E. Engelmann
Joseph A. Powers
Philip Han
Tia D. Fenton
Daniel Mitchell
Sajid Saleem


**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Jack B. Blumenfeld
Jennifer Ying

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ................................................................4

STATEMENT OF THE ISSUES......................................................................4

STATEMENT OF THE CASE.........................................................................5

I.     Technological Background............................................................5

       A.     Conventional Fiber Optics and the Problem of Non-Linearity.............5

       B.     The Inventors Solve the Non-Linearity Problem ...............................10

       C.     The '998 and '872 Patents......................................................13

II.    Proceedings Below ......................................................................18

       A.     Claim Construction ...........................................................18

       B.     Summary Judgment...........................................................19

              1.     Analog-Driven Products Without MZEs ...............................19

              2.     Analog-Driven Products With MZEs ....................................22

              3.     Digital-Driven Devices ............................................24

              4.     Claims Requiring "Deltas" That "Increase" or
                     "Decrease" .........................................................24

SUMMARY OF ARGUMENT ....................................................................26

STANDARD OF REVIEW ..........................................................................29

ARGUMENT ................................................................................................30

I.    The District Court's Construction of "Mapping" Is Erroneous and Does Not Support Summary Judgment ...........................................................31

    A.    The District Court Erred by Construing "Mapping" To Require a Fixed and Invariable One-to-One Correspondence Between a Given Input and a Singular, Specific Output .....................................32

        1.    The Ordinary Meanings of "Map" and "Mapping" Do Not Require That Each Input Correspond to Only One Fixed Output ....................................................................32

        2.    The Claims' Structure Defies the District Court's Fixed-and-Singular Correspondence Requirement ............................37

        3.    The Specification Does Not Support Requiring Each Input Value To Have a Fixed Correspondence to Only One Output Value ....................................................................38

    B.    The District Court's Contrary Analysis of Intrinsic Evidence Does Not Withstand Scrutiny ...........................................................40

        1.    The District Court's *Ipse-Dixit* Analysis of Ordinary Usage Contradicts Ordinary Meaning ......................................40

        2.    The District Court Erroneously Imported Limitations From One Embodiment Into the Claims ..................................42

    C.    The District Court's *Sua Sponte* Reliance on Inapposite Extrinsic Evidence Was Error ...........................................................45

        1.    The District Court's *Sua Sponte* Resort to a Treatise on Abstract Mathematics Was an Abuse of Discretion .................45

        2.    Abstract-Math Set-Theory Definitions Are Inapposite ...........48

        3.    The Set-Theory Definition of Mapping Does Not Support the District Court's Added Requirements Regardless..............51

    D.    The District Court's View That the "Output Cannot Depend on Prior Inputs" Underscores the Error.....................................................52

II.     Factual Disputes Preclude Summary Judgment As to the Accused Analog-Driven Devices With MZEs Even Under the District Court's Construction of "Mapping" ......................................................................54

        A.      Ramot Presented Ample Evidence of Infringement ...........................54

        B.      The District Court Erred in Granting Summary Judgment.................55

III.    Factual Disputes Preclude Summary Judgment as to the Accused Digital-Driven Devices Even Under the District Court's Construction of "Mapping" ......................................................................60

        A.      Ramot Presented Ample Evidence of Infringement ...........................60

        B.      The District Court Erred in Granting Summary Judgment.................61

IV.     The District Court's Construction of the "Deltas" Limitation (in a Subset of the Asserted Claims) Is Erroneous .................................................61

        A.      Sequences of Only Two Deltas Can "Increase" or "Decrease"..........62

        B.      The District Court's Reasoning Is Unavailing....................................64

CONCLUSION ......................................................................66

## CONFIDENTIAL MATERIAL OMITTED

The image and numbers redacted on page 56 contain technical information that Cisco contends is confidential under the applicable protective order.

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.,*
659 F.3d 1121 (Fed. Cir. 2011) ...................................................................58

*Accent Packaging, Inc. v. Leggett & Platt, Inc.,*
707 F.3d 1318 (Fed. Cir. 2013) .......................................................29, 63, 64

*AFG Indus., Inc. v. Cardinal IG Co.,*
239 F.3d 1239 (Fed. Cir. 2001) ..............................................................48, 49

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
629 F.3d 1311 (Fed. Cir. 2010) ...................................................................34

*Astellas Pharma, Inc. v. Sandoz Inc.,*
117 F.4th 1371 (Fed. Cir. 2024) .............................................................45, 47

*Brilliant Instruments, Inc. v. GuideTech, LLC,*
707 F.3d 1342 (Fed. Cir. 2013) .......................................................58, 59, 61

*Canada v. Samuel Grossi & Sons, Inc.,*
49 F.4th 340 (3d Cir. 2022) ..........................................................................30

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.,*
143 F.4th 718 (6th Cir. 2025) .................................................................47, 49

*CUPP Computing AS v. Trend Micro, Inc.,*
53 F.4th 1376 (Fed. Cir. 2022) ...............................................................39, 40

*directPacket Rsch., Inc. v. Polycom, Inc.,*
No. 2024-1147, 2025 WL 1752247 (Fed. Cir. Jun. 25, 2025) ...................47

*Fintiv, Inc. v. Apple Inc.,*
No. 2023-2208, 2025 WL 1419363 (Fed. Cir. May 16, 2025)...................59

*Greenlaw v. United States,*
554 U.S. 237 (2008)......................................................................................45

*Hoechst Celanese Corp. v. BP Chems., Ltd.,*
78 F.3d 1575 (Fed. Cir. 1996) .....................................................................48

*KJC Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) ................................................................53

*Malvern Panalytical Inc. v. TA Instruments-Waters LLC*,
85 F.4th 1365 (Fed. Cir. 2023) ................................................................37

*Mantech Env't Corp. v. Hudson Env't Servs., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998) ................................................................37

*Omega Eng'g, Inc., v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ................................................................43

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................35, 37, 43

*Smith & Nephew, Inc. v. Ethicon, Inc.*,
276 F.3d 1304 (Fed. Cir. 2001) ................................................................44

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) ................................................................43, 44

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ................................................40, 43, 63

*Texas Digit. Sys., Inc. v. Telegenix, Inc.*,
308 F.3d 1193 (Fed. Cir. 2002) ................................................................47

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ................................................................................45

*V-Formation, Inc. v. Benetton Group SpA*,
401 F.3d 1307 (Fed. Cir. 2005) ................................................................33

*VLSI Tech. LLC v. Intel Corp.*,
172 F.4th 1348 (Fed. Cir. 2026) ................................................................29

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ................................................................37, 38

*WSOU Invs. LLC v. F5, Inc.*,
Nos. 2023-1427, 2025-1505, 2025 WL 1135207
(Fed. Cir. Apr. 17, 2025) ................................................................34

**RULES**

Fed. R. Evid. 201(e) ..........................................................................47

**DICTIONARIES**

*The Authoritative Dictionary of IEEE Standards Terms*
    (7th ed. 2000) ..................................................................33, 35, 36, 50

*Compact Oxford English Dictionary* (3d ed. 2005)..................................63

*McGraw-Hill Dictionary of Scientific and Technical Terms*
    (6th ed. 2002) ..................................................................33, 34, 41, 50

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2004) ............................33, 41

*Newton's Telecom Dictionary* (27th ed. 2013) ........................................34

*Oxford English Dictionary* (2d ed. 1989) ........................................33, 41

*Oxford Dictionary of Computing* (6th ed. 2008) ....................................36

**OTHER AUTHORITIES**

*Configuring Control Plane Policing*, Cisco,
    https://tinyurl.com/48xu4vpn (last accessed May 21, 2026).......................34, 35

*IEEE 802.1X Port-Based Authentication*, Cisco,
    https://tinyurl.com/3fnk46mu (last visited May 21, 2026)................................36

*Pitchbook 2025*, Tel Aviv University,
    https://en-alumni.tau.ac.il/Pitchbook-7th-Place-TAU
    (last visited May 20, 2026) ..........................................................10

*Stateful Network Address Translation 64*, Cisco,
    https://tinyurl.com/4d4bd2kc
    (last visited May 21, 2026) ..........................................................34

Elias Zakon, *Mathematical Analysis* (Univ. of Windsor Press 2004),
    https://resources.saylor.org/wwwresources/archived/site/wp-
    content/ uploads/2012/02/Real-Analysis-I-Zakon-1-30-11-
    OTC.pdf ..................................................................46, 49, 50, 51

## STATEMENT OF RELATED CASES

No other appeal from the action below was previously before this or any other appellate court. The Court's decision in this appeal may directly affect or be directly affected by the following pending cases: *Cisco Systems, Inc. v. Ramot at Tel Aviv University Ltd.*, Nos. 24-1726, 24-1727, 24-1728 (Fed. Cir.); *Ramot at Tel Aviv University Ltd. v. Acacia Communications, Inc.*, No. 21-cv-00295 (D. Del.); *Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc.*, No. 19-cv-00225 (E.D. Tex.).

## INTRODUCTION

This case involves breakthrough technology, developed by researchers at Tel Aviv University, that improves the "modulators" that power high-speed fiber-optic communications networks. Modulators encode digital data into light waves that are transmitted over optical fibers. While modulators transmit zeros and ones in light waves according to mathematical equations, the modulators themselves are subject to real-world phenomena, such as heat buildup in lasers and manufacturing variation. Those phenomena cause "non-linearities," where the output of the modulator for given input data deviates from the mathematical ideal. Non-linearities make it difficult for receivers at the other end of the fiber to discern the data values being transmitted, which can result in errors or reduced speed.

Tel Aviv University researchers overcame the non-linearity problem with a novel approach that digitally processes the *input* data to compensate for non-linearities in the output. The invention computes a "mapping" that counteracts the modulator's non-linearity. It then "maps" input values to output values so that, when the processed signal is provided to the subsequent circuits, the output is more linear. The researchers obtained the asserted patents for their invention.

Ramot, Tel Aviv University's technology transfer office, brought this infringement action against Cisco and Acacia. ("Ramot" is Hebrew for "heights" or "elevations.") At *Markman*, the parties *agreed* that "map" in the asserted claims

1

means "selecting or generating a digital output . . . for a given digital input." Appx7. At summary judgment, the district court *sua sponte* undertook further construction. Applying definitions it found in sources neither party cited—from the field of abstract mathematics rather than engineering—it ruled that the term "map" requires a specific type of correspondence: "[E]ach unique input" must have a single "specific output, and said output cannot depend on prior inputs." Appx64. Based on that requirement, of an unchanging correspondence from a specific input value to a single possible output value, the district court granted summary judgment in favor of Cisco and Acacia.

That construction cannot be sustained. General-purpose and technical dictionaries alike define "mapping" to include correspondences from an input value to one ***or more*** possible output values; they do not limit "mapping" to fixed one-to-one mappings. Even a technical dictionary the district court invoked (for its definition of a different term) defines "mapping" in that manner. The district court also misapprehended the (never-briefed or argued) sources it invoked. Those sources confirm that "mapping" includes a relation between an input value and one ***or more*** possible output values. And the district court's analysis of the specification commits the "cardinal sin" of reading limitations from an embodiment into claims that use broad language.

2

Even under the district court's construction of "mapping," there were triable issues of fact as to subsets of the accused products. For example, the accused devices with Mach-Zehnder Equalizers correct the same types of non-linearity discussed in the asserted patents, and do so in a manner virtually identical to the patents' descriptions. Yet the district court granted summary judgment as to those products as well because, in its view, Ramot's expert did not sufficiently explain why the "multiple bit symbols of digital input data" in the accused products satisfies the requirement of a "plurality of N digital input data bits" in the claim. Appx71-75. But the expert expressly linked the input bits in the accused product to the input bits in the claim. The claim does not imbue the claimed input bits with any further requirements, and there was no construction of the term. So there was nothing else to explain. At the very least, a reasonable jury could make whatever remaining inference is required.

Finally, some asserted claims require that a sequence of "deltas" (differences between two numbers) "increase" or "decrease." The district court interpreted that language to require a sequence of *three or more* deltas that consistently increase or decrease. It reasoned that a sequence of numbers cannot be said to "increase" or "decrease" without a "trend" of three or more numbers. Appx89-90. But the words "increase" (and "decrease") encompass two numbers where the second value is

larger (or smaller) than the first.  For example, profits can increase or decrease year-over-year.  The district court's erroneous construction cannot stand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a).  It entered final judgment on December 1, 2025.  Appx95.  Ramot timely appealed on December 16, 2025.  Appx7839.  This Court has jurisdiction under 28 U.S.C. §§ 1291, 1295(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in construing "map" and "mapping" to require a fixed correspondence where a given input *always* produces the same output and the output does not depend on prior inputs.

2.      Whether the district court erred in granting summary judgment of non-infringement as to the accused analog-driven devices with MZEs, even under the district court's construction of "mapping."

3.      Whether the district court erred in granting summary judgment of non-infringement as to the accused digital-driven devices, even under the district court's construction of "mapping."

4.      Whether the district court erred in construing certain claims to require a sequence of *three* or more "deltas" that all "increase" (or "decrease"), where the

4

plain meaning of "increase" (and "decrease") encompasses *two* numbers where the second number is larger (or smaller) than the first number.

## STATEMENT OF THE CASE

This appeal concerns patented technology developed by Tel Aviv University for increasing data-transmission speeds and reducing data corruption in fiber-optic communications networks.

## I. TECHNOLOGICAL BACKGROUND

Computer and telephone networks use fiber optics to transmit data at high speeds over long distances. Appx5184-85(¶¶34-35). Today, companies also rely on fiber optics to deliver "ever faster" communications between servers within data centers built for AI and cloud computing. Appx5184-85(¶34).

### A. Conventional Fiber Optics and the Problem of Non-Linearity

Fiber-optic communications work by "encoding" data in light waves that are transmitted through optical fibers. Appx5187(¶41). Lasers or light-emitting diodes ("LEDs") in transmitters produce light waves (called carrier signals). Appx5185(¶36). A "modulator" in the transmitter alters the light waves in specific ways to encode data into the carrier signal. Appx5185-86(¶¶36-37); Appx5187(¶41). At the other end of the fiber, a "demodulator" in the receiver decodes the modulated signal to obtain the transmitted data. Appx5186(¶38) Appx5188(¶44).



Appx7954.  The image above depicts a modulator that receives a carrier signal (left circle) and produces a modulated signal containing the data (right circle) that can travel over an optical fiber.

Modulators typically encode data by altering the "amplitude" (intensity) and "phase" of light waves in the carrier signal.  Appx5187(¶41).  In the image above, the height of each wave's peak is its *amplitude*, while the wave's horizontal position is its *phase*.  A simple modulator might represent ones and zeros as light pulses with either high or low intensity.  Appx5185-86(¶37); Appx4210-11(¶58).  The pulses are called "symbol[s]."  Appx5185(¶37).  For that simple modulator, each symbol has two possible values (high or low intensity) and each symbol represents one bit. For example, low intensity might be a "0" and high intensity a "1." Appx5185(¶37).

6

The transmission speed is limited by the "switching speed" of the modulator—*i.e.*, how quickly it can produce distinct pulses. Appx5185-86(¶37).

To increase transmission speeds, modulators can use symbols that have more possible values and thus convey more data. Appx5185(¶37); Appx5187(¶40). For example, a pulse with four possible intensity levels can denote any of the four combinations of two bits ("00," "01," "10," and "11") and thus convey two bits in a pulse:



Appx7957-78; *see* Appx5187(¶40).

Modulators can also increase transmission speed by using two carrier waves ("quadrature amplitude modulation"). Using two carriers, each with eight amplitude or intensity levels, yields 64 (8×8) possibilities for each symbol:



7

Appx110. On the left-hand side of the above image, the horizontal axis shows eight possible intensities for the first wave ("I"), and the vertical axis shows eight possibilities for the second wave ("O"). That yields 64 possible combinations and corresponding symbols (depicted by small markers in each square). Using sixteen levels for each wave gives 256 (16×16) possibilities for each symbol, as shown on the right.

As the above images illustrate, however, increasing the number of possible values for each symbol or pulse diminishes the differences between them, making it harder to distinguish the values from each other. By analogy, a viewer can easily discern the difference between an inch and a foot. But distinguishing 2/8 of an inch from 3/8 of an inch is harder and more error-prone. The same is true when differences in amplitude or intensity become fine-grained. Appx5189(¶45); Appx5190-91(¶51); Appx5192(¶53).

That problem is exacerbated by the fact that real-world modulators have an "inherent[ly] non-linear response." Appx113(1:62-2:4). That means a fixed-size change in input value (the data going into the modulator) can produce a change in output value that varies across the range of potential inputs. Appx113(1:62-2:4). Non-linearity is caused by physical phenomena, such as "thermal roll-over" (heat buildup affecting laser output), "'deficiencies in the frequency response of the optical modulator,'" or "manufacturing variation." Appx5188-89(¶44);

Appx5274(¶240) (emphasis omitted). Non-linearities can also be "frequency-dependent," such that the amount of distortion depends on how quickly the input value changes. Appx5248(¶175).

Non-linearity can be illustrated using a graph that shows how output value changes as a function of the input value:



Appx5194 (annotated). In the above graph, each dot shows the output intensity (vertical y axis) as a function of the input (horizontal x axis). The diagonal line shows a linear response: a fixed-size change in input value (x axis) results in a fixed-size change in output intensity (y axis). The dots show a non-linear response: Fixed-sized changes in input value produce changes in output intensity of varying size. For example, the dots in the red and blue boxes reflect identical fixed-size changes in input value (x-axis changes). But the intensity differences between the three output values (y-axis changes) in the red box are smaller than the differences between the three output values (y-axis changes) in the blue box. Smaller intensity differences

make it harder for the receiver to distinguish values, which can cause transmission "errors." Appx5188-89 (¶44); Appx5192 (¶53).

Prior-art techniques sought to "compensate for modulator non-linearity" by, for example, using "analog pre-distortion circuit[s]," Appx113 (2:3-10), or "analog signal pre-conditioning." Appx5193 (¶55). But those approaches were "complicated," resulted in "output range restrictions," reduced "efficiency," and had other "severe limitations." Appx113 (2:14-18, 34); Appx5193 (¶55).

## B. The Inventors Solve the Non-Linearity Problem

Tel Aviv University ("TAU") is a leading research university: It invests $275 million per year in R&D, and ranks in the top 10 universities worldwide in the number of graduates who found startup companies.[1]

Dr. Yossef Ehrlichman, Dr. Amrani Ofer, and Prof. Shlomo Ruschin, from TAU's School of Electrical Engineering, developed a modulator that "improve[s] linearity of response" compared to conventional modulators. Appx113 (2:34-35). Their new modulator digitally preconditions data signals by processing each "digital data input word" in a way that counteracts the "non-linear response" of later-stage circuits. Appx114 (3:28-33, 49-44). When the preconditioned digital signal is

---

[1] *Pitchbook 2025*, Tel Aviv University, https://en-alumni.tau.ac.il/Pitchbook-7th-Place-TAU (last visited May 20, 2026).

provided to the modulation circuits, the output "approximat[es]" a "linear modulation of the optical signal." Appx114(3:28-33).

Conventionally, modulators receive input data bits for one symbol at a time; the patent refers to that as an "input data word" (or "N-bit input word" to refer to an input consisting of N bits). Appx113(1:55-62). The modulator uses the input data word to control a Mach-Zehnder Interferometer ("MZI"), which emits electrical signals that alter the phase and amplitude of light waves. Appx113(1:56-2:3).

TAU's researchers improved on that approach by adding a "digital-to-digital converter" ("DDC") to "process[] the digital data input word" *before* it is provided to the MZI, Appx114(3:50-61):



FIG. 1

Appx100 (annotated). The DDC (red box) starts with an "input data word" ("D") consisting of a certain number of bits (here, four) and "maps" that word ("D") to an output data word ("B"). Appx116(7:40-47, 55-57). The mapping selects output

11

data words ("B") that—when supplied to subsequent modulator stages—produce a more "linear response" than the original input data. Appx116(7:40-49, 55-57).

The "mapping" required to "mitigate the non-linear behavior of the device" depends on "the response characteristic of the particular modulator"—that is, the way in which the modulator's output deviates from the linear ideal. Appx119(13:27-31). The inventors developed specific mechanisms, equations, and formulas for computing that mapping for various types of modulators. Appx115-20(9:25-16:67). Given a modulator with a specific non-linear "natural response," the system can compute a mapping that compensates for the non-linearity. Appx116(8:57-67).

The figures below illustrate the invention's improved results. On the left is the non-linear output of a conventional modulator. *See* pp. 8-9, *supra*. On the right is the linearized output of a modulator using the invention:



Appx101 (annotated). On the left, the first three output values (red box) are closer together on the vertical axis—signifying smaller intensity differences—than they would be in the linear ideal. On the right, the mapping has spaced those three output values further apart on the vertical axis—signifying larger intensity differences—

similar to the linear ideal. Appx116(7:31-57). The invention thus ensures uniformly high "'contrast'" across the range of output values, making it easier for receivers to distinguish between symbol values. Appx142-43(8:60-9:8).

The inventors' "digital compensation" approach with a DDC is "simpler and faster" than prior art that used "analog filter[s]" to compensate for non-linearity. Appx5193(¶55). Analog filters are "bulkier and less reliable." Appx5193(¶55). And the DDC mapping can be implemented in "software" to enhance flexibility. Appx5193(¶55).

### C. The '998 and '872 Patents

1. The inventors were awarded the '998 and '872 patents for their invention, which were assigned to Ramot. Appx410(¶102). The patents disclose "a modulator" that uses a DDC to process input data bits before using the bits to control an MZI or similar device. Appx113(2:38-53). The DDC "map[s] an N bit input to a set of M" output bits such that, when the M output bits are used to control the modulator, the "non-linear behavior of the device" is "mitigate[d]." Appx114(4:63-66); Appx119(13:23-27).

In one embodiment, the modulator includes "input 12 for receiving an input data word D of N bits" and input 16 for receiving an input "optical [carrier] signal." Appx115(7:9-15); Appx117(9:27).



FIG. 1

Appx100. "For each digital vector $D_i$" of length N (input data word) "the DDC . . . produces a corresponding binary vector $B_i$ of length M" (output data word). Appx117(10:31-40). The device uses the output bits B to control the "voltages" used by the MZI, which alters the amplitude of carrier signal 16. Appx117(10:38-43).

As explained above, the "mapping" required to compensate for a modulator's non-linearity depends on the "response characteristic[s] of the particular modulator." Appx119(13:23-31); pp. 12-13, *supra*. The patents provide myriad mathematical formulas for computing mappings for different modulators, including Mach-Zehnder modulators. Appx117-20(9:25-16:67). The specification emphasizes that mappings "may be employed" for "***any*** desired response curve." Appx116(8:61-64) (emphasis added); *see* Appx116(8:54-61); Appx118(11:55-57) ("output response . . . may take ***any*** desired form" (emphasis added)). Implementers have "freedom"

14

to implement a "mapping" that "best approximates a desired ideal output." Appx116(7:5-25). The specification explains that, given particular non-linear behavior, "digital mappings may be derived ... by analytical methods or numerically" to compensate for that behavior. Appx120(15:15-21).

The patent defines the DDC's operation broadly as "a device which maps a set of possible digital input values to a set of possible digital output values." Appx114(4:63-66). The only restriction on the DDC's mapping is that "the input and output values are non-identical"—because that would produce no change in the input and thus no mitigation of non-linearity. Appx114(4:63-66).

The specification makes clear that a mapping can account for other inputs in addition to the input data word. Figure 10, below, depicts an embodiment of the DDC with *two* inputs: the input data word "$D_i$" and "RZ." Appx120(16:23-39).



FIG. 10

Appx108 (annotated).  Figure 10's embodiment "map[s]" the input data word to one of two possible values, depending on the value of "RZ."  Appx120(16:37-39).

2.  Claim 1 of the '998 patent recites:

An optical modulation system, the system comprising:

[a]  an input for a plurality of N digital input data bits;

[b]  an input optical signal;

[c]  a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and

[d]  ***wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values***;

[e]  wherein the input optical signal is modulated based on the plurality of voltage values;

16

[f]     ***wherein the digital-to-digital mapping comprises***, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values;

[g]     ***wherein, within the digital-to-digital mapping***, ***for a first subset*** of successively increasing digital input values specified in the digital-to-digital mapping, ***deltas between numerical values of successive digital outputs*** in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, ***decrease***; and

[h]     ***wherein, within the digital-to-digital mapping***, ***for a second subset*** of successively increasing digital input values specified in the digital-to-digital mapping, ***deltas between numerical values of successive digital outputs*** in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, ***increase***.

Appx147(17:23-55) (emphasis added).

The claimed device has an "input for a plurality of N digital input data bits" (an N-bit input word). Appx147(17:23-55) (limitation [a]). For each N-bit input, "a digital-to-digital mapping maps [the input] to a set of M digital output data bits" (an M-bit output word). Appx147(17:23-55) (limitation [d]). Limitations [g]-[h] require the mapping to have certain mathematical properties. Appx147(17:23-55).

3.     Claim 1 of the '872 patent is similar to claim 1 of the '998 patent, except it lacks the last two limitations (1[g] & [h]) relating to "deltas." Instead, claim 1 of the '872 patent provides a different, further limitation:

[g]     wherein M>N and N>l, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the

17

corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.

Appx121(17:30-37).

## II. PROCEEDINGS BELOW

Ramot filed suit against defendants Cisco Systems, Inc. and Acacia Communications, Inc. (collectively, "Cisco"), alleging that their optical transceiver modules infringe Ramot's '872 and '998 patents. Cisco sought a declaratory judgment of non-infringement. Appx863; *see* Appx5990-92.

### A. Claim Construction

The claims recite a digital-to-digital "mapping" that "maps" the input data word to an output data word. Appx147(17:23-55). At *Markman*, the district court substantially adopted the parties' agreed constructions for "map" and "mapping" (when used as a verb): "'selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital inputs . . . are not identical.'" Appx9; *see* Appx1725.

As to "mapping" used as a noun, the court modified the agreed construction to be more grammatical: "mapping" means "a structure that 'maps [a] plurality of N digital input data bits to M digital output data bits.'" Appx10-11.

18

## B. Summary Judgment

At summary judgment, Cisco urged that its accused products do not satisfy the asserted claims' "mapping" limitations. As relevant here, the accused products fall into three categories: analog-driven products without Mach-Zehnder Equalizers ("MZEs"), analog-driven products with MZEs, and digital-driven products.

### 1. *Analog-Driven Products Without MZEs*

There was no dispute that Cisco's accused devices contain "digital signal processors" ("DSPs") that receive each input data word and produce an output data word that is used to control the modulator. Appx5201-03 (¶¶64-70); Appx5235-36 (¶¶139-42). There was also no dispute that the DSPs "compensat[e]" for "'non-linear impairments'" by translating the digital input words into digital output words that, when used to drive the modulator, result in more linear output. Appx421 (¶126). Ramot's expert opined that the DSPs "map[]" input data words to output data words as the claims require, and that those mappings have the mathematical properties and other characteristics recited in the asserted claims. Appx5224 (¶115).

Cisco's expert conceded that the DSPs calculate output data words from input data words based on a mathematical "[f]unction[]." Appx3276-77 (¶¶204-05). But he asserted that they do not meet the claim because they consider not only the current input data word, but also prior inputs. Appx4222-23 (¶573); Appx3276-77 (¶¶204-05).

19

According to him, the DSPs rely on a "***one-to-many*** relationship between inputs and outputs such that each given input can have many possible outputs depending on the value of surrounding inputs" and thus do not meet the "mapping" limitation. Appx4222(¶573) (emphasis added); Appx4218(¶74).

Although neither party had requested further construction, the district court *sua sponte* ordered supplemental briefing on the issue. Appx5997-98. Cisco argued that the claim language and agreed construction was sufficient; in its view, the claim's requirement of mapping an input to a "'corresponding'" output necessitated a fixed, one-to-one relationship between a data word input and a corresponding output. Appx6020-22. Ramot replied that the claim language does not require a "static, one to one" correspondence. Appx6183.

The district court ruled that the agreed construction—"selecting or generating a digital output . . . for a given digital input" (where the outputs and inputs are not "identical"), Appx1725—was insufficient to resolve the dispute, Appx63-64. It thus imposed an additional requirement: "that each unique input has a specific output"— by which it meant that a given input data word always produces the same output— "and said output cannot depend on the prior inputs." Appx64; *see* Appx71.

The district court invoked "plain meaning," asserting that, if "input data bits could correspond to different output data bits, then they cannot be said to have been 'mapped.'" Appx64. The court thus appears to have understood the ordinary

20

meaning of "map" to require a fixed, one-to-one correspondence between a specific data input value and a single possible output value. The court emphasized the word "given" in the agreed construction: "selecting or generating a digital output . . . for a **given** digital input." Appx1725 (emphasis added); Appx64. It stated that, "if the same input could result in a different output, that output could not be said to have been selected or generated 'for a given digital input.'" Appx64-65. The court cited nothing to support that understanding of the word "given"—much less in a context where, as here, "given" describes the **starting** point, not the result.

Turning to the specification, the district court pointed to Figure 4, an embodiment in which the mapping takes the form of a two-column table specifying input values and output values. Appx65. The court did not mention Figure 10, which shows a mapping with **multiple** input values—the input data word and "RZ"—where the output for a given input data word depends on the RZ input.

The district court then turned to a treatise on abstract mathematics that neither party had cited. Appx65. Although the parties' experts agreed that the relevant field is "Electrical" or "Computer Engineering," Appx5181(¶24); Appx6692(¶24), the court declared (without citation or analysis) that a treatise on "Set Theory" is within "the relevant art," Appx65. The treatise stated that, in set theory, "mapping" means: a "'relation $R$'" between sets where each element "'$x$'" in a first set is associated with a "'**single** element'" "'$R[x]$'" in a second set. Appx66 (emphasis added). The

21

court asserted that this definition supported its view that "mapping" requires each given input value to have a fixed mapping to a single specific output value. Appx65-66. The court did not explain why skilled artisans would look to a mathematical set-theory definition to understand the claims. Nor did the court analyze the meaning of "map" or "mapping" in electrical or computer engineering.

The district court then applied its new construction to grant summary judgment for Cisco as to the analog-driven products without MZEs. Appx71. The district court ruled that, because the DSPs in the accused products can produce "different outputs" "for the same" input data word—depending on the value of other input variables, Appx6328-29—they do not practice "mapping" under its construction. Appx71.

### 2. *Analog-Driven Products With MZEs*

Some accused Cisco analog-driven devices contain an MZE block in the DSP; Ramot accused that MZE block as also performing the claimed mapping, even if a one-to-one mapping is required. Appx5222(¶112); Appx5225(¶116). Ramot's expert testified that the MZE block corrects for non-linearities using an approach that is nearly identical to the approach described in Figures 2A and 2B of the patents. Appx5222(¶112); Appx5225(¶116). "Like an example embodiment in the Asserted Patents," Ramot's expert testified, the MZE stage uses a "lookup table" to "map[]" the input bits to "pre-distort the baseband signal with the inverse of the

Mach-Zehnder transfer characteristic"—*i.e.*, compensate for non-linearity. Appx5225(¶116); *see* Appx3178 (citing Appx5225-26(¶117)); Appx147(18:43-51); Appx121(17:53-58); Appx139(1:64-66); Appx143(9:33); Appx144(11:18-21).

Cisco's expert did not dispute that the output values of the MZE depend on only the current input data word, not prior input data words. Appx4054. Jonas Geyer, a Cisco employee, testified that the accused devices translate digital input values to digital output values using a "lookup table" to "linearize" the output. Appx3867-68(69:24-70:3); Appx3868(70:13-16); Appx73-74.

The district court, however, held that the evidence did not create a triable issue of fact under its new construction of "mapping." Appx77; *see* Appx3178; Appx4881-82. The district court did not deny that Ramot's expert testified that skilled artisans would understand the MZE block to perform the claimed mapping. But it faulted Ramot's expert for supposedly not testifying that the MZE's "'multiple bit symbols of digital input data'" constitute the "N digital input data bits" in the claims. Appx73; Appx75. According to the court, that precluded jurors from "draw[ing] the inference that the input into the MZE block is the 'N digital input data bits,' required by the Asserted Claims." Appx75. The court overlooked that Ramot's expert had provided such testimony. Appx5215(¶98). The court also did not explain why a jury could not infer that the MZE input is the claimed "N digital

input data bits." It did not dispute that the claims use the phrase "N digital input data bits" *only* to refer to the input to the claimed mapping. Nor did it dispute that Ramot's expert testified that the MZE performs the claimed mapping by translating received digital input bits into digital output bits.

### 3. *Digital-Driven Devices*

Ramot also urged that Cisco's digital-driven devices infringe even if "mapping" requires a one-to-one correspondence. Appx84. But the district court granted summary judgment as to the digital-driven devices based on a different requirement. As explained above, the "decimal values" of the set of possible outputs and set of possible inputs cannot be "not identical." Appx80. The documents and expert testimony showed that the requirement is met. Appx5736(¶70). Disagreeing with Ramot's expert, Cisco's expert urged that the documentary evidence should be interpreted differently; under his reading, the sets of input and output values would be identical. Appx84-85; Appx5736-37(¶¶70-71). The district court agreed with Cisco's expert and granted summary judgment. Appx84-85.

### 4. *Claims Requiring "Deltas" That "Increase" or "Decrease"*

Independent claims 1 and 58 of the '998 patent, and claim 23 of the '872 patent, require certain characteristics for the mapping between inputs and outputs. Appx88-89. In particular, they focus on the "deltas" (changes) between successive output values. Limitation 1[g] of the '998 patent, for example, requires that "for a

24

first subset of successively increasing digital input values," the corresponding "deltas between numerical values of successive digital outputs" must "***decrease***." Appx147(17:42-48) (emphasis added). Limitation 1[h] is similar, but requires the "deltas" for a second set of output values to "***increase***." Appx147(17:49-55) (emphasis added).

Limitation 1[g], which provides for ***decreasing*** the deltas, counteracts a non-linearity where the differences in output value (y-axis differences) over a range are ***larger*** than desired, such as for the data points in the blue box below:



Appx127 (annotated). Limitation 1[h], which provides for the deltas to increase, counteracts a non-linearity where the output differences over a range are smaller than in the linear ideal, such as in the red box above.

The parties did not seek construction of those limitations at *Markman*. At summary judgment, the district court held that construction was required. Appx89. It ruled that the limitations require a sequence of ***three deltas*** that are all either increasing or decreasing. Appx89. The district court rejected Ramot's argument

that sequences with ***two deltas*** can be described as an increase or decrease. According to the district court, an increase or decrease requires a "trend."  Appx90 (emphasis omitted).  One "cannot determine whether or not values are increasing or decreasing based solely on two numbers."  Appx90.

## SUMMARY OF ARGUMENT

**I. A.**   The district court erred in construing "mapping" to require a fixed, one-to-one mapping where "each unique input has a specific output and said output cannot depend on prior inputs."  The ordinary meaning of "map" and "mapping" is a "correspondence" from one input to "one or more" possible outputs.  "Map" means to select an output based on such a correspondence.  General-purpose dictionaries, the technical dictionary cited in the patent (intrinsic evidence), and the court's technical dictionary all define "map" or "mapping" to encompass one-to-many mappings, such as where one input can map to two or more outputs depending on other variables.

The technical dictionary cited by the patent defines "function" to include functions that produce "one or more" outputs from a single input, including functions that produce a single output that depends on multiple variables.  Those definitions contradict the district court's requirement of a fixed and invariable mapping from one input to only one possible output.

26

The claims expressly recite the characteristics mappings must have. It is improper to read in unrecited limitations. And the specification defines "mapping" implicitly in defining "digital-to-digital converter": "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." That does not require a fixed, one-to-one, invariable map. The requirement of a fixed, one-to-one mapping also improperly excludes Figure 10's embodiment, which discloses a mapping with multiple inputs (the input data word and "RZ"), where the same input can map to one of two possible outputs depending on "RZ." Requiring a fixed, one-to-one mapping impermissibly excludes that embodiment.

**B.** The district court's analysis of the claim language rests on unsupported assertions about the meanings of "mapping" and "given." The court identified no lexicography or limiting language in the specification. Instead, it improperly read a limitation from a single embodiment into the claim.

**C.** The district court disregarded the party-presentation rule by invoking an extrinsic treatise on abstract mathematics and set theory that neither party cited. That treatise was outside the fields of art (electrical and computer engineering) that both parties' experts identified as relevant. The district court's contrary ruling was unsupported. Regardless, the court misapprehended the treatise. In context, the treatise contradicts the court's added limitations on "mapping."

**D.** Even if a one-to-one mapping were required, the district court's further gloss that the "output cannot depend on prior inputs" could not stand. The claims recite that "*a* mapping maps" each input. That encompasses one or more different mappings for each input, as well as different mappings for successive inputs. Nothing precludes the plurality of mappings from being computed using prior inputs. Thus, even if each mapping must be one-to-one, reversal is required. Ramot presented evidence that the accused products rely on a series of one-to-one mappings, computing each new mapping based on prior inputs.

**II.** The grant of summary judgment should be reversed as to the analog-driven products with MZEs. Ramot presented ample evidence that those products infringe even under the district court's construction of "mapping." The district court granted summary judgment anyway, asserting that Ramot's expert did not sufficiently identify the claimed "input for a plurality of N digital input data bits." But Ramot's expert pointed to specific "multiple bit symbols of digital input data" as meeting the input-bits limitation. The claims do not impose further limitations on the input bits, so Ramot's expert had no reason to say more. And a jury could reasonably infer that the input bits Ramot's expert pointed to in the accused products were the input bits in the claim.

**III.** The grant of summary judgment for the accused digital-driven products likewise must be reversed. Ramot presented ample evidence that those products

28

infringe regardless of the construction of "mapping." The district court, however, granted summary judgment based on the requirement that input values and output values cannot be identical. But Ramot presented evidence showing that the input values and output values in the accused products are "not identical." The district court granted summary judgment by improperly resolving a factual dispute between the experts about how to interpret technical evidence.

**IV.** The district court erred in construing the "deltas" limitations (in the asserted independent claims of the '998 patent and one of the four asserted independent claims of the '872 patent). Limitations [g] and [h] of claim 1 of the '998 patent require a sequence of "deltas"—differences between adjacent output values—that "decrease" or "increase," respectively. The plain meanings of those words encompasses two-item sequences where the second item is larger (or smaller) than the first item. The district court's requirement of three or more deltas, so as to show a "trend," is utterly unsupported.

<u>**STANDARD OF REVIEW**</u>

"Claim construction is a question of law . . . review[ed] de novo." *VLSI Tech. LLC v. Intel Corp.*, 172 F.4th 1348, 1354 (Fed. Cir. 2026). Grants of summary judgment also are reviewed de novo. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1325 (Fed. Cir. 2013). Under applicable Third Circuit law, summary-judgment decisions must "view the facts in the light most favorable to the

29

non-moving party" and "draw all reasonable inferences in that party's favor." *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up). Summary judgment is not appropriate if "a reasonable jury" could "decide in favor of the nonmoving party." *Id.*

## ARGUMENT

The district court's claim constructions cannot be sustained. The term "mapping" does not require a fixed correspondence where, for any input, there can be one and only one potential output. To the contrary, in engineering and computing alike, a single input can be "mapped" to multiple potential outputs (such as where additional variables affect the result). The district court erred in looking, *sua sponte*, to an abstract mathematics treatise chapter on "set theory" for the contrary view. Even under the district court's own construction, moreover, summary judgment was inappropriate. And the district court likewise erred in construing the term "increase" (or "decrease") to require a change across a set of at least three data points. In ordinary understanding, the term "increase" includes moving from a lower point to a higher point (or lower deltas to higher ones), and "decrease" encompasses moving from higher values to lower ones (or higher deltas to lower ones). The district court's three-point-trend requirement has no basis in the claims.

30

**I. THE DISTRICT COURT'S CONSTRUCTION OF "MAPPING" IS ERRONEOUS AND DOES NOT SUPPORT SUMMARY JUDGMENT**

Claim 1 of the '998 patent requires "*a digital-to-digital mapping*" that "*maps the plurality of N digital input data bits to a set of M digital output data bits.*" Appx147(17:23-55) (limitations [a] & [d]) (emphasis added). Based on an agreed construction, the district court initially ruled that "mapping" and "maps" mean "'selecting or generating a digital output . . . for a given digital input.'" Appx9. At summary judgment, however, the court construed the terms to impose an added requirement: "that each unique input has a specific output, and said output cannot depend on prior inputs." Appx64; *see* Appx64-65 ("identical input data bits" cannot "correspond to different output data bits"). That requirement of a fixed, one-to-one correspondence between input and output values has no basis in the claims, the specification, or how skilled artisans would understand "map" and "mapping" in the relevant field. To the contrary, "mapping" encompasses correspondences where an input may be mapped to multiple potential outputs depending on other variables.[2]

In electrical engineering and computer science, a "mapping" is a correspondence between an input value and one or more output values; "map" means to

---

[2] The construction also states that the "decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical." Appx9; p. 18, *supra*. That construction is not in dispute here. The court also clarified that "mapping," as a noun, refers to a structure that performs "mapping." Appx10-11; p. 18, *supra*.

translate an input value into an output value according to such a relation. The term "mapping" thus encompasses one-to-many associations. For example, a particular input (*e.g.*, voltage) may map to more than one possible output depending on other variables (*e.g.*, temperature or distance). The '998 and '872 patents invoke that same broad meaning. To the extent mappings must have specific mathematical characteristics, the claims recite those ***expressly***. Indeed, the patents disclose embodiments that do not meet the district court's fixed, one-to-one correspondence requirement. The district court erred in relying on definitions of "mapping" and "function" from abstract math treatises that neither party cited.

**A. The District Court Erred by Construing "Mapping" To Require a Fixed and Invariable One-to-One Correspondence Between a Given Input and a Singular, Specific Output**

The ordinary meaning, claim structure, and specification all confirm that the term "mapping" encompasses correspondences of input values to output values, not just the specific, fixed correspondence of a single input to a single output that the district court imposed at summary judgment.

*1. The Ordinary Meanings of "Map" and "Mapping" Do Not Require That Each Input Correspond to Only One Fixed Output*

At claim construction, the parties ***agreed*** that "'mapping can be either selecting or generating'" output values based on given input values. Appx9. The district court's initial construction reflected that "mutual understanding," which the court found to be "'consistent with the rules of English grammar and common sense.'"

32

Appx9-10.  That construction was correct and complete.  "Map" and "mapping" do not require a fixed correspondence between a particular input and one, and only one, output.  To the contrary, in ordinary usage, an input may be "mapped" to more than one potential output where, for example, the output depends on the input and other variables.

Ordinary Usage.  Dictionaries reflect that usage precisely, defining "map" in terms of "correspondence."  Webster's Collegiate Dictionary thus defines the verb to "map" as "to assign . . . in a mathematical or exact *correspondence*," and defines "correspondence" as "a relation between sets in which each member of one set is associated *with one or more members* of the other."  *Merriam-Webster's Collegiate Dictionary* 280, 758 (11th ed. 2004) (emphasis added).  The Oxford English Dictionary defines "mapping" as "[t]o associate with each element of (a set) *one or more elements* of another set."  9 *Oxford English Dictionary* 349 (2d ed. 1989).  Thus, a "mapping" is a correspondence between one value and one or more other values, while "map" means to select an output value for a given input according to such a correspondence.

Relevant technical dictionaries reflect that same understanding.  The dictionary cited in the patents—which constitutes intrinsic evidence—defines "map" as "[t]o establish a correspondence."  *The Authoritative Dictionary of IEEE Standards Terms* 664 (7th ed. 2000) ("*IEEE Dictionary*"); *see* Appx98; Appx125; *V-Forma-*

*tion, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Even the dictionary cited by the district court defines "mapping" as "***any*** multi-valued ***relation***," and "relation" as a "***correspondence***" or "set of ordered pairs." *McGraw-Hill Dictionary of Scientific and Technical Terms* 1281, 1780 (6th ed. 2002) (emphasis added). And, as just explained, a "correspondence" associates an input with "one ***or more***" possible outputs. Similarly, a "set of ordered pairs"—a list of pairs where the first value is the input and the second is the output—can associate an input with multiple possible outputs. For example, the square roots of the integers 1, 4, and 9 can be represented by ordered pairs as: [(1, 1), (1, -1), (4, 2), (4, -2), (9, 3), (9, -3)]. Each input maps to ***two*** possible outputs, because any number has two square roots.

Telecommunications dictionaries define "mapping" to include illustrative processes such as "name-address mapping." *Newton's Telecom Dictionary* 745 (27th ed. 2013). On the Internet, a "domain name" such as "'xyz-news.com'" can be name-address mapped to multiple possible network addresses for "multiple devices" or "servers" to allow load balancing across servers. *WSOU Invs. LLC v. F5, Inc.*, Nos. 23-1427, 25-1505, 2025 WL 1135207, at *1 (Fed. Cir. Apr. 17, 2025); *see Akamai Techs., Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311, 1315 (Fed. Cir. 2010). Cisco's own technical literature refers to "one-to-many" and "1:*n*" relation-

ships as "mapping[s]."[3] The district court's contrary view of "map"— associating a given "input" with a fixed "specific output," Appx64; Appx71—cannot be sustained. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

Function. The district court's contrary view rested on its effort to equate "mapping" with "function." Appx65. The district court assumed that, because the specification says that the non-linear response of a modulator can be expressed as a "'function,'" the mapping that corrects that non-linearity also must be a function. Appx65 (citing Appx116 (8:65-9:1)). That a non-linear response can be expressed as a function, however, does not mean any corrective mapping must be a function as well. But even if that were true, the term "function" in engineering and electronics encompasses mapping an input "x" to "one ***or more***" outputs "u." *IEEE Dictionary*, *supra*, at 468 (emphasis added). That contradicts the district court's requirement that a "given input" must be associated with only one fixed "specific output." Appx64.

Likewise, in engineering and electronics, the output of a "function" can depend on "two or more variables." *IEEE Dictionary*, *supra*, at 468. Cisco's expert

---

[3] *E.g.*, *IEEE 802.1X Port-Based Authentication*, Cisco, https://tinyurl.com/3fnk46mu (last visited May 21, 2026) ("mapping of user-to-IP address can be on a ... one-to-many ... basis"); *see also Stateful Network Address Translation 64*, Cisco, https://tinyurl.com/4d4bd2kc (last visited May 21, 2026) ("1:*n* mapping between IPv4 and IPv6 addresses"); *Configuring Control Plane Policing*, Cisco, at 2, https://tinyurl.com/48xu4vpn (last visited May 21, 2026) ("one-to-many mapping of a class-map to CPU queues").

testified that the multi-input calculations in the accused DSPs are "functions." Appx3276-77 (¶¶204-05). Here, the asserted patents disclose a mapping with multiple inputs, where the same input data word can result in different outputs depending on another variable's value. Thus, contrary to the district court's assertion (Appx64-65), given "identical input data bits," a function can produce "different output data bits" depending on other variables.

The definition of "function" in computing likewise reflects the ordinary understanding that an input can be associated with one or more outputs. In computing, a "function" is a "program unit that given values for input parameters computes [an output] value." *Oxford Dictionary of Computing* 213 (6th ed. 2008); *IEEE Dictionary*, *supra*, at 468. The district court's decision cannot be reconciled with that understanding—or the understanding used in engineering and electronics generally.

Because the patents recite engineering solutions to engineering problems, they must be understood as using engineering terms. Non-linearity arises from physical phenomena, such as "thermal roll-over," where heat buildup in the laser reduces the output produced for a given input. Appx5188-89 (¶44). The resulting distortions depend not only on the input, but also on other variables such as temperature. Appx5188-89 (¶44). Distortions can also be "frequency-dependent"—*i.e.*, deviations can be greater for rapid changes in the input versus slow changes.

Appx5248(¶175). Skilled artisans would understand that mappings calculated to counteract those non-linearities could likewise account for variables beyond the input itself. They would not understand "mapping" to be limited to the narrow subset of mathematical "functions" in which the output value is fixed depending solely on the input value.

2. *The Claims' Structure Defies the District Court's Fixed-and-Singular Correspondence Requirement*

Claim construction looks not merely to the words being construed but also the "'context of the surrounding words of the claim.'" *Phillips*, 415 F.3d at 1314. Here, that context and surrounding language confirms that "mapping" does not require any one given input to always produce the same output. Insofar as mappings must have specific mathematical characteristics to mitigate non-linearity, the claims recite those requirements expressly.

For example, limitations [g]-[h] in claim 1 of the '998 patent recite specific mathematical relationships between input and output "values specified in the mapping." Appx147(17:23-55). In particular, they require certain "deltas" to increase or decrease. Appx147(17:23-55); p. 17, *supra*. Where "claims" use a "broad" term for a structure and contain express limitations that "clarify and restrict what the [structure] does," with "no language suggesting [further] restrictions," it is improper to limit the term to particular "embodiments." *Malvern Panalytical Inc. v.*

*TA Instruments-Waters LLC*, 85 F.4th 1365, 1372 (Fed. Cir. 2023); *see Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1374 (Fed. Cir. 1998).

### 3. The Specification Does Not Support Requiring Each Input Value To Have a Fixed Correspondence to Only One Output Value

The specification confirms that the patentee "'cho[se] a broad term and expect[ed] to obtain the full scope of its plain and ordinary meaning.'" *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017). The specification defines "map" implicitly in its definition of "digital-to-digital converter": "a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical." Appx114(4:63-67). That definition, which was the basis for the agreed construction, *see* Appx1725, imposes a single requirement: that the mapping is not a nullity, and maps at least some input values to different possible output values. Nothing in that language suggests "mapping" imposes a further, negative limitation to exclude mappings where a given input may be mapped to multiple potential outputs (in view of additional variables).

To the contrary, the specification emphasizes the broad function of the digital-to-digital converter (DDC) that effectuates the required mapping. The DDC "convert[s] a digital input into an analog output approximating . . . ***any desired response curve***." Appx143(9:2-5) (emphasis added). And the invention provides implementers "***freedom to choose***" the mapping that "best approximates a desired

38

ideal output for the given input." Appx142-43 (7:29-33, 8:60-9:8) (emphasis added).

Those statements about the broad reach of the DDC indicate that "mapping" is similarly broad. For the DDC to address the wide range of non-linearities described in the patent, the mappings which it uses to do so must be flexible enough to compensate for myriad types of non-linearities, some of which may result from different sources.

The district court's construction also "excludes a preferred embodiment from the scope of the claim," which is "rarely, if ever, correct." *CUPP Computing AS v. Trend Micro, Inc.*, 53 F.4th 1376, 1381 (Fed. Cir. 2022). Figure 10 discloses a mapping with *two* inputs, where, contrary to the district court's construction, "identical input data bits could correspond to different output data bits." Appx64.



Appx108 (annotated). In the embodiment, a DDC receives *two* inputs: the input data word "$D_i$" (yellow) and another input, "RZ" (red). Appx120(16:23-39). The output ("B") depends on both inputs: "When [RZ] . . . is high, the DDC will map the electrode actuation pattern to . . . zero"; otherwise, the input will be mapped to the result of equation 11 in the patent. Appx120(16:23-39); Appx119(14:54-67).

Figure 10's mapping thus is a function of two factors, input data word $D_i$ and variable RZ. More importantly, there is *more than one* potential output for any given input $D_i$: Depending on RZ, the output can be the result of "equation 11," or "zero." Appx120(16:23-39). Thus, in Figure 10's mapping, "identical input data bits" (a given value of $D_i$) can "correspond to different output data bits" depending on RZ. Appx64. That is consistent with how "mapping" and "function" are understood in engineering. It is irreconcilable with the district court's contrary construction. *See CUPP Computing*, 53 F.4th at 1381.[4]

**B. The District Court's Contrary Analysis of Intrinsic Evidence Does Not Withstand Scrutiny**

1. *The District Court's Ipse-Dixit Analysis of Ordinary Usage Contradicts Ordinary Meaning*

This Court "indulge[s] a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d

---

[4] The inclusion of two DDCs in Figure 10 relates to use of quadrature amplitude modulation, *see* p. 7, *supra*, but that distinction is not relevant here.

1313, 1325 (Fed. Cir. 2002). The district court gave ordinary meaning short shrift. To support requiring that "each unique input ha[ve] a specific output," the district court asserted that, if "identical input data bits could correspond to different output data bits, then they cannot be said to have been 'mapped.'" Appx64. But that is mere assertion. As explained above, general-purpose dictionaries define "map" in terms of "correspondence," *i.e.*, an association between an input and "one *or more*" outputs. *Merriam-Webster's Collegiate Dictionary, supra*, at 280 (emphasis added); *Oxford English Dictionary*, *supra*, at 349. As a result, a given input can be mapped to one or more possible outputs, such as where the output depends on both the input and other variables. The district court's contrary view, that each input must have a fixed correspondence to a single potential output, does not reflect but defies that ordinary meaning.

The district court cited a single technical dictionary but overlooked its definition of "*mapping*." Appx65. Consistent with the agreed construction and Ramot's view, that source defines "mapping" as "any multi-valued *relation*"; and it defines "relation" to include "*correspondence*." *McGraw-Hill Dictionary of Scientific and Technical Terms*, *supra*, at 1281, 1780 (emphasis added). Thus, it too confirms that a "mapping" can be any type of relation or correspondence—an association between an input and one or more outputs. A fixed relationship between a specific input and a single specific output is not required.

The district court also seized on the word "given" in the agreed construction: "selecting or generating a digital output from a set of possible digital outputs for a ***given*** digital input from a set of possible digital inputs." Appx9 (emphasis added); *see* Appx64. It posited that, "if the same input could result in a different output, that output could not be said to have been selected or generated 'for a given digital input.'" Appx65. The district court did not explain why "given" requires a particular input value to always map to a specific output. Grammatically, the district court's analysis is backwards. Under the construction, the input "given" is the starting point. The term "given" does not modify the identity or number of ending points the mapping might produce from that given input.

Regardless, "given" appears only in the agreed construction, and it serves a non-limiting grammatical purpose. The claims recite "an input" value and that "a digital-to-digital mapping maps ***the***" input value to an output value. Appx147(17:33-40) (emphasis added). When offering a construction of "map," it would be ungrammatical to refer to "***the***" input value, which has no antecedent basis in the construction. As a result, the agreed construction is phrased in terms of a "given" input value. That phrasing does not support the district court's conclusion that a given input must always correspond to an invariable, fixed output regardless of other variables.

42

### 2. *The District Court Erroneously Imported Limitations From One Embodiment Into the Claims*

The district court's reliance on the "specification," Appx67-68, was likewise misplaced. Appx67. The district court did not "identif[y] any express disclaimer or independent lexicography in the written description that would justify adding [its] negative limitation" to the term "mapping." *Omega Eng'g, Inc., v. Raytek Corp.,* 334 F.3d 1314, 1322 (Fed. Cir. 2003). Nor did the court point to any "'clear statements of scope'" or any "expression of manifest exclusion or restriction" that could "limit the term" "mapping" to a specific type of correspondence that always produces the same output for a given input. *Teleflex*, 299 F.3d at 1327. Absent such limiting language in the specification, there was no basis for the district court to read "negative limitation[s]" into the claim. *Omega*, 334 F.3d at 1322.

Instead, the district court committed the "cardinal sin" of claim construction by reading limitations from an embodiment "into the claims." *Phillips*, 415 F.3d at 1316; *see SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1117 (Fed. Cir. 1985). It pointed to "Figure 4," which depicts a mapping in the form of a table with two columns: "DDC Input" and "DDC Output." Appx67-68. But Figure 4 is a simplified, pedagogical example that "illustrates" the problem of non-linearity and how it can be addressed with mappings. Appx142(8:5-6); Appx142(7:39-8:28); *see* pp. 11-13, *supra*. It is not even mentioned in the patent's detailed analysis of how to compute mappings for real modulators. *See* Appx143-47(9:33-16:49). Such a

pedagogical illustration does not limit claim scope. *See SRI*, 775 F.2d at 1121; *Phillips*, 415 F.3d at 1320.[5]

The district court urged that the specification fails to disclose "an embodiment" with something other than a fixed, one-to-one mapping. Appx65. But Figure 10 discloses an embodiment with multiple inputs where the output depends on other variables in addition to the input data word. *See* pp. 15-16, *supra*. Regardless, the specification need not describe "every conceivable and possible future embodiment" within the claims. *SRI*, 775 F.2d at 1121.

The district court's decision also contravenes the general rule that infringers that practice all limitations in a claim cannot escape liability merely because their devices add extra steps. *Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1310 (Fed. Cir. 2001). Here, the accused devices ***do*** what the patent discloses, computing compensatory mappings based on the input data word and modulator characteristics. But the district court essentially held that they do not infringe because they ***additionally*** account for other factors, such as temperature or how quickly inputs are changing. But infringement cannot be evaded by ***adding*** steps or limitations. It makes no sense to lard claim constructions with negative limitations so as to produce that same result. *Ethicon*, 276 F.3d at 1310.

---

[5] Even if Table 4 suggests mappings must be tables, Ramot's expert testified that the accused DSPs' calculations can be "implemented as a lookup table." Appx4449-50.

**C.   The District Court's *Sua Sponte* Reliance on Inapposite Extrinsic Evidence Was Error**

The district court's claim construction could and should have stopped with a proper evaluation of ordinary usage and the specification.  But the district court turned to what it called "extrinsic evidence" (that neither party had presented).  Appx65.  Without notice to the parties, the court posited that the "relevant art" includes the field of abstract mathematics and that, as a result, sources in that field are probative of the meaning of the claims here.  Appx66.  Having done so, the court then invoked a source neither party had presented—a treatise on abstract mathematics describing set theory.  Appx66.  That violation of the party-presentation rule was an abuse of discretion.  The court identified no evidence that abstract-math set-theory definitions were relevant.  To the contrary, its ruling defied both parties' understanding of the relevant art.  And the set-theory definition on which the district court relied does not support its conclusion in any event.

**1.   *The District Court's* Sua Sponte *Resort to a Treatise on Abstract Mathematics Was an Abuse of Discretion***

District court proceedings are subject to the "principle of party presentation," which requires that "parties," not courts, "frame the issues for decision."  *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020).  The "principle of party presentation" applies with no less force to "'patent law'" than to other areas of law.  *Astellas Pharma, Inc. v. Sandoz*

45

*Inc.*, 117 F.4th 1371, 1377 (Fed. Cir. 2024). The district court's *sua sponte* reliance on set-theory definitions disregarded that important principle here.

Here, the parties had agreed to a construction that was also applied in related matters, including PTO proceedings where the PTO and this Court upheld the validity of the asserted patents. In those cases, the parties, their experts, and the PTO agreed that the relevant art is ***computer and electrical engineering***. Appx5181(¶24); Appx6692(¶24). No party urged the relevant field includes abstract mathematics or that skilled artisans would interpret "mapping" by reference to definitions in that field.

Nonetheless, the district court *sua sponte* invoked a treatise on abstract mathematics—specifically, a chapter on "Set Theory"—as within the "relevant art." Appx66 (citing Elias Zakon, *Mathematical Analysis* at 10 (Univ. of Windsor Press 2004), https://resources.saylor.org/wwwresources/archived/site/wp-content/uploads/2012/02/Real-Analysis-I-Zakon-1-30-11-OTC.pdf); *see* Appx65. It did not explain its finding that the field of abstract mathematics is "relevant." Nor could it. The very treatise the court invoked notes the specialized nature of the terminology in the field, warning that "'[c]olloquial' language fails here." Zakon, *supra*, at x.

The district court then analyzed the treatise's definition of "mapping": a "'relation $R$'" where "every element x $\in D_r$ has a unique $R$-relative, so that $R[x]$ consists of a single element. This unique element is denoted by $R(x)$ and is called the function

46

value at $x$ (under $R$). Thus, $R(x)$ is the only member of $R[x]$." Appx66 (emphasis altered). The district court had no expert testimony at its disposal saying how skilled artisans would apply that definition when reading the claims. Nonetheless, it asserted that the passage means that "the term 'mapping,' as used in the relevant art, refers to a function, where only one output corresponds to a given input." Appx66.

That result cannot be sustained. The district court gave Ramot no notice that it was expanding the scope of the relevant art beyond what the parties had agreed, or of the new definition it found probative. Nor did it give Ramot an opportunity to present expert testimony on (1) whether the relevant art included set theory; (2) how skilled artisans would apply set-theory definitions to the claims; or (3) whether Cisco's accused products infringe even under the narrower, set-theory definition of "mapping." In doing so, the district court "violated the principle of party presentation." *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th 718, 725 (6th Cir. 2025); *see Astellas*, 117 F.4th at 1377.[6]

District courts may, of course, rely on "***relevant*** dictionaries, encyclopedias and treatises to ascertain possible meanings that would have been attributed to the

---

[6] For the same reasons, the district court's approach also was contrary to Federal Rule of Evidence 201(e), which requires that, before a court takes judicial notice of adjudicative facts, it must afford the parties an opportunity "to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e); *see directPacket Rsch., Inc. v. Polycom, Inc.*, No. 24-1147, 2025 WL 1752247, at *6 (Fed. Cir. Jun. 25, 2025).

words of the claim by those skilled in the art." *Tex. Digit. Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1205 (Fed. Cir. 2002) (emphasis added).  But that prerogative does not displace the principle of party presentation.  This Court has never sanctioned a district court turning to uncited sources **beyond** the fields the parties have agreed upon, without opportunity to brief any new issues that arise from expanding the scope of the relevant art.

The district court's error was undoubtedly prejudicial.  Even after the district court *sua sponte* requested letter briefs on further construction, Cisco never suggested turning to narrower definitions of "mapping" in specialized fields. Appx6018-21.  With good reason:  Cisco was then appealing Board decisions upholding the validity of the asserted patents; in those IPRs, Cisco had agreed the relevant field is computer and electrical engineering and applied the agreed construction of "mapping."  *See* Appx24-25 in *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 24-1726, -1728 (Fed. Cir.).  Cisco could not urge the district court to adopt a narrower definition from a different field of art.  The district court thus made for Cisco an argument Cisco had strategically avoided.

### 2. *Abstract-Math Set-Theory Definitions Are Inapposite*

The district court's reliance on definitions from abstract mathematics was also substantively incorrect.

The district court asserted that abstract-mathematics set theory is within the "relevant art." Appx66. But the court gave no basis for that assertion. Nor could it: Under black-letter law, a "technical term" must be given "the meaning that it would be given by persons experienced in the field of the invention." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996); *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247-48 (Fed. Cir. 2001). The experts here agreed that the relevant skilled artisan is a practitioner in "Electrical" or "Computer Engineering." Appx5181 (¶24); Appx6692 (¶24). The court cited no evidence that abstract-math set theory falls within those fields, or that relevant skilled artisans would consult abstract-math set-theory definitions to understand claims such as these. And neither party cited definitions drawn from abstract mathematics or set theory. The district court's finding that the set-theory definitions are within the "relevant art" is unsupported by any record evidence. *See AFG Indus.*, 239 F.3d at 1252; *In re Chrysler*, 143 F.4th at 725.

Further, the set-theory definitions the district court invoked are irrelevant. The experts here agreed that the relevant artisans were engineers, not mathematicians. And the patents on their face address ***engineering problems***; they mitigate non-linearity, which arises from the ***real-world vagaries*** of temperature and time and manufacturing variance. Consistent with that, the patents cite IEEE papers and the IEEE's authoritative technical dictionary. Appx124-25. The patents thus

reflect, and are properly interpreted in light of, the understandings of artisans in the computer and electrical engineering fields, not abstract mathematicians. *See* p. 21, *supra*. Indeed, the mathematics textbook itself warns that it uses specialized terminology specific to abstract math. *See* Zakon, *supra*, at x.

Even if skilled artisans were somehow familiar with abstract mathematics and set theory, they would also understand that the terms "map" and "mapping" have a more specialized meaning there than in the engineering context. In set theory, the term "***relation***" includes correspondences from a given input to one ***or more*** outputs, consistent with the agreed construction. Zakon, *supra* at 8. Set theory apparently uses "mapping" to refer to a specific "kind of relation" where each input maps to only one output. *Id.* at 11. But ***engineers*** use the term "mapping" to refer to the broader concept of a "***relation***," or to a "correspondence" generally. *McGraw-Hill Dictionary of Scientific and Technical Terms*, *supra*, at 1281, 1780 (emphasis added); *IEEE Dictionary*, *supra*, at 664-65; *see* pp. 33-34, *supra*. It is not uncommon for such subtle terminological distinctions to develop when terms are used in different fields or different contexts. In patent law, for example, the word "obvious" has specific requirements that depart from the meaning in ordinary parlance. Even if one assumes *dubitante* that skilled artisans reviewing the '998 and '872 patents would be familiar with the specialized definition of "mapping" in set theory, they

would understand that ***the claims*** use the broader understanding.  The district court

offered no reason for thinking otherwise.[7]

3.    *The Set-Theory Definition of Mapping Does Not Support the District Court's Added Requirements Regardless*

Even on its own terms, the district court's analysis of the set-theory definition

was incorrect.  Its cited treatise explains that "mapping" and "function" in set theory

encompass "functions of two . . . [to] n . . . variables" where the output "depend[s]

on" more than one input.  Zakon, *supra*, at 12 (cleaned up).  For example, the

"addition of natural numbers may be treated as a map f: $N \times N \rightarrow N$, with $f(x,$

$y) = x+y$."  Zakon, *supra*, at 12.  The output of that mapping depends on ***both*** x and

y.  Given a particular input x, the output might be different depending on y.

Consequently, even the set-theory definitions of "mapping" and "function" do

not support the district court's effort to require that a given input data word always

maps to the same output.  Appx64-65.  For example, an implementation of the patent

could rely on a mapping that is a function of two variables, such as the input data

word and a temperature variable (to compensate for "thermal roll-over," Appx5188-

89($\P$44)).  Figure 10 of the specification itself discloses a mapping that is a function

of multiple variables: "RZ" and the input data word "$D_i$."  Appx120(16:22-39);

Appx108.  Those embodiments would satisfy the set-theory definition of "mapping"

---

[7] While the claims use the word "set," they do so in the ordinary sense of a group of values.  That does not support importing set-theory concepts into the claims.

as well: They would recite a function under which, for any given *pairing* of input data word and another variable, there would be a single, fixed "unique" result. But the district court's construction would exclude them nonetheless because "identical input data bits could correspond to different output data bits," depending on the other input variables (*e.g.*, temperature, RZ, or prior inputs). Appx64. The district court's added limitation thus contradicts the definitions it invoked.

### D. The District Court's View that the "Output Cannot Depend on Prior Inputs" Underscores the Error

The district court did not merely construe "mapping" to require that "each unique input ha[ve] a specific output"; it added the gloss that the "output cannot depend on prior inputs." Appx64. The district court offered no reason for that gloss. Nor does it follow logically from the district court's textual analysis. The claims require only that "*a* mapping" maps each input word to an output. Appx121(17:30-37) (emphasis added). They nowhere require a single mapping that is wholly independent of prior inputs.

The claimed device processes one input data word at a time. It has an "input for a plurality of N digital input data bits"—*i.e.*, one input consisting of N bits. Appx147(17:23-55) (limitation 1[a]). For each input, "*a* digital-to-digital mapping maps *the* plurality of N digital input data bits"—one input—"to a set of M digital output data bits." Appx147(17:23-55) (limitation 1[d]) (emphasis added). There is nothing in the phrase "*a* mapping" that precludes use of prior inputs in mapping the

52

input data word at issue. Nor does the phrase require that only one mapping be possible for each unique input. To the contrary, the phrase "*a* mapping" by its terms permits multiple mappings for an input. "This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more.'" *KJC Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).

The claims also impose no restrictions on how "a mapping" is computed when there is a series of input values. Indeed, the claims contemplate processing one input value at a time and are silent as to whether there can be a relationship among mappings for successive input values. Thus, even if the term "mapping" is limited to a fixed, one-to-one correspondence, that would not preclude using a different new mapping that is selected based on "prior inputs" for each successive data input word. Appx64. That would be consistent with the specification, which emphasizes that mapping can be applied to correct myriad types of non-linearity. *See* pp. 11-13, 38-39, *supra*. And skilled artisans would understand that non-linearities can be "frequency-dependent" and arise from how quickly the input value is changing, such that correcting it would require considering prior inputs. Appx5248 (¶175).

Thus, even if the Court upholds the district court's requirement that each "mapping" is a one-to-one correspondence between an input and a single output—and it should not, *see* pp. 32-40, *supra*—reversal still must follow. As Ramot explained, the calculations in Cisco's DSPs can also be characterized as a multi-

input function that depends on the current input word in addition to prior inputs, or as a one-to-one function that "calculat[es]" a new "mapping" for each successive iteration based on prior inputs. Appx6173-74. Either way, absent the district court's unsubstantiated requirement that the "output cannot depend on prior inputs," Cisco's DSPs infringe the "mapping" limitation.

## II. FACTUAL DISPUTES PRECLUDE SUMMARY JUDGMENT AS TO THE ACCUSED ANALOG-DRIVEN DEVICES WITH MZEs EVEN UNDER THE DISTRICT COURT'S CONSTRUCTION OF "MAPPING"

Even if this Court upholds the district court's construction of "mapping," the district court's grant of summary judgment for the analog-driven devices with Mach-Zehnder Equalizers ("MZEs") should be reversed. Ramot's expert testified that those products infringe because the MZE component performs the claimed mapping. Appx5225-28. That component, moreover, undisputedly uses a mapping that does not "depend on prior inputs." Appx64. Consequently, even under the district court's view of "mapping," summary judgment was inappropriate.

### A. Ramot Presented Ample Evidence of Infringement

Ramot's expert explained that Cisco's MZE products fall within the claim even if each input must correspond to a single output. Indeed, he explained Cisco's MZE products correct the same linearities addressed in the preferred embodiments of the patents and do so in the way those embodiments describe. Appx5222-23(¶112); Appx5225(¶116). In particular, the MZE products "correct" "non-

linearity" "due to the sinusoidal" distortion from the "Mach-Zehnder modulator," Appx5225-26(¶116-18); *see* Appx5228(¶122).

The evidence also showed that the MZE products correct that non-linearity in the way described by the asserted patents. "[L]ike an example" in the patents, Ramot's expert explained, the MZE uses a "lookup table" to "map[ ]" input bits and output bits and to "pre-distort the baseband signal with the inverse of the Mach-Zehnder transfer characteristic." Appx5225(¶116). A Cisco employee confirmed that testimony. He testified that the MZE translates input values to output values using a "lookup table" to "linearize the Mach-Zender transfer function" of the modulator. Appx3867-68(69:24-70:3); Appx3868(70:13-16); Appx73-74. That was sufficient to defeat summary judgment.

## B. The District Court Erred in Granting Summary Judgment

The district court did not deny there was evidence from which the jury could conclude that Cisco's MZE devices practice "mapping" consistent with the court's construction of that term. Appx72. Instead, the court asserted that Ramot's expert did not "specify that the input into the MZE data block" in the accused products "is the 'N digital input data bits' recited in the claims." Appx73. But Ramot's expert did just that.

1. Ramot's expert carefully traced the flow of the input data to the MZE in the accused devices. The accused devices include a "digital signal process[or]"

("DSP chip") that performs various functions, including mapping. Appx5216(¶100). With respect to limitation 1[a], the "input for a plurality of N digital input data bits," Ramot's expert testified that the "DSP circuits . . . have an ***input of N bits of digital data*** to the transmit DSP blocks that perform the digital-to-digital mapping of the claims." Appx5215(¶98) (emphasis added). That data flows through a "datapath" that carries "No.-bit code word[s]" to the various functional blocks, Appx5215-16(¶99):

Appx5216(¶99) (annotated). In the above image, drawn from the expert's report, the data path (arrows) carries data to the functional blocks (rectangles). Ramot's expert explained that the "DSP data path" includes the "Mach-Zehnder Equalizer block" (blue) that is accused of performing mapping. Appx5222(¶112). The blocks on the data path that perform the "mapping functions of the . . . DSP chip" (including the MZE block), he continued, receive data " 'No.-bytes [ No. bits] at a time' " and operate on it in terms of "N-bit" " 'symbols.' " Appx5217(¶101).

In addressing the "mapping" limitations, Ramot's expert explained that they were satisfied because the accused devices include functionality for "mapping . . . the plurality [of] N digital input data bits." Appx5221(¶109). Referring back to his

testimony about the data path, he explained that the "DSP . . . receives and operates on multiple bit symbols of digital input data," which are carried through the "datapath" to "multiple functions that provide digital-to-digital mapping." Appx5222(¶110). And he emphasized that the "data path . . . includes a 'Mach-Zehnder Equalization' block that performs a digital-to-digital mapping" as required by the claims. Appx5225(¶116). That testimony is crystal clear that the "plurality of N digital input data bits" in limitation 1[d] is the "multiple bit symbols of digital input data" carried via the data path to the "multiple functions that provide digital-to-digital mapping," including the MZE. Appx5221-22(¶¶109-10).

2. The district court found all that insufficient because, according to it, Ramot's expert never explained how "the input into the MZE could qualify, on its own, as the 'N digital input data bits.'" Appx73; Appx75. But Ramot's expert explained how the DSP "functions that provide digital-to-digital mapping," including the MZE, receive "multiple bit symbols of digital input data" via the "datapath." Appx5222(¶110). Those "multiple bit symbols of digital input data" satisfy the requirement of a "plurality of N digital input data bits." Data bits are data bits. No further explanation was required.

The district court asserted that, "[m]erely because the data that enters the MZE block . . . can be described as an 'input,' in a general sense, does not" mean it is the claimed "'N digital input data bits.'" Appx73-76. The district court never explained

why it does not mean precisely that. To infer otherwise, one would have to give the term "N digital input bits" a meaning it does not have. The term simply means N bits of data that is provided (input) to perform the mapping. The claims and specification impose no further requirements, and Cisco never sought a construction of the term. Thus, Ramot's expert was not required to do anything more than identify the bits and testify that they satisfied the limitation—which he did. That "multiple bit symbols of digital input data" qualify as "N digital input data bits" is self-evident. Summary judgment is proper only where "no reasonable jury could find infringement." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013). Here, a reasonable jury could find that the "multiple bit symbols of digital input data" qualify as "N digital input data bits."

3. Even if there were a "gap" in the expert testimony—and there was none—the district court legally erred in failing to "draw a reasonable inference in favor" of the non-moving party, Ramot. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1133 (Fed. Cir. 2011). As explained above, Ramot's expert described in detail exactly how data flowed through the accused DSPs to the MZE, which performs the claimed "mapping." Appx5225(¶¶116-18); Appx5228(¶122). From that testimony, the jury could easily conclude that the input to the MZE block was the claimed "N digital input data bits." The district court's assertion that the "inference" would not be "reasonable" defies the law. Appx75. This Court has

never required expert reports to explain why "multiple bits" counts as "N bits." Ramot's expert's testimony was, if anything, beyond what was required. It would have been sufficient for Ramot to simply describe the operation of the data path, *see* Appx5225 (¶¶116-18), without linking it to the limitation. Even "'circumstantial evidence may be sufficient'" to "'prove infringement.'" *Fintiv, Inc. v. Apple Inc.*, No. 2023-2208, 2025 WL 1419363, at *4-5 (Fed. Cir. May 16, 2025). Ramot's evidence here went far beyond that.

"'[A] patentee,'" moreover, "may prove infringement by 'any method of analysis that is probative of the fact of infringement.'" *Fintiv*, 2025 WL 1419363, at *4. For example, patentees can rely on documents such as schematics and "datasheets" to create a factual dispute to overcome summary judgment. *Brilliant Instruments*, 707 F.3d at 1345-46. Here, it did not take an expert to understand that "multiple input data bits" satisfies the requirement of "N digital input data bits." And the "mapping" was conceded: Cisco's own witness testified that the MZE was "configur[ed]" as a "lookup table" and functioned to "linearize the Mach-Zender transfer function" of the modulator. Appx3867-68 (69:24-70:3); Appx3868 (70:13-16). From that evidence, a reasonable jury could find that the data-path inputs depicted in Cisco's datasheets provided "N digital input data bits," and that the MZE performs the claimed "mapping." The district court's grant of summary judgment was error.

### III. FACTUAL DISPUTES PRECLUDE SUMMARY JUDGMENT AS TO THE ACCUSED DIGITAL-DRIVEN DEVICES EVEN UNDER THE DISTRICT COURT'S CONSTRUCTION OF "MAPPING"

#### A. Ramot Presented Ample Evidence of Infringement

There was no dispute that the accused digital-driven devices perform a fixed, one-to-one mapping. The claims, however, also require that the "decimal values of the set of possible digital outputs" of the mapping "and [the] decimal values of the set of possible digital inputs are not identical." Appx35.

Ramot's expert testified, based on technical documents, that the non-identicality requirement was met. The digital-driven devices, he explained, perform "a 2-bit to 3-bit mapping." Appx5350(¶467); Appx5355(¶483). He opined that the "combined effect of the applied codings" in the mapping "swaps some 2-bit symbols in order and shifts their position relative to where they would occur in a straight translation to, *e.g.*, equally spaced symbols in the 3-bit space." Appx5356(¶484). That mapping, he concluded, produces results such that the "decimal values of the set of possible digital outputs and the decimal values of the set of possible digital inputs are not identical." Appx5736(¶70).

Cisco's expert urged that the output values from the accused devices should be interpreted in terms of "thermometer encoding." Appx5736-37(¶¶70-71). Under that interpretation, he opined, the sets of input and output values would be identical except for the ordering of the values. Appx5736-37(¶¶70-71). In his view, that did

not meet the claim. That dispute between the experts about how to interpret the technical document was for the jury. *See Brilliant*, 707 F.3d at 1344.

## B. The District Court Erred in Granting Summary Judgment

The district court granted summary judgment because, in its view, two sets that differ only in the ordering of values are "identical." Appx78. That issue was irrelevant, however. Ramot's expert opined that, in the accused products, the sets of output values and input values are not "the same"—no matter how one rearranges the order in which the values are listed. Appx5736-37(¶¶70-71). And whether to understand the technical documents as describing thermometer encoded values, as Cisco's expert urged, was a factual issue for the jury, not for resolution on summary judgment.

The court's assertion of "waive[r]" makes no sense. Appx84-85. Cisco's expert insisted that the numbers in documents should be interpreted using a special "thermometer" encoding. Ramot's expert disagreed and asserted that the "combined effect of the applied codings" was that the values in the input-value and output-value sets are different, ordering aside. Appx5356(¶484); Appx5736(¶70). Resolution of that dispute was for the jury.

## IV. THE DISTRICT COURT'S CONSTRUCTION OF THE "DELTAS" LIMITATION (IN A SUBSET OF THE ASSERTED CLAIMS) IS ERRONEOUS

Independent claims 1 and 58 of the '998 patent and independent claim 23 of the '872 patent—but not independent claims 1, 11, and 15 of the '872 patent—

include two additional limitations.  Limitation [g] of claim 1 (and corresponding limitations in other asserted claims) require the mapping to contain a subset of increasing inputs where the "deltas between" the corresponding "output values . . . *decrease*."  Appx147(17:49-55) (emphasis added).  Limitation 1[h] requires the mapping to contain a subset of increasing inputs where the "deltas between" the corresponding "output values . . . *increase*."  Appx147(17:49-55) (emphasis added).  The district court interpreted that language to require a sequence of *three or more deltas* that consistently increase or decrease because, in its view, a sequence of numbers cannot be said to "increase" or "decrease" without a "trend" of three or more entries.  Appx90.  That is incorrect as a matter of plain meaning.  The ordinary meaning of increase or decrease is to go up or down; it does not require the change to extend across three points.  The figures in the specification confirm that meaning.

### A.      Sequences of Only Two Deltas Can "Increase" or "Decrease"

"Claim construction analysis" "begin[s]" "with the words of the claim."  *Teleflex*, 299 F.3d at 1324.  There is a "'heavy presumption' that a claim term carries its ordinary and customary meaning."  *Id.* at 1325.  Here, the plain meaning is dispositive.  "Increase" means to "become . . . greater"; "decrease" means to "become smaller."  *Compact Oxford English Dictionary* 257, 513 (3d ed. 2005).  A sequence with only two values can increase or decrease.  If the second value is "greater" than the first, it increases; if the second value is "smaller" than the first, it

decreases. Profits can "increase year-over-year" or "decrease year-over-year." Two children can be arranged in order of increasing age or decreasing age. Two coins can be arranged in order of increasing value or decreasing value. Limitation 1[g] thus must be read to mean what it says. It requires a set of increasing input values where the deltas (or differences) between the corresponding output values "decrease." Limitation 1[h] is similar but requires the deltas to "increase."

The district court's construction improperly excludes a preferred embodiment in the claims. *See Accent Packaging*, 707 F.3d at 1326. Figure 4 of the patent (reproduced below with annotations to show deltas) illustrates an embodiment where only two deltas are increasing or decreasing:

| Numerical Input Value (decimal) | DDC Input | DDC Output | Numerical Output Value (decimal) | "Deltas Between Numerical Values of Successive Digital Outputs" (e.g., '998 Claim element 1[g]) |
|---|---|---|---|---|
| 0 | 0000 | 0000 | 0 | |
| 1 | 0001 | 0011 | 3 | 3 |
| 2 | 0010 | 0100 | 4 | 1 |
| 3 | 0011 | 0101 | 5 | 1 |
| 4 | 0100 | 0101 | 5 | 0 |
| 5 | 0101 | 0110 | 6 | 1 |
| 6 | 0110 | 0111 | 7 | 1 |
| 7 | 0111 | 0111 | 7 | 0 |
| 8 | 1000 | 1000 | 8 | 1 |
| 9 | 1001 | 1001 | 9 | 1 |
| 10 | 1010 | 1001 | 9 | 0 |
| 11 | 1011 | 1010 | 10 | 1 |
| 12 | 1100 | 1011 | 11 | 1 |
| 13 | 1101 | 1011 | 11 | 0 |
| 14 | 1110 | 1100 | 12 | 1 |
| 15 | 1111 | 1101 | 13 | 1 |

Appx4062 (annotated). In the image above, the second and third columns are from Figure 4, while the fifth column shows the deltas between the output values. This

63

embodiment contains no subset of ***three or more deltas*** that sequentially increase or sequentially decrease.  For example, in the first three rows (input values: 0, 1, 2) the two deltas between the output values (red) decrease.  In the next three rows (input values: 3, 4, 5) the two deltas between the output values (blue) increase.  But there is no sequence of three or more deltas that all increase or all decrease.  The district court's construction would exclude the embodiment of Figure 4.  That confirms that it is incorrect.  *See Accent Packaging*, 707 F.3d at 1326.

**B.     The District Court's Reasoning Is Unavailing**

The district court did not look to the ordinary meaning of "increase" or "decrease."  The district court instead asserted that those words require a "trend."  Appx90.  But it cited no source for that assumption.  As explained above, any sequence of two or more numbers can be described as an increase or decrease.

The district court's statement that one "cannot determine whether or not values are increasing or decreasing based solely on two numbers" misapprehends the claims.  Appx90.  The claims do not recite using "deltas" to predict whether a sequence of values is increasing or decreasing.  Instead, the claim seeks to counteract non-linearities where the differences between successive output values are too large or too small.  For example, the three output values in the red box in the image below change too slowly as the input changes.  Meanwhile, the three output values in the blue box change too quickly as the input changes.  The non-linearity is apparent with

just two deltas between the three output values—the output values (y axis) are spaced too tightly or too far apart relative to the linear ideal.



Appx127. And the patent explains how non-linearities can be corrected with the mapping in Figure 4, which, as explained above, contains sequences of only two deltas that increase or decrease. *See* pp. 62-64, *supra*.

The district court may have been confused by the fact that, to get two deltas, one needs ***three output values***. (If you have two outputs, you can measure only one difference; with three output values, you can measure two differences.) But the patent is clear that you need an increase or decrease in ***deltas***. That requires only two deltas, not three. The district court's characterization of Ramot's expert as having conceded the need for three deltas misapprehends the record. Appx89. His statement that "deltas . . . ***are*** decreasing," Appx90 (emphasis added)—even though it would be more grammatical to say "***have*** decreased" when speaking of only two deltas—is not an admission that three or more deltas are required. And it certainly

65

cannot overcome clear text and overwhelming intrinsic evidence showing only two deltas are required.

## <u>**CONCLUSION**</u>

The district court's decision should be reversed and remanded.

May 22, 2026

Denise Marie De Mory
Richard Cheng-Hong Lin
Michael E. Flynn-O'Brien
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA  94063
(650) 351-7241
ddemory@bdiplaw.com


Bonnie K. St. Charles
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 450-6706

Respectfully submitted,

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken
Rayiner Hashem
Lidiya Mishchenko
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com


Ryan Baldwin
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8173


*Counsel for Plaintiff-Appellant Ramot at Tel Aviv University Ltd.*



# NON-CONFIDENTIAL ADDENDUM

# <u>NON-CONFIDENTIAL ADDENDUM – TABLE OF CONTENTS</u>

<u>Page</u>

Claim Construction Memorandum Opinion (Nov. 12, 2024) (Dkt. 122).........Appx1

Claim Construction Order (Nov. 12, 2024) (Dkt. 123) ...................................Appx34

Memorandum Opinion Denying Ramot's Motions for Partial
Summary Judgment (Oct. 23, 2025) (Dkt. 280) .......................................Appx36

Order Denying Ramot's Motions for Partial Summary Judgment
(Oct. 23, 2025) (Dkt. 281) ......................................................................Appx47

Memorandum Opinion Granting Cisco's Motion for Summary Judgment of
No Infringement (Nov. 18, 2025) (Dkt. 331-1)
**[redacted version of Dkt. 305]**...............................................................Appx48

Order Granting Cisco's Motion for Summary Judgment of No Infringement
(Nov. 18, 2025) (Dkt. 306) ......................................................................Appx92

Final Judgment (Dec. 1, 2025) (Dkt. 315).......................................................Appx94

U.S. Patent No. 11,133,872..............................................................................Appx96

U.S. Patent No. 11,342,988............................................................................Appx123

**<u>CONFIDENTIAL MATERIAL OMITTED</u>**

On Appx56, a figure depicting the confidential operation of Cisco's optical modulation systems has been redacted. On Appx75 and Appx76, confidential information regarding the operation of Cisco's DSP and MZE blocks has been redacted.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CISCO SYSTEMS INC. and ACACIA COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAMOT AT TEL AVIV UNIVERSITY LTD., <br><br> Defendant. | C.A. No. 21-1365-GBW |
| CISCO SYSTEMS INC. and ACACIA COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAMOT AT TEL AVIV UNIVERSITY LTD., <br><br> Defendant. | C.A. No. 22-674-GBW (consolidated) |

Jack B. Blumenfeld, Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; L. Norwood Jameson, Matthew C. Gaudet, Sajid Saleem, Aniel Mitchell, DUANE MORRIS LLP, Atlanta, GA; Joseph A. Powers, Aleksander J. Goranin, DUANE MORRIS LLP, Philadelphia, PA; Holly E. Engelmann, DUANE MORRIS LLP, Austin, TX.

*Counsel for Plaintiffs*

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Denise De Mory, Corey Johanningmeier, Michael Flynn-O'Brien, Brenda Entzminger, BUNSOW DE MORY LLP, Redwood City, CA; James T. Wilson, Wayne M. Helge, BUNSOW DE MORY LLP, Alexandria, VA.

*Counsel for Defendant*

## MEMORANDUM OPINION

November 12, 2024
Wilmington, Delaware

2



GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs Cisco Systems Inc. and Acacia Communications, Inc. (collectively, "Cisco") have brought declaratory judgment actions against patentee Ramot at Tel Aviv University ("Ramot"). Before the Court are two claim construction disputes, relating to U.S. Patent Nos. 11,133,872 (the "'872 patent") and 11,342,998 (the "'998 patent").[1] The Court has reviewed the parties' briefing. D.I. 111.[2] The Court held a claim construction hearing on September 17, 2024 ("Tr. [#]").

## I.    LEGAL STANDARDS

### A.    Claim Construction

"[A] patent is[] the conferral of rights in a particular claimed set of elements." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014). "'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted); *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (same). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. The Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The ultimate question of the proper construction of a patent is a question of law, although "subsidiary factfinding is sometimes necessary." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326–27 (2015); *see Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("the construction of a patent . . . is exclusively within the province of the court.").

---

[1] The Court writes for the benefit of the parties and assumes familiarity with the case.
[2] Unless otherwise noted, all D.I. cites are to the 21-cv-1365 action.

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1313); *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) (similar). The "'only two exceptions to this general rule'" are (1) when a patentee defines a term or (2) disavowal of "'the full scope of a claim term either in the specification or during prosecution.'" *Thorner*, 669 F.3d at 1365 (citation omitted).

The Court "'first look[s] to, and primarily rel[ies] on, the intrinsic evidence,'" which includes the claims, written description, and prosecution history and "'is usually dispositive.'" *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) (citation omitted). "[T]he specification 'is the single best guide to the meaning of a disputed term.'" *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (citation omitted). "'[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.' When the patentee acts as its own lexicographer, that definition governs." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1316). However, "'[the Court] do[es] not read limitations from the embodiments in the specification into the claims.'" *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017) (citation omitted)). The "written description . . . is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The Court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370; *Cont'l Cirs.*, 915 F.3d at 796 (same). The prosecution history may "'demonstrat[e] how the

2

inventor understood the invention and whether the inventor limited the invention in the course of prosecution . . . ." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1377 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1317).

The Court may "need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980; *Phillips*, 415 F.3d at 1317 (same). Extrinsic evidence may be useful, but it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Cont'l Cirs.*, 915 F.3d at 799 (internal quotation marks and citations omitted). However, "[p]atent documents are written for persons familiar with the relevant field . . . . Thus resolution of any ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention." *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002); *see Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014) (explaining that patents are addressed "to those skilled in the relevant art").

## B. Definiteness/Indefiniteness

Section 112 of the Patent Act requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). The "primary purpose of the definiteness requirement" that § 112(b) contains "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental*

Appx5

*Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citation omitted).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. While a "'potential infringer'" need not "'be able to determine *ex ante* if a particular act infringes the claims,'" the patentee must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346-47 (Fed. Cir. 2022) (citations omitted).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). "Patent claims are presumed to be valid and definite." *B.E. Tech., LLC v. Twitter Inc.*, No. CV 20-621-GBW, 2024 WL 579076, at *1 (D. Del. Feb. 13, 2024) (citing 35 U.S.C. § 282). Thus, the challenger must prove indefiniteness by clear and convincing evidence. *See Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. CV 21-1015-GBW, 2023 WL 4314485, at *6 (D. Del. July 3, 2023).

Appx6

## II. AGREED-UPON TERMS

The parties have agreed upon the construction of the following claim terms (D.I. 111 at 2):

| Claim Term | Agreed-Upon Construction | Court's Construction |
|---|---|---|
| "modulator"<br><br>'998 Patent: claims 1, 4, 6, 49, 50, 58, 61<br><br>'872 Patent: claims 1, 2, 3, 6, 7, 10, 11, 12, 13, 15, 16, 18, 20, 21, 23, 25, 26, 27 | any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified | any device which outputs an optical signal with controlled variation of intensity |
| "mapping/map/mapped/converting"<br><br>'998 Patent: claims 1, 13, 14, 45, 46, 47, 49, 58, 63<br><br>'872 Patent: claims 1, 11, 13, 15, 23, 27 | selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical<br><br>translating from one representation format to another representation format is not mapping/converting | (verbs)<br>selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical |

An agreed upon construction is akin to a stipulation. *See United States v. Gillette*, 738 F.3d 63, 75 (3d Cir. 2013) (noting "[a] stipulation is '[a] voluntary agreement between opposing parties concerning the same relevant point'"). The parties have not explained whether the Court is bound by the parties' agreed upon constructions.[3] Claim construction is ultimately a question

---

[3] While Cisco contends that estoppel bars the parties from going against the stipulated claim constructions, *see* D.I. 111 at 24 (citing *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005)); Tr. at 19:13-19, that argument does not address whether the Court is bound to accept a stipulated construction. The *LizardTech* case that Cisco relies on involved a party that "agreed to the district court's construction at the time." 424 F.3d at 1341. This Court has not adopted a claim construction yet. Further, the *LizardTech* court simply noted that, on

of law, *see* 574 U.S. at 326, and generally "[c]ourts are 'not bound to accept, as controlling, stipulations as to questions of law.'" *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1347 n.9 (Fed. Cir. 2013) (quoting *Sanford's Est. v. Comm'r of Internal Revenue*, 308 U.S. 39 (1939)).

While "the *parties*—not the court—[] chart the course of the litigation," "[u]nder binding Federal Circuit law, 'the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties.'" *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1378 (Fed. Cir. 2024) (first quote); *Alnylam Pharms., Inc. v. Pfizer Pharmacia & Upjohn Co. LLC*, No. CV 22-336-CFC, 2024 WL 4123553, at *3 n.1 (D. Del. Sept. 9, 2024) (second quote) (quoting *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553 (Fed. Cir. 1995)). Thus, the Court is "not bound by the parties' arguments as to claim construction." *Sony Corp. v. Iancu*, 924 F.3d 1235, 1240 (Fed. Cir. 2019).

**A. The Parties' Agreed upon Constructions Are Adopted in Part**

**1. The Court Partially Adopts the Parties' Agreed upon Construction for "Modulator"**

The Court partially adopts the parties' agreed upon construction for the term "modulator." Specifically, in the context of the identified claims, the Court adopts the construction that modulator refers to "any device which outputs an optical signal with controlled variation of intensity." D.I. 111 at 2. This construction is consistent with the claims and "might be helpful to a jury." *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. CV 19-1937-RGA, 2021 WL 2209868, at *10 (D. Del. June 1, 2021). However, as discussed below, the Court declines to adopt the remainder of the parties' agreed upon construction.

The Court declines to adopt the remainder of the parties' proposed construction for "modulator," which states "whether the variation is induced during production of the signal (such

---

appeal, the party "cannot now argue against that claim construction simply because it resulted in an adverse ruling on summary judgment." *Id.*

as in a semiconductor laser) or whether a signal input from another source is modified." D.I. 111 at 2. Essentially, that proposed language gives nonlimiting examples to show the scope of the phrase "optical signal with controlled variation of intensity." D.I. 111 at 2. While including examples in constructions is sometimes permitted,[4] the Court is not convinced that the proffered examples improve the claim construction. Thus, the remainder of the proposed construction is not adopted, as it would not "change[] the meaning of the construction [and] would [not] be helpful to a jury." 2023 WL 5333633, at *4 n.3 (partially adopting proffered claim construction); *see Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("Importantly, a claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term."); *VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 653 (Fed. Cir. 2022) (noting that "a construction that introduces redundancy into a claim is disfavored").

### 2. The Court Partially Adopts the Parties' Agreed upon Construction for "Mapping/Map/Mapped/Converting"

The Court partially adopts the parties' agreed upon construction for the terms "mapping/map/mapped/converting." *See* D.I. 111 at 2. Specifically, to the extent that those terms correspond to verbs in the identified claims, the Court adopts the construction that "mapping/map/mapped/converting" refers to: "selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical." D.I. 111 at 2. That proffered construction apparently reflects the parties' mutual understanding that "mapping can be either selecting or generating." Tr. 7:25.

---

[4] *See Genzyme Corp. v. Novartis Gene Therapies, Inc.*, No. CV 21-1736-RGA, 2023 WL 5333633, at *2 n.2 (D. Del. Aug. 18, 2023), *reargument denied*, No. CV 21-1736-RGA, 2024 WL 147780 (D. Del. Jan. 12, 2024).

7

Further, that "construction is consistent with the rules of English grammar and common sense." *St. Jude Med. v. Volcano Corp.*, No. CV 12-441-RGA, 2014 WL 1619157, at *9 (D. Del. Apr. 22, 2014).

With respect to nouns, however, "[t]he Court is not persuaded [] [] that the[] proposed construction is appropriate as a matter of logic, law, grammar, or technology." *Enova Tech. Corp. v. Initio Corp.*, No. CV 10-04-LPS, 2013 WL 611315, at *1 n.1 (D. Del. Feb. 19, 2013). Here, Cisco is the most ardent supporter of applying the "selecting or generating" construction.[5] Yet, Cisco does not explain why, as a matter of law, the Court should fully adopt the "selecting or generating" construction. At best, Cisco contends that the Court should adopt the construction simply because the parties agreed to it. *See* D.I. 111 at 12, 23-24. However, as discussed above, the Court has "an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties." 2024 WL 4123553, at *3 n.1.

The Court is not persuaded that the "selecting or generating" construction should apply universally. Claim 1 of the '998 patent, which recites "digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values," exemplifies the Court's concern. In that context, "the words and grammar [that] the patentee actually used to describe the invention" suggest that digital-to-digital mapping is a noun, not a verb, and that the remainder of the clause is the corresponding predicate. *Callaway Golf Co. v. Acushnet Co.*, No. CV 06-091SLR, 2007 WL 4165415, at *1 (D. Del. Nov. 20, 2007) (noting that "when the science (such as it is) is ambiguous, the claim construction exercise becomes more a matter of semantics"). The '998 patent's specification

---

[5] This is unsurprising, given that the parties' stipulated construction is crucial to Cisco's contention that certain claims are indefinite due to the "wherein . . . mapping maps" clause. *See infra* Part III.A.1.a.

further supports that view. *See* D.I. 111 at 18 (providing "[e]xamples of [digital-to-digital mapping] structures [that] are described in the specification"). Thus, the Court will not adopt the stipulated "selecting or generating" construction with respect to corresponding nouns, such as "digital-to-digital mapping" in claim 1 and claim 58 of the '998 patent.

Given the parties dispute over the aforementioned "digital-to-digital mapping" term, *see infra* Part III.A.1.a, the Court will "construe [that] term[], and only to the extent necessary to resolve the controversy" over that term. *Voice Tech Corp. v. Unified Pats., LLC*, 110 F.4th 1331, 1341 (Fed. Cir. 2024). The Court construes a "digital-to-digital mapping," in the context of claim 1 and claim 58 of the '998 patent, to be: a structure that "maps [a] plurality of N digital input data bits to M digital output data bits." '998 patent, 17:32-34, 23:54-55.[6] As discussed later, *see infra* Part III.A.1.a (rejecting Cisco's contention that certain claims are indefinite due to the "wherein . . . mapping maps" clause), by clarifying that the "digital-to-digital mapping" is a structure, the Court's construction "resolve[s] the controversy" surrounding that term. 110 F.4th at 1341.

Except for the "digital-to-digital mapping" term, which was discussed above, the Court is unaware of any "mapping/map/mapped/converting" nouns that are in controversy and require construction. Thus, the Court will not provide express constructions for any remaining nouns corresponding to "mapping/map/mapped/converting" terms. *See Sentient Sensors, LLC v. Cypress Semiconductor Corp.*, No. 19-1868 (MN), 2021 WL 1966406, at *1–2 (D. Del. May 17, 2021) (concluding that the Court "discharged its duty to resolve the parties' dispute," after finding a term "need not be construed").

---

[6] "Because [the Court] adopt[s] a construction that neither party proposed, [the Court] [is] open to considering additional argument about it at the summary judgment stage." *Groove Digital, Inc. v. King.com Ltd.*, No. CV 18-1331-RGA, 2022 WL 16922027, at *3 n.2 (D. Del. Nov. 14, 2022).

Appx11

The Court declines to adopt the remainder of the proposed construction for "mapping/map/mapped/converting," which through a negative limitation states: "translating from one representation format to another representation format **is not** mapping/converting." D.I. 111 at 2 (emphasis added). "[A] negative claim limitation speaks to what an invention **is not** or what it excludes." *Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*, 605 F. Supp. 3d 198, 210 (D. Mass. 2022); *see Equil IP Holdings LLC v. Akamai Techs., Inc*, No. CV 22-1531-RGA, 2024 WL 3273494, at *11 (D. Del. July 2, 2024) ("The negative limitation at issue is that the instruction 'does not itself contain media content for transmission to the user, but which indicates to the content server what media content the content server should transmit to the user.'"). "Negative limitations are not preferred. They are only appropriate in the rare circumstances. Two such circumstances are when a negative limitation is required by lexicography or by disclaimer." 2024 WL 3273494, at *11. The parties have not explained why a negative limitation is appropriate. Given that it is not readily apparent to the Court why a negative limitation applies, the Court does not adopt the remainder of the proposed construction. *See* 2024 WL 3273494, at *11 (observing that negative limitations "are only appropriate in [] rare circumstances").

10

Appx12

## III. DISPUTED TERMS

### A. Definiteness

### 1. Some, but Not All, of the Challenged Claims Withstand *Nautilus* Scrutiny

| Claim Term | Ramot's Construction | Cisco's Construction | Court's Construction |
|---|---|---|---|
| "wherein a digital-to-digital mapping maps ..."<br><br>'998 Patent: claims 1, 4, 6-15, 58, 61-63 | Not indefinite | Indefinite | not indefinite;<br><br>digital-to-digital mapping is a structure that maps a plurality of N digital input data bits to M digital output data bits |
| "wherein the N bits of the N bit digital input data word are mapped ..."<br><br>'998 Patent: claims 45-47, 49-54 | Not indefinite | Indefinite | indefinite |

Cisco contends that the asserted claims of the '998 patent are "invalid as indefinite because each recites, in the same claim, both an apparatus and a method." D.I. 111 at 10 (emphases removed). The burden is on Cisco to demonstrate, by clear and convincing evidence, that the challenged claims "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." 2023 WL 4314485, at \*6–7 (quoting *Nautilus*, 572 U.S. at 901).

"As relevant to this dispute, the Federal Circuit [in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)] [] explained that a claim is indefinite if it 'recites both a system and a method for using that system,' because such a claim 'does not apprise a person of ordinary skill in the art of its scope.'" *KOM Software Inc. v. NetApp, Inc.*,

11

No. CV 18-160-WCB, D.I. 116 at 31 (D. Del. May 18, 2023) (quoting *IPXL*, 430 F.3d 1377).[7] "The problem with such claims is that they fail to make it clear to a skilled artisan whether infringement occurs when one creates a system with the capabilities described in the claim, or whether infringement occurs only when the system is used in an infringing manner." *Id.* at 31-32.

"While a claim directed to both a method and an apparatus may be indefinite, apparatus claims are not necessarily indefinite for using functional language." *3G Licensing, S.A. v. Blackberry Ltd.*, No. CV 17-82-LPS-CJB, 2018 WL 4375091, at *10 (D. Del. Sept. 13, 2018) (cleaned up) (quoting *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307 (Fed. Cir. 2017)). "[T]he Federal Circuit has found that functional language is not always directed to the performance of steps in a method." *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 32. Functional language that is "directed to describing the capability of a system or apparatus, or the environment in which the system or apparatus performs . . . . does not give rise to an *IPXL* problem." *Id.* "On the other hand, where the claim language is not directed to the capability of a system or apparatus, but instead recites a step in a method, the court in *MasterMine* recognized that the rule from *IPXL* applies, and that the claim is indefinite." *Id.*

a.      **Cisco Has Not Established That Certain Claims Are Indefinite Due to the "Mapping Maps" Term**

As discussed below, the Court holds that Cisco has not carried its burden of demonstrating, by clear and convincing evidence, that certain claims are indefinite due to the "wherein . . . mapping maps" clause.

---

[7] This opinion is available for download on Lexis, *see* https://plus.lexis.com/api/permalink/454a370b-2dc3-436e-9a5c-d2bbd9386b29/?context=1530671.

### 1) "wherein a digital-to-digital mapping maps . . ."

Cisco has not established, by clear and convincing evidence, that certain claims are indefinite, based on the wherein clause that states "a digital-to-digital mapping maps . . . ." A system claim may be indefinite, if it recites a function that "appear[s] in isolation and [is] not 'specifically tied to structure.'" *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 34 n.6 (discussing *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011)); *see Ingenico Inc. v. IOENGINE, LLC*, No. CV 18-826-WCB, D.I. 248 at 10-21, 2021 U.S. Dist. Ct. Briefs LEXIS 16797 (D. Del. June 25, 2021) (opinion thoroughly reviewing caselaw regarding indefiniteness due to claiming "both a method and an apparatus or [being] ambiguous in that regard"). Cisco contends that the "wherein a digital-to-digital mapping maps" renders certain claims indefinite, as the "agreed construction of 'mapping' and 'map'" is "a method limitation" that purportedly "is untethered to any structural component." D.I. 111 at 10-11; *see id.* at 13 (contending that "the agreed claim construction resolved this: the claim element recites an action and nothing else"), 24 ("Ramot cannot read unclaimed structure into this verb-only construction."); *see also* D.I. 99 at 5.

Cisco's contention that the "wherein a digital-to-digital mapping maps" clause renders certain claims indefinite fails, as it rests on the "completely good-faith but incorrect assumption" that the Court would fully adopt the parties' proposed construction. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988). As discussed above, the Court rejected the parties' attempt to substitute nouns with verbs. Importantly, with respect to the term "digital-to-digital mapping," the Court construed digital-to-digital mapping as a structure that maps a plurality of N digital input data bits to M digital output data bits. *See supra* Part II.A.2. Consequently, under the Court's construction, the "wherein a digital-to-digital mapping maps" clause is "distinguishable from the limitation that was found to give rise to indefiniteness in the

13

*Rembrandt* case," as the functionality that Cisco points to is "specifically tied to the [digital-to-digital mapping] structure." *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 34 n.6. Therefore, the "wherein a digital-to-digital mapping maps" clause "does not present the problem inherent in mixing system (or apparatus) claims with method claims—the difficulty in determining when infringement occurs." *Id.* at 34. Therefore, claims 1, 4, 6-15, 58, and 61-63 of the '998 patent have not been shown by Cisco to be indefinite.

"Having found the ["wherein a digital-to-digital mapping maps"] [clause] not indefinite, there is no further material dispute to be resolved by a construction." *Align Tech., Inc. v. 3Shape A/S*, No. CV 18-1949-LPS, 2020 WL 7695927, at *10 (D. Del. Dec. 28, 2020); *see, e.g.*, *SentriLock, LLC v. Carrier Fire & Sec. Americas LLC*, No. CV 20-520 (MN), 2024 WL 3328495, at *4 n.2 (D. Del. July 8, 2024); *Cirba Inc. v. VMware, Inc.*, No. CV 19-742-LPS, 2022 WL 608185, at *7–8 (D. Del. Feb. 24, 2022); *Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, No. CV 20-464-RGA, 2021 WL 1737531, at *8–9 (D. Del. May 3, 2021).

**b.      Cisco Has Established That Certain Claims Are Indefinite Due to the "Are Mapped" Term**

As discussed below, the Court holds that Cisco has carried its burden of demonstrating, by clear and convincing evidence, that certain claims are indefinite due to the "wherein . . . are mapped" clause.

**1)      "wherein the N bits of the N bit digital input data word are mapped . . ."**

Cisco has established, by clear and convincing evidence, that certain claims are indefinite, based on the wherein clause that states "wherein the N bits of the N bit digital input data word are mapped . . . ." As noted above, a system claim may be indefinite, if it recites a function that "appear[s] in isolation and [is] not 'specifically tied to structure.'" *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 34 n.6. Contrary to Ramot's repeated assertion, *see* D.I. 111

14

at 3, 6-9, 17, 20, the preceding rule can apply to functions that are "not directed to a function performed by a user (as was the case in *IPXL, Katz, and H-W Technology*)." *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 34 n.6; *see TQ Delta, LLC v. 2WIRE, Inc.*, No. CV 13-1835-RGA, 2017 WL 6435334, at *10 (D. Del. Dec. 18, 2017).

Cisco contends that the "wherein the N bits of the N bit digital input data word are mapped" clause renders certain claims indefinite, as "the claim is devoid of any structure for performing the operation." D.I. 111 at 17; *see* D.I. 111 at 16; D.I. 118-1 at 23; *see also* D.I. 99 at 6. On the other hand, Ramot contends that the "wherein the N bits of the N bit digital input data word are mapped" clause "refers to an aspect of a system, in which, digital bits 'are mapped.'" D.I. 111 at 21; *see* D.I. 111 at 9 (contending that "there is no reasonable interpretation . . . in which the mapping is not a functional capability of the delivered system"); Tr. 17:19-18:2.[8] According to Ramot, "there is no ambiguity about how the digital mapping is done or that infringement occurs when the optical modulation system in which the digital bits 'are mapped' is created." D.I. 111 at 22; *see id.* at 18.[9] As discussed below, Cisco's contention is persuasive.

The Court holds that claims 45-47 and 49-54 of the '998 patent are "invalid for indefiniteness [as] [those] claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the

---

[8] "Functional language describes something by means of what it does, not by means of what it is." *3G Licensing, S.A.*, 2018 WL 4375091, at *10.

[9] After briefing had closed, Ramot for the first time contended that the "structure that maps digital inputs to outputs" is the "one or more electro-absorption signal generation devices." D.I. 119-1 at 40; *see* Tr. 11:18-13:24, 17:19-18:2. "In this district, a *Markman* hearing is not the time to raise a new claim construction argument. New arguments made at a *Markman* hearing are waived." *CoolTVNetwork.com, Inc. v. Blackboard Inc.*, No. CV 19-291-LPS-JLH, 2020 WL 6536960, at *5 (D. Del. Nov. 6, 2020) (Hall, J.), *report and recommendation adopted*, No. CV 19-291-LPS-JLH, 2021 WL 2010579 (D. Del. May 20, 2021); *see Sight Scis., Inc. v. Ivantis, Inc.*, No. CV 21-1317-GBW-SRF, 2023 WL 5287215, at *5 n.3 (D. Del. Aug. 17, 2023) ("This Court does not consider new arguments raised for the first time at a *Markman* hearing.").

15

scope of the invention." *Nautilus*, 572 U.S. at 901. Specifically, with respect to those preceding claims, "the problematic limitation" is the "wherein the N bits of the N bit digital input data word are mapped" clause, which "although not directed to a function performed by a user[,] . . . appear[s] in isolation and [is] not 'specifically tied to structure.'" *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 34 n.6.

Claims 45-47 and 49-54 of the '998 patent are ambiguous about whether their claimed invention has the functionality/capability to perform the "wherein . . . are mapped" clause. Moreover, claims 45-47 and 49-54 of the '998 patent are ambiguous about what structure is tied to the "wherein . . . are mapped" clause. The Court is not convinced by Ramot's argument that the corresponding structure is the entire claimed invention. *See* D.I. 111 at 18 ("'An optical modulation system for converting a plurality of input digital data words … wherein the N bits of the N bit digital input data word are mapped' is a structure."). Ramot's argument is conclusory and lacks textual support in the claims. Nothing in the claim language suggests that "a component in the system contains the functionality described." 2018 WL 4375091, at *10. Likewise, nothing in the claim language suggests that the "wherein . . . are mapped" limitation is "a functional limitation on components recited in the claims." *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, No. CV 13-1353-LPS, 2019 WL 1011321, at *7 (D. Del. Mar. 4, 2019) (distinguishing *Rembrandt*, 641 F.3d 1331).[10] That is what distinguishes claims 45-47 and 49-54 of the '998 patent from the challenged claim in *KOM Software* that withstood indefiniteness scrutiny. *See* No. CV 18-160-WCB, D.I. 116 at 34 n.6.

---

[10] For example, with respect to the disputed limitation, the drafter did not use "plural indentations to further segregate subcombinations or related steps." MPEP § 608.01(m); *see Shotkam LLC v. Tachyon, Inc.*, No. CV H-20-1070, 2021 WL 23311, at *4 (S.D. Tex. Jan. 4, 2021) (noting that "indentation [can be] meaningful").

Appx18

Thus, given the ambiguity surrounding the "wherein . . . are mapped" clause, claims 45-47 and 49-54 of the '998 patent "fail to inform, with reasonable certainty, those skilled in the art about" "whether infringement occurs when one creates a system with the capabilities described in the claim, or whether infringement occurs only when the system is used in an infringing manner." *Nautilus*, 572 U.S. at 901 (first quote); *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 31-32 (second quote).

Having determined that claims 45-47 and 49-54 of the '998 patent are invalid, the Court finds no further construction of these claims is necessary. *See, e.g., Intell. Ventures I LLC v. AT & T Mobility LLC*, No. CV 12-193-LPS, 2015 WL 1393386, at *22 (D. Del. Mar. 24, 2015) ("Because Claim 16 is indefinite, the Court does not construe the other disputed means-plus-function limitation in the claim."), *aff'd*, 748 F. App'x 330 (Fed. Cir. 2019); *Intermec Techs. Corp. v. Palm Inc.*, 738 F. Supp. 2d 522, 540 (D. Del. 2010) (observing that "[t]he court did not construe the communications means limitation of claim 1 of the '678 patent because that claim was held to be invalid as indefinite"), *aff'd*, 466 F. App'x 881 (Fed. Cir. 2012); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1257 (Fed. Cir. 2004) ("Because the '561 patent is invalid for the reasons noted above, this court need not reach the question of claim construction.").

## B.    Disclaimer

Cisco proposes various constructions, based on "Ramot's statements in [inter partes reviews[11]] on related patents . . . . to confirm that the claims do not cover analog-driven modulators" (D.I. 111 at 32, 34):

---

[11] "The Leahy–Smith America Invents Act, 35 U.S.C. § 100 *et seq.,* establishes a process called 'inter partes review.' Under that process, the United States Patent and Trademark Office (PTO) is authorized to reconsider and to cancel an issued patent claim in limited circumstances." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 328–29 (2018). "Proceedings before the Patent Office, including IPRs . . . are properly considered as part of

| Claim Term | Ramot's Construction | Cisco's Construction | Court's Construction |
|---|---|---|---|
| "digital output . . ."/"output bits . . ."  '872 patent, claims 1, 11, 13, 15, 23  '998 patent, claims 1, 45, 58 | No construction necessary | "digital output . . ."/"output bits . . ." "for directly driving electrodes of modulator without any mediating digital-to-analog converter" | No construction necessary |

Specifically, Cisco points to an inter partes review involving U.S. Patent No. 10,270,535 (the "'535 patent"), which Cisco represents is a related patent that "shares the same specification" as the '872 patent and '998 patent. D.I. 111 at 38.[12] The remainder of this paragraph, of this Memorandum Opinion, chronologically lists overlaps in timing and contents of the '535 patent, the '872 patent, and the '998 patent. According to the '535 patent's cover, it was filed in December 2018 and issued in April 2019. According to the '872 patent's cover, it was filed in August 2019. The '872 patent's specification states it "incorporate[s] by reference" "[t]he contents of" "U.S. patent application Ser. No. 16/234,635 filed on Dec. 28, 2018, now U.S. Pat. No. 10,270,535." '872 patent, 1:5-28. Cisco filed an inter partes review petition against claim 1 and claim 2 of the '535 patent in November 2019. *See Cisco Sys. v. Ramot at Tel Aviv Univ., Ltd.*, No. IPR2020-00123, Paper 2 at 21, 2019 PAT. APP. FILINGS LEXIS 20934 (P.T.A.B. Nov. 5, 2019). In February 2020, Ramot submitted a preliminary response to Cisco's inter partes review petition. *See* No. IPR2020-00123, Paper 8, 2020 PAT. APP. FILINGS LEXIS 5739 (P.T.A.B. Feb. 18, 2020). In May 2020, the Patent Trial and Appeal Board denied Cisco's inter partes review petition. *See* No. IPR2020-00123, Paper 14, 2020 Pat. App. LEXIS

---

th[e] intrinsic evidence." *Schwendimann v. Neenah, Inc.*, No. CV 19-361-LPS, 2021 WL 466876, at *2 (D. Del. Feb. 9, 2021).

[12] The Court does not consider a separate inter partes review that Cisco identifies only in a cursory footnote. *See Chervon (HK) Ltd. v. One World Techs., Inc.*, No. CV 19-1293-GBW, 2022 WL 14812531, at *2 (D. Del. Oct. 26, 2022).

13152 (P.T.A.B. May 15, 2020). According to the '998 patent's cover, it was filed on September 22, 2021. The '998 patent's specification states it "incorporate[s] by reference" "[t]he contents of" "U.S. patent application Ser. No. 16/234,635 filed on Dec. 28, 2018, now U.S. Pat. No. 10,270,535." '998 patent, 1:6-30. According to the '872 patent's cover, it was issued on September 28, 2021. According to the '998 patent's cover, it was issued in May 2022.

Cisco contends that the claims of the '872 patent and '998 patent are subject to "clear and unmistakable disclaimers [during IPRs] that the digital output of the 'mapping' or 'converting' elements is for directly driving the electrodes of the modulator, without any mediating digital-to-analog converter." D.I. 111 at 38 (emphases removed). "The Federal Circuit has held that the doctrine of prosecution disclaimer equally applies in IPR proceedings." *Int'l Bus. Machines Corp. v. Rakuten, Inc.*, No. CV 21-461-GBW, 2023 WL 3750906, at *12 (D. Del. June 1, 2023); *see Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) ("[W]e hold that statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer."); *see also Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023); *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 13.

"Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.' '[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.'" 2023 WL 3750906, at *12 (citations omitted) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)); *see Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (surveying caselaw on disclaimers/ disavowal). "When determining whether disclaimer applies, we consider the

19

Appx21

statements in the context of the entire prosecution." *Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017).

The prosecution disclaimer doctrine is related to other claim construction rules and principles. For example, the prosecution disclaimer "inquiry is related to but distinct from the inquiry into what the prosecution history shows about a relevant artisan's understanding of the claim language in context." *K-fee Sys. GmbH v. Nespresso USA, Inc.*, 89 F.4th 915, 923 (Fed. Cir. 2023) (analyzing whether patentee acted with "sufficient clarity" before a foreign patent office, such that a purported disclaimer should be imported to a related U.S. patent). Moreover, "[t]he same general tenets that apply to prosecution history estoppel apply to prosecution history disclaimer." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063 (Fed. Cir. 2016).

Prosecution disclaimers can sometimes extend across patent family members. *See, e.g., Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013); *Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1274 (Fed. Cir. 2016); *Vitaworks IP, LLC v. Glanbia Nutritionals (NA), Inc.*, No. CV 19-2259-GBW, 2023 WL 356160, at *7 (D. Del. Jan. 23, 2023). Whether a prosecution disclaimer should extend from one patent to its family members "is [often] less straightforward" than determining the presence of an initial disclaimer. 2021 WL 466876, at *7; *see Sanofi v. Glenmark Pharms. Inc.*, No. CV 14-264-RGA, D.I. 332 at 53-61 (D. Del. Aug. 31, 2016) (discussing prosecution disclaimer doctrine).[13] On one hand, "the Court should interpret claim[] terms 'consistently across all the [related] patents.'" 2021 WL 466876, at *7 (quoting *Cap. Mach. Co. v. Miller Veneers, Inc.*, 524 F. App'x 644 (Fed. Cir. 2013)); *see MasterMine*, 874 F.3d at 1312 n.2 (quoting *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d

---

[13] The *Sanofi* opinion is available for download on Lexis, *see* https://plus.lexis.com/api/permalink/ff57e800-56c2-490a-94e0-cc8ccfdd9125/?context=1530671.

20

1335 (Fed. Cir. 2015)) ("We have often held that the meaning of claim terms in one patent can be informed by statements made during prosecution of other patents in the same family. We have explained, for example, that 'past and future prosecution of related patents may be relevant to the construction of a given claim term.'"). However, the general rule that "a claim term should be construed consistently across related patents . . . does not permit importing terms or limitations into the claims of related patents that do not recite that disputed term." *Eis, Inc. v. Intihealth Ger GMBH*, No. CV 19-1227-GBW, 2023 WL 346631, at *3 (D. Del. Jan. 9, 2023).

### 1. Cisco Has Not Demonstrated Clear and Unmistakable Disclaimers

Cisco contends that the claim scope of the '872 patent and the '998 patent are narrowed by a purported prosecution disclaimer that Ramot made regarding the '535 patent, which is an ancestor of the '872 patent and the '998 patent. *See* D.I. 111 at 39-43. This Court has previously stated that "it is well-settled that, '[i]n general, a prosecution disclaimer will only apply to a subsequent patent if that patent contains the same claim limitation as its predecessor.'" *Sanofi*, No. CV 14-264-RGA, D.I. 332 at 54 (quoting *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929 (Fed. Cir. 2013)); *see Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, No. 22-CV-1387-GBW, 2023 WL 8622111, at *3 (D. Del. Dec. 13, 2023) ("When a patentee disclaims claim scope in a predecessor patent, that disclaimer binds the patentee's subsequent patents only if the subsequent patent has the same, or immaterially different, claim limitations as its predecessor."). Further, this Court has observed that "[t]he sole exception," to that general rule, "is when the disclaimer is directed to the scope of the invention as a whole, not a particular claim." *Sanofi*, No. CV 14-264-RGA, D.I. 332 at 54 (quoting *AGA Med. Corp.*, 717 F.3d 929).[14]

---

[14] To the extent that Cisco suggests that (what it refers to as) "same subject matter" disclaimer is separate from the aforementioned general rule and exception, *see* D.I. 111 at 38-39, 44, the Court is not convinced. *See RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 F. App'x 628, 630 (Fed.

As discussed below, even assuming *arguendo* that prosecution disclaimers were made regarding the '535 patent, the Court is not convinced that such disclaimers unambiguously apply to the disputed claims of the '872 patent and the '998 patent.

For the reasons discussed below, the Court holds that Cisco has not met its burden of establishing disclaimers in the '872 patent and the '998 patent. Thus, the Court rejects Cisco's proffered constructions that are based on alleged disclaimers.

a. **Cisco Has Not Established That Ramot Made "Invention as a Whole" Disclaimers During an Inter Partes Review**

As discussed below, the Court holds that Cisco has failed to "demonstrate an 'unambiguous' disclaimer, based on 'clear and unmistakable evidence' that some of the scope that would otherwise be captured by [] claim[s] [in the '872 patent and the '998 patent] was relinquished during" an IPR proceeding involving the '535 patent. *Abbott Lab'ys v. Lupin Ltd.*, 753 F. Supp. 2d 382, 398 (D. Del. 2010) (citation omitted) (noting the same unambiguous disclaimer requirement "is true of disclaimers made during the prosecution history of a patent in the same family as the patent-in-suit").

The Court is not convinced by Cisco's argument that "Ramot's disclaimer arguments were 'directed to the invention as a whole[,]'[] and thus carry forward to the Asserted Patents." D.I. 111 at 43; *see id.* at 38-39 (contending that "Ramot argued throughout its POPR that its invention as a whole was limited to directly driving electrodes of the modulator without any mediating digital-to-analog converter"). As "[t]he party seeking to invoke prosecution history

---

Cir. 2009) (emphasis added) ("Prosecution disclaimer *may* also arise from an applicant's statements in a parent patent application if the parent application relates to the same subject matter as the claim language at issue."). *Vitaworks IP*, which is the case that Cisco relies on (*see* D.I. 111 at 39), used the phrase "same subject matter" in the context of relevance. Cisco assumes, without explanation, that a disclaimer per se extends to any patent claims on the "same subject matter."

disclaimer[,] [Cisco] bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (quoting *Massachusetts Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111 (Fed. Cir. 2016)). "[T]his is a heavy burden." *Merck KGaA v. Hopewell Pharma Ventures, Inc.*, No. CV 22-1365-GBW-CJB, 2024 WL 3967463, at *2 (D. Del. Aug. 28, 2024). "If the challenged statements are ambiguous or amenable to multiple reasonable interpretations, prosecution disclaimer is not established." 29 F.4th at 1374. As discussed below, considering the prosecution as a whole, the Court is not convinced that the four challenged statements, which Cisco relies on, prove the existence of a clear and unmistakable disclaimer in the '872 patent or the '998 patent.

In support of its argument that the disclaimer is directed to the scope of the invention as a whole, Cisco relies on four excerpts from Ramot's preliminary response to Cisco's inter partes review petition against the '535 patent, which is not asserted in this case. The first two excerpts are found in the introduction of Ramot's preliminary response to Cisco's inter partes review petition, where Ramot uses the phrase "the '535 Patent." *See* D.I. 111 at 34 (quoting No. IPR2020-00123, Paper 8 at 7-8), 40; *see also* D.I. 118-1 at 37. The Court, however, is not convinced that these two excerpts are "clear and unmistakable evidence" that Ramot relinquished claim scope in the '872 patent and the '998 patent. 753 F. Supp. 2d at 398. Importantly, Cisco's argument assumes that references to the "'535 Patent" are necessarily references to the whole shared patent specification. Given that Cisco has not supported that assumption, there is ambiguity regarding whether "'535 Patent" refers to (a) the shared "written description and drawing of the invention[, or (b)] [the] one or more claims [of the '535 patent] particularly setting out the invention's scope." *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559 (2021).

23

Appx25

That ambiguity cuts against importing a disclaimer from the '535 patent to the '872 patent and the '998 patent.

The third excerpt, on which Cisco relies to attempt to support its argument that the disclaimer is directed to the scope of the invention as a whole, is found in Ramot's preliminary response to Cisco's inter partes review petition. Under the heading "The '535 Patent Challenged Claims," Ramot uses the phrase "the '535 specification." *See* D.I. 111 at 41 (quoting No. IPR2020-00123, Paper 8 at 37); *see also* D.I. 118-1 at 35. However, this Court is not persuaded that Ramot's statement, made in the context of "The '535 Patent Challenged Claims," unambiguously disclaims claim scope in the '872 patent and the '998 patent. Given that patent claims that share a specification can be directed to distinct inventions,[15] the Court is not convinced that the excerpt is "clear and unmistakable evidence" that Ramot relinquished claim scope in the '872 patent and the '998 patent. 753 F. Supp. 2d at 398. At this stage, the Court finds credible Ramot's contention that the '872 patent and the '998 patent recite "various claims, each of which necessarily defines its own invention, cover different aspects and embodiments of the multiple inventions disclosed in the shared specification." D.I. 111 at 53.

The fourth excerpt that Cisco relies to attempt to support its argument that the disclaimer is directed to the scope of the invention as a whole is found in Ramot's preliminary response to Cisco's inter partes review petition. There, Ramot uses the phrase "the invention of the '535 Patent." *See* D.I. 111 at 42 (quoting No. IPR2020-00123, Paper 8 at 34), 64; *see also* D.I. 118-1 at 41. The phrases "the invention" and "the present invention" are sometimes (but not always)

---

[15] *See Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 884 (Fed. Cir. 2018) (nonprecedential), *as amended* (June 1, 2018) ("It is hardly unknown for one set of claims to use language that picks out one among several embodiments, especially where other claims (perhaps in the same or related patents) claim more broadly or focus on other embodiments."); *LadaTech, LLC v. Illumina, Inc.*, 841 F. Supp. 2d 860, 866 (D. Del. 2012).

24

associated with disclaimers. *See, e.g., MasterObjects, Inc. v. Meta Platforms, Inc.*, No. 2023-1097, 2024 WL 630330, at *6 (Fed. Cir. Feb. 15, 2024) (nonprecedential); *Applications in Internet Time, LLC v. Salesforce, Inc.*, No. 2024-1133, 2024 WL 4456271, at *3 (Fed. Cir. Oct. 10, 2024) (nonprecedential); *Jackson v. Seaspine Holdings Corp.*, No. CV 20-1784-RGA, 2023 WL 5334359, at *5 (D. Del. Aug. 18, 2023); *Eis*, 2023 WL 346631, at *7. However, as this Court has previously recognized, "the Federal Circuit has abjured taking any rigid position with respect to the use of phrases such as 'according to the invention' or 'according to the present invention.'" *Zadro Prod., Inc. v. SDI Techs., Inc.*, No. 17-1406-WCB, 2019 WL 10252726, at *6 (D. Del. June 19, 2019).

Thus, for the same reasons discussed above with respect to the preceding three excerpts, the Court is not convinced that the fourth excerpt is "clear and unmistakable evidence" that Ramot relinquished claim scope in the '872 patent and the '998 patent. 753 F. Supp. 2d at 398. Moreover, considered in context, the use of the phrase "the invention of the '535 Patent" is at worst "vague." 2023 WL 5334359, at *5 ("Although this language is vague, I do not think there is any disclaimer based on the language."). Arguably, the fourth excerpt that Cisco relies on refers to "[a] preferred method or embodiment[, and] does not disclaim other embodiments" that are claimed in the '872 patent and the '998 patent. *Allergan, Inc. v. Revance Therapeutics, Inc.*, No. CV 21-1411-RGA, 2023 WL 5562417, at *5 (D. Del. Aug. 29, 2023), *reconsideration denied,* No. CV 21-1411-RGA, 2023 WL 7634454 (D. Del. Nov. 14, 2023). Therefore, the Court agrees with Ramot that the excerpt does not clearly and unmistakably disclaim claim scope in the '872 patent and the '998 patent. *See* D.I. 111 at 58-59.

## b. Cisco Also Has Not Established That Ramot Made Specification Disclaimers

As discussed below, the Court finds that Cisco has failed to "demonstrate an 'unambiguous' disclaimer, based on 'clear and unmistakable evidence' that some of the scope that would otherwise be captured by [] claim[s] [in the '872 patent and the '998 patent] w[ere] relinquished" through the specification. *Abbott Lab'ys*, 753 F. Supp. at 398.

The record is somewhat murky on whether Cisco's characterization of the specification was intended to support a specification disclaimer argument,[16] as opposed to a prosecution history disclaimer argument. In its opening brief, Cisco contends that "statements [in the specification] limit the claim scope" of the '872 patent and the '998 patent. D.I. 111 at 47; *see* D.I. 111 at 34 (alleging that "the specification's description of 'the invention' fully aligns with the[] statements" Ramot made in the IPR proceeding involving the '535 patent). Ramot responds that "[t]he specification does not limit the claims." D.I. 111 at 60 (emphasis removed). Cisco does not make a specification disclaimer argument in its sur-reply brief, *see* D.I. 111 at 61-67, or in its "*Markman* Presentation," *see* D.I. 118-1 at 25-49. In fact, Cisco's sur-reply suggests that there is no live dispute over specification disclaimer. *See* D.I. 111 at 67. Thus, assuming *arguendo* that Cisco initially raised a specification disclaimer argument, based on the briefing, the Court need not reach that issue. *See, e.g., Victaulic Co. v. ASC Engineered Sols., LLC*, No. CV 20-887-GBW, 2022 WL 17250376, at *5 n.3 (D. Del. Nov. 28, 2022), *appeal dismissed*, No. 2023-2013, 2024 WL 3060300 (Fed. Cir. June 20, 2024); *Est. of Albart by Albart v. Lavastone Cap. LLC*, No. CV 20-608-RGA, 2021 WL 1063339, at *2 (D. Del. Mar. 18, 2021); *Progressive*

---

[16] "The specification may also reveal an intentional disclaimer or disavowal of claim scope." *Apple Inc. v. Masimo Corp.*, No. CV 22-1377-JLH, 2024 WL 4441741, at *2 (D. Del. Oct. 8, 2024).

26

*Sterilization, LLC v. Turbett Surgical LLC*, No. CV 19-627-CFC, 2020 WL 3071951, at *2 (D. Del. June 10, 2020).

> **c.**     **Cisco Also Has Not Established Ramot Made "Same Claim" Disclaimers During an Inter Partes Review**

As discussed below, the Court is not convinced that claims in the '872 patent and the '998 patent are subject to same claim limitation disclaimers, based on Ramot's statements in the inter partes review of the '535 patent.

As noted earlier, "disclaimer[s] [can] bind[] the patentee's subsequent patents [] if the subsequent patent has the same, or immaterially different, claim limitations as its predecessor." *Acadia Pharms.*, 2023 WL 8622111, at *3. The record is somewhat murky on whether Cisco is making a disclaimer argument based on the similarity of claim limitations between claims in the '535 patent and claims in the '872 patent and the '998 patent.

What Cisco refers to as "same subject matter" disclaimer arguably resembles a same claim limitation disclaimer. For example, Cisco alleges that "Ramot [] tied its disclaimer arguments to the 'converting'/'mapping' limitations" and that "[e]ach Asserted Claim [of the '872 patent and the '998 patent] recites a 'mapping' or 'converting' limitation." D.I. 111 at 43; *see id.* at 45 (alleging that "each Asserted Claim includes the 'mapping'/'converting' limitation in common with the parent/related patents in connection with which Ramot made its disclaiming arguments"). Also, Cisco contends that claim 1 in each of the three patents has "substantially the same 'converting' limitation." D.I. 111 at 44. Ramot's briefing also addresses the issue of same claim limitation disclaimers. *See* D.I. 111 at 55-56 ("Cisco makes little to no effort to compare the claims on the modulator-driving elements that are the subject of its alleged disclaimers— providing two sentences and an oddly highlighted chart of some of them. This cannot meet the 'substantially the same' limitation requirement for finding disclaimer."); *see also* D.I. 119-1 at

61-80 (emphasis removed) (contending that "[t]he claims here are materially different from those alleged to be disclaimed"). Therefore, the Court will evaluate whether Cisco has proven, by "clear and unmistakable evidence," that Ramot relinquished claim scope in the '872 patent and the '998 patent, based on disclaimers of same, or immaterially different, claim limitations. 753 F. Supp. 2d at 398.

"When evaluating whether two claim limitations are the same, the 'appropriate focus is on the scope of the claim element, not the meaning of particular words in isolation.'" *Reckitt Benckiser LLC v. Aurobindo Pharma Ltd.*, No. CV 14-1203-LPS, 2016 WL 6542724, at *2 (D. Del. Nov. 3, 2016) (quoting *AGA Med.*, 717 F.3d 929). Below the Court discusses three opinions that address when a claim limitation is deemed similar enough to apply a same claim disclaimer.

An example of "immaterial differences" in claim limitations is found in *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973 (Fed. Cir. 1999). *AGA Med.*, 717 F.3d at 944 (citing *Elkay Mfg.*). In *Elkay Mfg.*, the Federal Circuit addressed whether a limitation found in the claim of one patent extended to a claim in a second patent that "stem[med] from the same genus" as the first patent. 192 F.3d at 980. The "disputed limitation" recited in claim 1 of the first patent was "*an upstanding feed tube . . . to provide a hygienic flow path for delivering liquid from . . . and for admitting air . . . into said container . . . .*" 192 F.3d at 975–76 (emphasizing portion of "Claim 1 of the '531 patent"). Claim 1 of the second patent "include[d] the limitation 'an upstanding feed probe ... to provide a hygienic flow path for delivering liquid from ... and for admitting air ... into said container." 192 F.3d at 976 (quoting "claim 1 of the '855 patent"). The *Elkay Mfg.* court remarked that "[t]he relevant portion of claim 1 of the '855 patent [(i.e., the second patent)] is identical to the above-quoted limitation in claim 1 of the '531 patent [(i.e., the first patent)]

28

with the exception that the feed tube in the '531 patent is described as a feed probe in the '855 patent." 192 F.3d at 979. Ultimately, the *Elkay Mfg.* court "h[eld] that Elkay's relinquishment of a potential construction of the feed tube limitation in claim 1 of the '531 patent to include separate feed tubes for liquid and air applies to the feed probe limitation in claim 1 of the '855 patent." 192 F.3d at 980.

An example of "significantly different claim limitations" is found in *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270 (Fed. Cir. 2012). *AGA Med.*, 717 F.3d at 943–44 (discussing *Digital-Vending Servs.*). In *Digital-Vending Servs.*, the Federal Circuit addressed whether a limitation in a first set of claims ("claims 1–3 and 7–15 of the '221 application[, which] eventually issued as claims of the '014 patent") extended to a second set of claims ("claims 16–37[, which] later issued as claims of the '573 patent") in a related, divisional patent. 672 F.3d at 1276–77.[17] According to the USPTO, the first set of claims in *Digital-Vending Servs.* "were drawn to 'managing content in a shared environment through a security manager and a funds flow manager,' while [the] [second set of claims] were drawn to a distinct invention involving a 'preregistered user accessing content that contains previously treated critical portion.'" 672 F.3d at 1272 (quoting J.A.). The whole first set of claims and part of the second set of claims "explicitly require[d] 'at least one registration server, each registration server comprising a remote registration manager and a registration database for new user registration, and *each registration server being further characterized in that it is free of content managed by the architecture*.'" 672 F.3d at 1274-75. A portion of the second set of claims

---

[17] "'[A] divisional application contains an identical disclosure to its parent application' and 'is defined as a later application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter in the earlier or parent application.'" *BASF Corp. v. Enthone, Inc.*, 749 F. App'x 978, 985 n.4 (Fed. Cir. 2018) (quoting *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353 (Fed. Cir. 2008)).

29

(specifically, "claims 13–22 of the '573 patent"), however, "d[id] not contain the phrase 'registration server.'" 672 F.3d at 1275; *see id.* at 1277 ("Claims 13–22 of the '573 patent do not contain the words 'registration server' but require a 'registered user.'"). Ultimately, the *Digital-Vending Servs.* court "decline[d] to read the 'free of content managed by the architecture' limitation that is explicitly recited in various claims into the stand-alone phrase 'registration server.'" 672 F.3d at 1277.

Another example of "a subsequent limitation that contained 'materially' different claim language" is found in *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326 (Fed. Cir. 2007). *AGA Med.*, 717 F.3d at 944 (citing *Saunders Grp.*). In *Saunders Grp.*, the Federal Circuit addressed whether a limitation found in the claim of one patent ("the '174 patent") extended to a claim in a second patent ("the '690 patent"), which "was a continuation of the application that led to the" first patent. 492 F.3d at 1330, 1334. "All the claims in the '174 patent [i.e., the first patent] explicitly require[d] a pneumatic cylinder having at least one pressure activated seal." 492 F.3d at 1329. The second patent "omitted any reference to a 'pressure activated seal' in two of the independent claims (claims 1 and 16) and in most of their dependent claims." 492 F.3d at 1330; *see id.* ("The 'pressure activated seal' limitation was explicitly included in two other independent claims (claims 14 and 15) and in two of the claims that depended from claim 1 (claims 6 and 7)."), 1333 ("[A]ll the claims in the '174 patent [(i.e., the first patent)] explicitly require at least one pressure activated seal while the '690 patent [(i.e., the second patent)] omits that language from the asserted claims."). Ultimately, the *Saunders Grp.* court held that "any arguments in the prosecution history of the '174 patent that distinguish prior art based on the presence or absence of a pressure activated seal are inapplicable to the '690 patent." 492 F.3d at 1334.

30

Returning to the claims at issue, the Court is not convinced that Cisco has shown the claims are sufficiently similar to apply same claim limitation disclaimers. The Court agrees with Ramot that, with respect to the issue of same claim limitation disclaimers, Cisco has not made sufficient "effort to compare the claims." D.I. 111 at 55. At best, Cisco has compared one claim of the '535 patent with claim 1 of both the '872 patent and the '998 patent. However, even those comparisons are lacking, as they fail to convince the Court that at most there exist "immaterial differences" between pertinent claim limitations. *AGA Med.*, 717 F.3d at 944. Given Cisco's burden on the issue of disclaimers, the Court need not decide whether "Ramot [c]an[] [s]how '[m]aterial [d]ifferences.'" D.I. 111 at 65 (emphasis removed).

Having rejected each of Cisco's disclaimer arguments, the Court finds that no additional construction is necessary. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("ActiveVideo's proposed construction erroneously reads limitations into the claims and the district court properly rejected that construction and resolved the dispute between the parties."); *Immersion Corp. v. Motorola Mobility LLC*, No. 17-CV-1081-RGA, 2018 WL 5294508, at *5 (D. Del. Oct. 25, 2018) ("I do not think Defendants have shown an 'unequivocal' surrender warranting their proposed construction. Therefore, I reject Defendants' construction and find no construction necessary."); *Sentient Sensors*, 2021 WL 1966406, at *1–2 (concluding that the Court "discharged its duty to resolve the parties' dispute," after finding a term "need not be construed").

## IV. CONCLUSION

The Court will adopt the parties' agreed upon constructions in part and construe the disputed claim terms as described above. The Court will issue an Order consistent with this Memorandum Opinion.

31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CISCO SYSTEMS INC. and<br>ACACIA COMMUNICATIONS, INC.,<br><br>            Plaintiffs,<br><br>            v.<br><br>RAMOT AT TEL AVIV UNIVERSITY<br>LTD.,<br><br>            Defendant. | C.A. No. 21-1365-GBW |
| CISCO SYSTEMS INC. and<br>ACACIA COMMUNICATIONS, INC.,<br><br>            Plaintiffs,<br><br>            v.<br><br>RAMOT AT TEL AVIV UNIVERSITY<br>LTD.,<br><br>            Defendant. | C.A. No. 22-674-GBW (consolidated) |

## ORDER

At Wilmington this 12th day of November, 2024:

Consistent with the Memorandum Opinion issued this date, **IT IS HEREBY ORDERED** that the Court construes the below claim terms of U.S. Patent Nos. 11,133,872 (the "'872 patent") and 11,342,998 (the "'998 patent") as follows:

Appx34

| Claim Term | Court's Construction |
|---|---|
| **Agreed-Upon Terms** | |
| "modulator"<br><br>'998 Patent: claims 1, 4, 6, 49, 50, 58, 61<br><br>'872 Patent: claims 1, 2, 3, 6, 7, 10, 11, 12, 13, 15, 16, 18, 20, 21, 23, 25, 26, 27 | any device which outputs an optical signal with controlled variation of intensity |
| "mapping/map/mapped/converting" verbs<br><br>'998 Patent: claims 1, 13, 14, 45, 46, 47, 49, 58, 63<br><br>'872 Patent: claims 1, 11, 13, 15, 23, 27 | selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical |
| **Disputed Terms** | |
| "wherein a digital-to-digital mapping maps …"<br><br><br><br>'998 Patent: claims 1, 4, 6-15, 58, 61-63 | not indefinite;<br><br>digital-to-digital mapping is a structure that maps a plurality of N digital input data bits to M digital output data bits |
| "wherein the N bits of the N bit digital input data word are mapped …"<br><br>'998 Patent: claims 45-47, 49-54 | indefinite |
| "digital output . . ."/"output bits . . ."<br><br>'872 Patent: claims 1, 11, 13, 15, 23<br><br>'998 Patent: claims 1, 45, 58 | No construction necessary |

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAMOT AT TEL AVIV UNIVERSITY LTD., <br><br> Defendant. | C.A. No. 21-1365-GBW |
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAMOT AT TEL AVIV UNIVERSITY LTD., <br><br> Defendant. | C.A. No. 22-674-GBW (consolidated) |

Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; L. Norwood Jameson, Matthew C. Gaudet, Sajid Saleem, Daniel Mitchell, DUANE MORRIS LLP, Atlanta, GA; Joseph A. Powers, DUANE MORRIS LLP, Philadelphia, PA; Holly E. Engelmann, DUANE MORRIS LLP, Austin, TX; Elizabeth Moulton, ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, CA.

*Counsel for Plaintiffs*

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Denise De Mory, Corey Johanningmeier, BUNSOW DE MORY LLP, Redwood City, CA.

*Counsel for Defendant*

## MEMORANDUM OPINION

October 23, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs Cisco Systems, Inc. and Acacia Communications, Inc. (collectively, "Plaintiffs") have brought declaratory judgment actions against patentee Ramot at Tel Aviv University ("Defendant"). Before the Court are Defendant's Motion for Partial Summary Judgment (No. 1) (D.I. 225) and Defendant's Motion for Partial Summary Judgment (No. 2) (D.I. 226) (collectively, "Defendant's Summary Judgment Motions").[1] For the reasons set forth below, Defendant's Summary Judgment Motions are DENIED.

## I.    BACKGROUND

### A.    Procedural History

On September 28, 2021, Plaintiffs filed this action against Defendant seeking "declaratory relief under 28 U.S.C. §§ 2201 and 2202 with respect to U.S. Patent No. 11,133,872 ('the '872 Patent')." (D.I. 1 at 1). On February 7, 2022, Defendant filed its Answer and Counterclaims, asserting that Plaintiffs "directly and indirectly infringe" the '872 Patent. (D.I. 8 ¶ 79).

On May 24, 2022, Defendant's United States Patent No. 11,342,998 ("the '998 Patent") issued and Plaintiffs "brought another declaratory judgment action against [Defendant] in this Court and alleged that [Plaintiffs] did not infringe the newly-issued '998 [P]atent . . . ." (D.I. 51 at 3 (citing C.A. No. 22-674, D.I. 1)). Defendant then filed an Answer and Counterclaim for Patent Infringement on July 29, 2022 in 22-674, alleging that Plaintiffs "directly and indirectly infringe" the '998 Patent. (C.A. 22-674, D.I. 10 ¶ 98).

---

[1]    Unless otherwise noted, all citations to the docket are referring to C.A. No. 21-1365-GBW.

Appx37

On January 26, 2024, Plaintiffs filed Amended Answers[2] to Defendant's Counterclaims in both 21-1365 and 22-674, raising as an affirmative defense that the asserted claims of the '872 Patent and the '998 Patent (together, "the Asserted Patents") are invalid for, among other reasons, failing to meet the requirements of 35 U.S.C. § 102. (D.I. 90 at 21 (Second Defense); C.A. No. 22-674, D.I. 80 at 22 (Second Defense)).

**B.      The Nortel Modem**

The following facts are undisputed for the purposes of this motion. Plaintiffs' technical expert, Dr. Duncan MacFarlane ("Dr. MacFarlane"), opines that the Asserted Patents are "invalid under 35 U.S.C. § 102(b) based on [the] Nortel/Ciena Next Generation Modem ('NGM') Transmitter System" (the "Nortel Modem"). (D.I. 228 ¶ 1; *see also* D.I. 253 ¶ 1 (not disputing)). Dr. MacFarlane believes that the Nortel Modem qualifies as prior art under § 102(b) because it "was on sale in the U.S. during the first quarter of 2006," more than a year before the Asserted Patents' earliest claimed priority date of June 13, 2007. (D.I. 253 ¶ 1 (quoting D.I. 229, Ex. C ¶ 188)). "With the exception of two press releases, all of the technical documents . . . relied on by Dr. MacFarlane to analyze the [Nortel Modem] were kept, marked, and designated as secret." (D.I. 228 ¶ 7; *see also* D.I. 253 ¶ 7 (not disputing)). Additionally, "[t]he circuitry of the [Nortel Modem] that Dr. Macfarlane points to as performing the claimed features is not discernable by the public from the identified system." (D.I. 228 ¶ 6 (citations omitted); *see also* D.I. 253 ¶ 6 (not disputing)).

*      *      *

On May 15, 2025, Defendant filed its Summary Judgment Motions. (D.I. 225; D.I. 226). Defendant's Summary Judgment Motions have been fully briefed. (*See* D.I. 227; D.I. 252; D.I. 275). The Court now turns to the merits.

---

[2]      Plaintiffs filed earlier answers to Defendant's Counterclaims. (D.I. 11; 22-674, D.I. 14).

## II.    LEGAL STANDARD

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (citing *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* at 308 (quoting *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016)).

### B.    On-Sale Bar to Patentability

"A person shall be entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(b) (pre-AIA).[3]  In order for a patent to be invalid under the on-sale bar, "[t]he statute requires that (1) the subject of the offer for sale must embody the claims of the asserted patent; (2) the offer for sale must have been 'in this country;' and (3) the offer for sale must occur before the critical date of the asserted patent." *Crown Packaging Tech., Inc. v. Belvac Prod. Mach., Inc.*, 122 F.4th 919, 924 (Fed. Cir. 2024) (quoting *Meds. Co v. Hospira, Inc. (Medicines I)*, 827 F.3d 1363, 1372, 1374 (Fed. Cir. 2016) (en banc)).  Additionally, the Supreme Court has articulated "two additional conditions [that] must be met before the critical date: the invention is (4) 'the subject of a commercial offer for sale' and (5) 'ready for patenting.'" *Id.* (quoting *Pfaff v.*

---

[3]    Both the '872 Patent and the '998 Patent have an earliest claimed priority date of June 13, 2007. (*See* D.I. 253 ¶ 1).

3
Appx39

*Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998)). "Whether the on-sale bar applies is a question of law based on underlying factual findings." *Meds. Co.*, 827 F.3d at 1371.

### III. DISCUSSION

Defendant first moves for summary judgment that the Nortel Modem, upon which Plaintiffs intend to rely on for their invalidity arguments, is not prior art under pre-AIA § 102(b). (D.I. 227 at 1 (citing D.I. 229, Ex. C ¶¶ 236, 386, 406, and 595)). Even if Nortel, a third party, sold the Nortel Modem before the critical date, Defendant asserts that "the details [of the Nortel Modem] that [Plaintiffs] allege[] correspond to the claimed features were intentionally kept secret." (D.I. 227 at 3-4 (citing D.I. 228 ¶¶ 1-8)). In Defendant's view, § 102(b)'s on-sale bar "is not implicated by a third-party sale when the claimed details of the invention are 'kept secret and remain secret after a sale.'" (*Id.* at 5 (quoting *In re Caveney*, 761 F.2d 671, 675-76 (Fed. Cir. 1985))). Therefore, according to Defendant, the Nortel Modem "does not qualify as prior art under [§] 102(b) as a matter of law." (D.I. 227 at 1). The Court disagrees.

The Federal Circuit has addressed this issue in *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577 (Fed. Cir. 1986). In *J.A. LaPorte*, the Federal Circuit held that secret sales by a third party can implicate § 102(b)'s on-sale bar. 787 F.2d at 1583. In determining whether the sale of a product implicated the on-sale bar, the Federal Circuit made clear that "the question is not whether the sale, even a third-party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that *embodies* the invention." *J.A. LaPorte.*, 787 F.2d at 1583 (emphasis in original).

Also, as Plaintiffs point out, the Federal Circuit cases discussing the on-sale bar that Defendant relies on concern third-party sales of unpatented products that were manufactured by a secret method. *See, e.g., In re Caveney*, 761 F.2d 671, 675 (Fed. Cir. 1985) ("An exception to [the on-sale bar] exists where *a patented method* is kept secret and remains secret after a sale of the

4
Appx40

unpatented product of the method." (emphasis added)); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) ("If [the third party] offered and sold anything, it was only tape, ***not whatever process was used in producing it***. Neither party contends, and there was no evidence, that the public could learn ***the claimed process*** by examining the tape." (emphasis added)); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 (Fed. Cir. 1983) ("Where ***a method is kept secret***, and remains secret after a sale ***of the product of the method***, that sale will not, of course, bar another inventor from the grant of a patent on that method." (emphasis added)).

In response, Defendant asserts that "there is no reason to treat" a device embodying a claimed system differently than a device manufactured using a claimed process when determining if § 102(b)'s on sale bar is implicated. (D.I. 275 at 4). However, the Federal Circuit has clearly explained otherwise in *J.A. LaPorte*, which it differentiated from *W.L Gore*:

> With respect to *Gore v. Garlock*, that decision does not support the broad proposition that the "secret" commercialization of an invention by a third party creates no bar. As indicated, the question there was whether the process had been placed on sale by the third party's sale of a product made by the process. There had been no sale of the process *per se*, and the process was not discoverable from the product. Under those circumstances, the "secret" commercial use of the process by one did not raise the on-sale bar against the other.

787 F.2d at 1582. Thus, the Court finds that the line of cases cited by Defendant, which concern devices manufactured by a claimed process, and the instant case, which concerns devices embodied by the claims, are distinguishable.

Defendant also asserts that "some of the claims that [Plaintiffs] seek[] to invalidate with the Nortel [Modem] are in fact method claims – squarely within the rule as explicitly formulated in the *W.L. Gore* line of cases, and acknowledged by [Plaintiffs]." (D.I. 275 at 4 (citations omitted)). Defendant's assertion, however, misses the mark. It is not simply that *all* third-party

sales concerning method claims are properly analyzed under the "for use" prong of § 102(b), but only sales of *products manufactured using a secret method. See, e.g., In re Caveney,* 761 F.2d at 675. If the Nortel Modem was merely *manufactured* using a method claimed in the Asserted Patents, then the Court would agree with Defendant that the Nortel Modem would not qualify as prior art under § 102(b)'s on-sale bar as to those claims. If, however, the Nortel Modem *practices* a method claimed in the Asserted Patents, then it may be considered a "sale of the process *per se*" and would qualify as prior art under § 102(b)'s on-sale bar, *J.A. LaPorte,* 787 F.2d at 1582. Because this argument appears in one sentence in Defendant's reply brief, *(see* D.I. 275 at 4), and because this distinction is not fully developed, the Court declines to treat the method and systems claims separately at the summary judgment stage.

Importantly, Defendant does not squarely address *J.A. LaPorte* in its briefing. Defendant does, however, try to claim that the on-sale bar does not apply "where the alleged prior invention is secret and the claimed features are not discernable from the thing sold and used . . . ." (D.I. 275 at 4; *see also id.* at 5 ("What is undisputed here is that no disclosure, explicit or inherent, of the claimed features occurred by the alleged sale. Even if someone wanted to know, they could not know – even with the [Nortel Modem] in hand." (citation omitted))). Although *J.A. LaPorte* did involve a scenario where "the invention . . . was discoverable from the device which was sold," 787 F.2d at 1582, the Court finds that distinction to be without consequence in the present circumstance. The Federal Circuit has stated that the on-sale bar is concerned with "whether the sale relates to a device that *embodies* the invention," not whether the sale discloses the invention. *J.A. LaPorte,* 787 F.2d at 1583 (citations omitted); *see also Ingenico Inc. v. IOENGINE, LLC,* C.A. No. 18-826-WCB, 2022 WL 20814960, at *17 (D. Del. Dec. 9, 2022) (Bryson, J., sitting by designation) ("In cases involving disclosure by a third party not under an obligation of

confidentiality, courts have consistently rejected IOENGINE's argument that a device is not in public use if its contents would not have been apparent to an ordinary user of the device. . . . The same rule has been applied to cases involving the 'on sale' bar to patentability . . . ."), *aff'd*, 136 F.4th 1354 (Fed. Cir. 2025); *Verizon California Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, No. 01-CV-09871 RGK (RCX), 2003 WL 25761597, at *52 (C.D. Cal. Dec. 2, 2003) ("The sale of a device embodying a claimed invention by a third party more than one year prior to the critical date may bar the patentee from obtaining a valid patent on the claimed invention. That actual users of the device purchased by another may not learn the details of its operation is immaterial." (citations omitted)). A device embodies the invention if it practices each claim limitation. *See Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999) ("[T]he first determination in the § 102(b) analysis must be whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention."). Thus, the Court finds that, although the circuitry of the Nortel Modem is not discernable by the public, or even the alleged purchaser, it may still qualify as prior art under § 102(b).

Defendant also emphasizes that the information regarding the Nortel Modem was confidential. (D.I. 227 at 7 ("[Defendant]'s expert, Dr. Dallesasse, looked at each of the documents that Dr. MacFarlane listed as having been relied on, and confirmed that they all bore restrictive confidentiality designations." (citation omitted))). In *J.A. LaPorte*, the device that was placed on sale was derived from photographs of the inventor's device, with the photographing party obtaining the inventor's permission, and without instructions from the inventor regarding confidentiality. 787 F.2d at 1579 ("It is undisputed that Jantzen photographed the extension in Cucheran's presence, with his permission, and with no directions from him concerning confidentiality."). However, the Court also finds this distinction to be without consequence. In

*J.A. Laporte*, the Federal Circuit did not emphasize that the invention originally stemmed from the patentee in their ruling, except to note that such a derivation provided conclusive proof that the subject of the sale embodied the patented invention. 787 F.2d at 1583 ("The fact that the device here was made from photographs of the inventor's own embodiment of his invention eliminates any question that the subject of the sale and the claimed subject matter of the patent were one and the same."). Whether the Nortel Modem embodies the invention is not a question currently before the Court. The question is whether a secret sale of a device by a third party that embodies the claimed invention, but did not stem from the inventor of said invention, can qualify as prior art under § 102(b). Under the circumstances of the instant action, the Court concludes that the answer is yes.

In so holding, the Court is aware that "some courts have held that a secret sale by a third party of a product that allegedly anticipates an apparatus claim that would cover the product will not trigger an on-sale bar." Robert A. Matthews, Jr., Annotated Patent Digest § 17:99.50 (2025). *Schlumberger Technology Corp. v. BICO Drilling Tools, Inc.*, C.A. H-17-3211, 2019 WL 2450948 (S.D. Tex. June 12, 2019) is emblematic of such cases. In *Schlumberger*, the court held that, when sales of a product by a third party disclose the invention, such sales "should be analyzed under the public use prong," relying on the Federal Circuit's decisions in *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) and *In re Caveney*, 761 F.2d 671 (Fed. Cir. 1985). 2019 WL 2450948, at *9. The *Schlumberger* court did not address *J.A. Laporte*, but instead drilled down on a footnote in *Caveney*, which was quoted in *ResQNet*, stating "that sales 'made by others and disclosing the claimed invention implicate the "public use" provision,' not the 'on-sale' bar . . . ." 2019 WL 2450948, at *6 (quoting *In re Caveney*, 761 F.2d at 675 n.5). The court in *Schlumberger* went on to explain that the courts in *Cavaney* and *RsQNet* noted "that the on-sale provision 'is

8
Appx44

directed at precluding an inventor from commercializing his [or her] invention for over a year before he [or she] files his [or her] application.'" 2019 WL 2450948, at *6 (alterations in original) (quoting *In re Caveney*, 761 F.2d at 675 n.5).

This Court, however, finds that the *Caveney* footnote, and its repetition in *RsQNet*, to be dicta. *FMC Techs., Inc. v. OneSubsea IP UK Ltd.*, 412 F. Supp. 3d 706, 713 (S.D. Tex. 2019) ("The statement in *ResQNet* regarding the 'public use' provision of § 102(a)(1), like the statement in *Caveney*'s footnote, was dicta.").[4] *Caveney* and *RsQNet* are properly distinguishable. In *Caveney*, the Federal Circuit was addressing the situation "where a patented method is kept secret and remains secret after a sale of the unpatented product of the method." 761 F.2d at 675. As discussed above, such a situation is distinguishable from the instant case. And although the dicta in *Caveney* is repeated in *RsQNet*, the Federal Circuit in *RsQNet* affirmed the lower court, not because the on-sale bar was inapplicable to third-party sales, but because "the advertised version [of the allegedly invalidating reference] did not embody all of the elements of the patented product . . . ." *Schlumberger*, 2019 WL 2450948, at *6 (citing *RsQNet*, 594 F.3d at 867). Because the cases relied on by the *Schlumberger* court are distinguishable, and because *Schlumberger* did not address *J.A. LaPorte*, this Court finds that *Schlumberger* and similar cases do not warrant granting Defendant's motion for summary judgment.

Based on the above analysis, this Court concludes that *J.A. LaPorte* governs in the circumstances of the present action. Secret sales by third parties, even sales where there is no

---

[4]  The Court in *FMC Technologies* references § 102(a)(1) rather than § 102(b) because the patents at issue there were filed after the enactment of the AIA. 412 F. Supp. 3d at 709 ("The patent application was filed [on] March 27, 2017, and . . . granted [on] April 17, 2018."). This distinction, however, is without consequence, as the analysis of the on-sale bar under pre-AIA and post-AIA law is the same. *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 132 (2019) ("Congress did not alter the meaning of 'on sale' when it enacted the AIA . . . .").

9

disclosure of the claimed invention, can trigger § 102(b)'s on-sale bar if the sold product embodies the claimed invention. *See BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 968 n.7 (Fed. Cir. 2020) ("In [*J.A. LaPorte*], we held only that a third party's secret sale of a device created an on-sale bar to a later inventor's patent on the same device – an unremarkable proposition . . . ."). For the foregoing reasons, Defendant's Motion for Partial Summary Judgment (No. 1) (D.I. 225) is DENIED. Also, given the Court's summary judgment ranking procedures, Defendant's Motion for Partial Summary Judgment (No. 2) (D.I. 226) is DENIED. (*See* D.I. 103 ¶ 13(d)). An appropriate Order will be entered.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAMOT AT TEL AVIV UNIVERSITY LTD., <br><br> Defendant. | C.A. No. 21-1365-GBW |
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAMOT AT TEL AVIV UNIVERSITY LTD., <br><br> Defendant. | C.A. No. 22-674-GBW (consolidated) |

## ORDER

AND NOW, this 23rd day of October 2025 and based on the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Partial Summary Judgment (No. 1) (D.I. 225) is **DENIED**; and

2. Defendant's Motion for Partial Summary Judgment (No. 2) (D.I. 226) is **DENIED**.

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Appx47

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| RAMOT AT TEL AVIV UNIVERSITY LTD., | | |
| Plaintiff, | | C.A. No. 22-674-GBW (consolidated) |
| v. | | |
| CISCO SYSTEMS, INC. and ACACIA COMMUNICATIONS, INC., | | **FILED UNDER SEAL** |
| Defendants. | | |

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Denise De Mory, Corey Johanningmeier, BUNSOW DE MORY LLP, Redwood City, CA.

*Counsel for Plaintiff*

Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; L. Norwood Jameson, Matthew C. Gaudet, Sajid Saleem, Daniel Mitchell, DUANE MORRIS LLP, Atlanta, GA; Joseph A. Powers, DUANE MORRIS LLP, Philadelphia, PA; Holly E. Engelmann, DUANE MORRIS LLP, Austin, TX; Elizabeth Moulton, ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, CA.

*Counsel for Defendants*

**MEMORANDUM OPINION**

November 18, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Defendants Cisco Systems, Inc. and Acacia Communications, Inc. (collectively, "Defendants") have brought declaratory judgment actions against patentee Ramot at Tel Aviv University ("Plaintiff").[1]  Plaintiff has brought patent infringement counterclaims.  Before the Court is Defendants' Motion for Summary Judgment of No Infringement ("Defendants' Summary Judgment Motion") (D.I. 220).[2]  For the reasons set forth below, Defendants' Summary Judgment Motion is GRANTED.

## I.    BACKGROUND

### A.    Technical Background

"A light wave can be used to transmit data by associating characteristics of the light wave," such as its amplitude or phase, with digital data. (D.I. 222 ¶ 1; D.I. 246 ¶ 1 (not disputing)). "For example, different phase shifts can be used to represent" individual bits. (D.I. 222 ¶ 1; D.I. 246 ¶ 1 (not disputing)). "[A] phase shift of 0 degrees [could be used to represent] an analog representation of a '0' and a phase shift of 180 degrees [could be used to represent] an analog representation of a '1.'" (D.I. 222 ¶ 1; D.I. 246 ¶ 1 (not disputing)). A light wave can also be used to transmit multiple bits of data at the same time. (D.I. 222 ¶ 2; D.I. 246 ¶ 2 (not disputing)). If, for example, the data to be transmitted consisted of four bits, the light wave could be modified, by

---

[1]    Although Cisco Systems, Inc. and Acacia Communications, Inc. were originally the Plaintiffs, having brought this action, Civil Action Nos. 21-1365 and 22-674 have since undergone a case consolidation and realignment, where Cisco Systems, Inc. and Acacia Communications, Inc. were realigned as the Defendants, and Ramot at Tel Aviv University was realigned as the Plaintiff. (D.I. 273).

[2]    Unless otherwise noted, all citations to the docket are referring to C.A. No. 22-674-GBW.

changing its amplitude and phase, to represent one of sixteen possible combinations. (D.I. 222 ¶ 3; D.I. 246 ¶ 3 (not disputing)). "The process of encoding a light beam with information for transmission is called modulation," and this process is performed by a modulator. (D.I. 222 ¶ 4; D.I. 246 ¶ 4 (not disputing)).

**B.** **The Asserted Claims**

Defendants move for summary judgment of noninfringement for independent claims 1 and 58 of United States Patent No. 11,342,998 ("the '998 Patent") and independent claims 1, 11, 15, and 23 of U.S. Patent No. 11,133,872 ("the '872 Patent"), as well as certain dependent claims.[3] (D.I. 220) (together, "the Asserted Patents" and "the Asserted Claims").

**1.** The '998 Patent's Asserted Claims

Claim 1 of the '998 Patent recites:

1. An optical modulation system, the system comprising:
an input for a plurality of N digital input data bits;
an input optical signal;
a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and
wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values;
wherein the input optical signal is modulated based on the plurality of voltage values;
wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values;
wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values

---

[3] Defendants move for summary judgment on dependent claims 5, 7, 10, 20 and 27 of the '872 Patent, as well as dependent claims 4 and 13 of the '998 Patent.

corresponding respectively to the successively increasing digital input values in the first subset, decrease; and

wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase.

('998 Patent at Claim 1).  Claim 58 of the '998 Patent recites:

58. An optical modulation system, the system comprising:
an input for a plurality of N digital input data bits;
an input optical signal;
wherein a digital-to-digital mapping maps the plurality of N digital input data bits to M digital output data bits;
wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of M corresponding digital output values from a set of possible digital output values;
wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease; and
wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase; and
wherein the optical modulation system further comprises a modulator for modulating the input optical signal responsively to the M digital output data bits, to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers.

('998 Patent at Claim 58).

2.      The '872 Patent's Asserted Claims

Claim 1 of the '872 Patent recites:

1. A modulation system, the system comprising:
an input for a plurality of N digital input data bits;
an optical signal source for providing an input optical signal;

a modulator for modulating the input optical signal to output a modulation of the power of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and

a converter for:

converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and

providing the M drive voltage values to the modulator for the modulating,

wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.

('872 Patent at Claim 1). Claim 11 of the '872 Patent recites:

11. A method for generating, outputting and transmitting one or more modulated optical signal outputs by a modulation system, the method comprising;

receiving N digital input data bits at a first input to the modulation system, the modulation system comprising one or more input optical signal sources, a modulator, a converter and one or more optical fibers;

converting, based on a digital-to-digital mapping, the N digital input data bits to M digital output data bits associated with M drive voltage values, wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator;

providing the M drive voltage values to the modulator;

inputting one or more input optical signals into the modulator of the modulation system from the one or more input optical signal sources;

modulating the one or more input optical signals responsive to the M drive voltages values, wherein said modulating the one or more input optical signals generates the one or more modulated optical signal outputs; and

coupling the one or more modulated optical signal outputs to one or more optical fibers for transmission.

4

Appx52

('872 Patent at Claim 11).  Claum 15 of the '872 Patent recites:

15. A modulation system, the system comprising:

an input for N digital input data bits;

a modulator that is a semiconductor light generating device enabled for directly generating, responsively to an input signal that is responsive to the N digital input data bits, one or more modulated optical signal outputs for transmission over one or more optical fibers; and

a converter for:

converting, based on a digital-to-digital mapping, the N digital input data bits to M digital output data bits associated with M drive voltage values, and

providing the M drive voltage values to the modulator for the generating,

wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.

('872 Patent at Claim 15).  Claim 23 of the '872 Patent recites:

23. A method for converting digital inputs of N bits in parallel into modulated optical streams, comprising:

inputting into an optical modulator a digital input, wherein the digital input is one from a set of $2^N$ digital inputs that each has N bits of digital data, and wherein N>1; and

mapping, based on a digital-to-digital mapping, the digital input to a first digital output associated with M drive voltages, wherein the first digital output is one from a set of digital outputs that each has M bits of digital data, wherein the set of digital outputs comprises $2^M$ digital outputs, and wherein M>=N,

wherein the digital-to-digital mapping comprises, for each digital input included in the set of $2^N$ digital inputs, a mapping to a corresponding digital output included in the set of digital outputs,

wherein, for a first subset of successively increasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively increasing digital inputs in the first subset decrease, and

wherein, for a second subset of successively increasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital

5

> mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively increasing digital inputs in the second subset increase.

('872 Patent at Claim 23).

### C.   The Accused Products

Plaintiff accuses several of Defendants' products of infringing the Asserted Claims. (D.I. 222 ¶ 6; D.I. 246 ¶ 6 (not disputing)). Defendants separate the accused devices into three categories: Analog-Driven Products, Analog-Driven Products with a Mach-Zehnder Equalizer, and Digital-Driven Products. (*See generally* D.I. 222 (splitting Defendants' devices accused of infringement into the aforementioned three categories)).

### 1.   Defendants' Analog-Driven Products

In Defendants' Analog-Driven Products, "electrical signals representing the data to be transmitted via optical signals are input into a 'digital signal processor,' or DSP." (D.I. 222 ¶ 9; D.I. 246 ¶ 9 (not disputing)). "The DSP alters the [inputted] electrical signals and outputs different electrical signals." (D.I. 222 ¶ 9; D.I. 246 ¶ 9 (not disputing)). "[Plaintiff] accuses portions of the DSP of being the claimed 'input for a plurality of N digital input data bits,'" and "of being 'a converter for converting, based on a digital-to-digital mapping, the plurality of N digital input data bits to M digital output data bits.'" (D.I. 222 ¶ 10; D.I. 246 ¶ 10 (not disputing)).

"The electrical signals output from the DSP are input into a digital-to-analog convert[e]r, or DAC," which "encodes the digital values into analog values." (D.I. 222 ¶ 11 (cleaned up); D.I. 246 ¶ 11 (not disputing)). "One signal, or voltage, is output from the DAC" and is then "provided to a driver that then applies the corresponding voltage to, e.g., the electrode, in the modulator of the analog-driven products." (D.I. 222 ¶ 11; D.I. 246 ¶ 11 (not disputing)). Plaintiff "accuses the DSP to DAC to driver to modulator path of meeting the claim limitation: 'providing the M drive

voltage values to the modulator,' for all analog-driven products." (D.I. 222 ¶ 13; D.I. 246 ¶ 13 (not disputing)).

Defendants' Analog-Driven Products also contain a Finite Impulse Response ("FIR") filter. (*See* D.I. 222 ¶ 15; *see also* D.I. 246 ¶ 15 ("[Plaintiff] does accuse FIR filter functionality in each 'Analog-Driven Product' . . . .")). A FIR filter "is sometimes described as 'essentially a moving-average calculation,'" whose operation is performed iteratively. (*See* D.I. 246 ¶ 16). On iteration, or "tap," $n$, a given value $x_n$ is transmitted into the filter and a different value $y_n$ is transmitted from the filter. (*See* D.I. 246 ¶ 16). The value transmitted from the filter, $y_n$, is calculated using $x_n$ and values inputted into the system from previous taps ($x_{n-1}$, $x_{n-2}$, etc.). (*See id.*). Plaintiff accuses the FIR filter of performing "the required 'digital-to-digital mapping,' i.e., the structure that maps each 'plurality of N digital input data bits' to a corresponding 'M digital output data bits.'" (D.I. 222 ¶ 15; *see also* D.I. 246 ¶ 15 ("Ramot does accuse FIR filter functionality in each 'Analog-Driven Product' . . . .")). Each unique $x_n$, which is referred to as a "symbol," comprises a number of bits. (D.I. 222 ¶ 18; *see also* D.I. 246 ¶ 18 (not disputing)). Plaintiff "accuses each individual . . . symbol to the FIR as [being] a respective 'plurality of N digital input data bits.'" (D.I. 222 ¶ 18; *see also* D.I. 246 ¶ 18 (not disputing)).

### 2. Defendants' Analog-Driven Products with a Mach-Zehnder Equalizer ("MZE") Block

Certain of Defendants' Analog-Driven Products "have a component called a Mach-Zehnder Equalizer (or 'MZE')." (D.I. 222 ¶ 24; *see also* D.I. 246 ¶ 24 (not disputing)). An MZE takes "the output from the FIR filter . . . and makes further adjustments to it." (D.I. 222 ¶ 24; *see also* D.I. 246 ¶ 24 (not disputing)). The FIR filter, in these devices, is located in the TSS block of the data's pathway, upstream from the MZE block. (D.I. 222 ¶ 24; *see also* D.I. 246 ¶ 24 (not disputing)). This is illustrated by the following figure:

CONFIDENTIAL INFORMATION OMITTED



(D.I. 222 ¶ 24; *see also* D.I. 246 ¶ 24 (not disputing)).

### 3.    Defendants' Digital-Driven Products

Defendants' Digital-Driven Products "do not include a DAC," but instead contain "a transmit DSP function, the digital outputs of which are coupled to the unmodulated optical signal via a silicon photonic driver, driving the electrodes of the modulator." (D.I. 222 ¶ 21; *see also* D.I. 246 ¶ 21 (not disputing)). "For these Digital-Driven [P]roducts, [Plaintiff] accuses the use of a combination of two code translations, specifically the combination of gray coding and driver thermometer coding, as satisfying the Court's construction of 'mapping/map/mapped/converting.'" (D.I. 222 ¶ 22; *see also* D.I. 246 ¶ 22 (not disputing)).

### D.    **Procedural History**

On September 28, 2021, Defendants filed Civil Action No. 21-1365 against Plaintiff seeking "declaratory relief under 28 U.S.C. §§ 2201 and 2202 with respect to U.S. Patent No. 11,133,872 . . . ." (C.A. 21-1365, D.I. 1 at 1). On February 7, 2022, Plaintiff filed its Answer and Counterclaims, asserting that Defendants "directly and indirectly infringe" the '872 Patent. (C.A. 21-1365, D.I. 8 ¶ 79).

On May 24, 2022, Plaintiff's United States Patent No. 11,342,998 issued and Defendants "brought another declaratory judgment action against [Plaintiff] in this Court and alleged that [Defendants] did not infringe the newly-issued '998 [P]atent . . . ." (D.I. 45 at 3 (citing D.I. 1)). Plaintiff then filed an Answer and Counterclaim for Patent Infringement on July 29, 2022 in Civil

Action No. 22-674, alleging that Defendants "directly and indirectly infringe" the '998 Patent. (D.I. 10 ¶ 98).

On May 15, 2025, Defendants filed their Summary Judgment Motion. (D.I. 220). Defendants' Summary Judgment Motion has been fully briefed. (*See* D.I. 221; D.I. 244; D.I. 258). The Court now turns to the merits.

## II.    LEGAL STANDARD

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (citing *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* at 308 (quoting *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016)).

### B.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention."). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. The Court is free to attach the appropriate weight

9

Appx57

to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The ultimate question of the proper construction of a patent is a question of law, although subsidiary fact-finding is sometimes necessary. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 378, 388-91 (1996).

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1313). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

"When construing claim terms, [the court] first look[s] to, and primarily rel[ies] on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013). "Other claims of the patent in question, both asserted and unasserted, can . . . be valuable" in discerning the meaning of a disputed claim term, because "claim terms are normally used consistently throughout the patent" and so "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314 (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)). In addition, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)). "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (citing *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).

In addition to the claims, the court should analyze the specification, which "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "[E]ven when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim*, 358 F.3d at 906). Furthermore, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), (citing *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966)), *aff'd*, 517 U.S. 370 (1996). The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution . . . ." *Phillips*, 415 F.3d at 1317.

In some cases, the court "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331 (citing *Seymour v. Osborne*, 20 L.Ed. 33 (1871)). Extrinsic evidence "consists of all evidence external to

11

Appx59

the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (cleaned up).

### C.    Literal Non-Infringement

"The Patent Act . . . provides that '[n]oninfringement . . .' may be raised 'in any action involving the validity or infringement of a patent.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 n.15 (2014) (dictum) (alteration in original) (quoting 35 U.S.C. § 282(b)). "A determination of non-infringement, either literal or under the doctrine of equivalents, is a question of fact." *Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d 1331, 1336 (Fed. Cir. 2008) (citing *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000)).

"A district court should approach a summary judgment motion on the issue of non-infringement with great care." *Rudkin-Riley Corp. v. Pulse, Inc.*, No. S85-654, 1990 WL 132572, at *2 (N.D. Ind. Apr. 12, 1990) (citing *Calumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed. Cir. 1985)); *see also Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 528 (Fed. Cir. 1996) ("A district court should approach a motion for summary judgment on the fact issue of infringement with great care."). "Summary judgment of no literal infringement is proper when, construing the facts in a manner most favorable to the nonmovant, no reasonable jury could find that the accused system [or method] meets every limitation recited in the properly construed claims." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002) (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). "[W]here the parties do not dispute

any relevant facts regarding the accused product … but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1363 (Fed. Cir. 2019) (omission in original) (quoting *Gen. Mills, Inc. v. Hunt-Wesson*, 103 F.3d 978, 983 (Fed. Cir. 1997)); *see also MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007) ("Because there is no dispute regarding the operation of the accused systems, that issue reduces to a question of claim interpretation and is amenable to summary judgment."). In such a case, a trial court has discretion to resolve disagreements over possible claim interpretations at the summary judgment stage. *See Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, C.A. No. 20-464-WCB, D.I. 283 at 6-8 (D. Del. Mar. 29, 2023); *see also Int'l Bus. Machines Corp. v. Zynga Inc.*, C.A. No. 22-590-GBW, D.I. 538 at 6-7 (D. Del. Sep. 29, 2024). A trial court also has discretion to defer resolving such disagreements. *See Sensormatic Elecs., LLC v. Genetec (USA) Inc.*, C.A. No. 20-760-GBW, D.I. 253 at 15, 2023 U.S. DIST. CT. MOTIONS LEXIS 11097 (D. Del. Jan. 3, 2023); *see also CosmoKey Sols. GmbH & Co. KG. v. Duo Sec., Inc.*, No. 8-1477-JLH-CJB, 2025 WL 1435827, at *1 n.1 (D. Del. May 19, 2025).

At the summary judgment stage, a finding of noninfringement is often precluded due to genuine issues of material fact. *See, e.g., Transcenic, Inc. v. Google, Inc.*, C.A. No. 11-582-LPS, 2014 WL 7275835, at *2 (D. Del. Dec. 22, 2014); *Bd. of Regents v. Bos. Sci. Corp.*, C.A. No. 18-392-GBW, 2022 WL 5241931, at *4 (D. Del. Oct. 6, 2022); *Cirba Inc. v. VMware, Inc.*, C.A. No. 19-742-GBW, 2023 WL 3151854, at *2 (D. Del. Apr. 18, 2023). Nevertheless, courts routinely grant summary judgment of noninfringement in situations where there is no dispute as to how the accused products function, but the dispute is whether those functions infringe the asserted claims.

*See, e.g., Cooper Notification, Inc. v. Twitter, Inc.*, 867 F. Supp. 2d 485, 495-96 (D. Del. 2012), *aff'd*, 545 F. App'x 959 (Fed. Cir. 2013).

## III.   DISCUSSION

Defendants move for summary judgment that all accused products do not infringe any of the Asserted Claims, alleging that the "digital-to-digital mapping" requirement of all Asserted Claims is not met by any of the Asserted Products. (D.I. 221 at 2). Defendants also assert that the "deltas" limitations, present in some of the Asserted Claims, is not met by any of the Accused Products. (D.I. 221 at 20). In response, Plaintiff asserts that there are factual issues, "of weight and credibility of the evidence," that preclude summary judgment. (D.I. 244 at 1). The Court will address each limitation in turn, but will first address the threshold question of whether the proper application of claim language to an allegedly infringing product is a question of law.

### A.   The Court Determines the Proper Scope of the Claims

Many of the "disputed facts" that Plaintiff asserts preclude summary judgment concern whether a function of the Accused Products maps on to an element of the Asserted Claims. (*See, e.g.*, D.I. 244 at 5 ("[T]he experts disagree about this application of the claim language to the products."); *id.* ("[O]n the issue of how many deltas does it take, [Defendants'] Motion brief presents no more than an expert disagreement over an application of the claim language."); *id.* at 11 ("The fact that the second function uses a prior stored value of x, changes and means nothing relative to the construed claims. Dr. MacFarlane and Cisco clearly think that it does, but Ramot and Professor Dallesasse dispute that."); *id.* at 15 ("Professor Dallesasse did opine that the input at the MZE block also meets the 'N digital input data bits' of the claims."); *id.* at 16 ("The proposition ... that two sets of numbers can be in a different order but still be identical, is disputed—as a matter of basic math but more relevantly here, as a matter of expert testimony and credibility.")).

14
Appx62

Plaintiff is generally correct in asserting that "[a] determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact . . . ." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058 (Fed. Cir. 2004); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002) (same); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (same); *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009) (same); (D.I. 244 at 1-6 (Plaintiff alleging that "factual issues, of weight and credibility" preclude summary judgment.)). However, where "there is no dispute regarding the operation of the accused systems, that issue reduces to a question of claim interpretation and is amenable to summary judgment." *MyMail*, 476 F.3d at 1378 (citing *Gen. Mills, Inc. v. Hunt–Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997)); *see also Cooper Notification*, 867 F. Supp. 2d at 490 (same). Both parties generally agree on *how* the accused devices work; the disagreement, as Plaintiff puts it, is the "application of the claim language to the products.[4]" (D.I. 244 at 5). This disagreement, therefore, is one of claim *scope*, and is properly answered by the Court. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" (alteration in original) (quoting *Markman*, 52 F.3d at 976)); *see also O2 Micro*, 521 F.3d at 1360 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." (citing *Markman*, 52 F.3d at 979)). The Court will therefore turn to the substance of the disputes.

---

[4]   In supplemental briefing, Plaintiff proffered a new theory about the operation of the Accused Products. (*See* D.I. 292 at 7-10). However, as will be discussed below, the Court finds that Plaintiff has waived its newly-proffered theory, and that said theory lacks any evidence in the record. (*See infra* § (III)(C)(3)). Therefore, for purposes of this motion, there is no genuine dispute of material fact over the operation and functionality of the Accused Products.

**B.** **Defendants' Analog-Driven Devices Do Not Practice the "Mapping" Element of the Asserted Claims**

Defendants assert that their Analog-Driven Devices cannot infringe the Asserted Claims because they do not practice a "digital-to-digital mapping." (D.I. 221 at 2). For the reasons set forth below, the Court agrees.

1.    The Court Construes "Mapping" to Require a Single Corresponding Output for a Given Input

All Asserted Claims contain a "mapping" element, which "maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values." (*See, e.g.,* '998 Patent at Claim 1). The Court has previously construed this term as "selecting or generating a digital output from a set of possible digital outputs for a *given digital input* from a set of possible digital inputs . . . .[5]" (D.I. 122 at 5) (emphasis added). The Court further construes this term to require that each unique input has a specific output, and said output cannot depend on prior inputs.

The Court finds this construction to be consistent with the plain meaning of the claims and consistent with the Court's prior interpretation. *See Sunovion Pharms., Inc.,* 731 F.3d at 1276 ("When construing claim terms, [the court] first look[s] to, and primarily rel[ies] on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent . . . ."). If input data bits are mapped to a set of output data bits, but identical input data bits could correspond to different output data bits, then they cannot be said to have been "mapped." Additionally, according the Court's prior construction, the digital output is selected or generated "for a *given digital input* . . ." (D.I. 122 at 5) (emphasis added). The Court holds that, if the same

[5]    The Court notes that this term was construed in accordance with the parties' agreed-upon construction. (D.I. 122 at 5). Although the proposed construction of this term was adopted in-part, (D.I. 122 at 6-10), the language the Court further construes in this opinion was agreed-upon, (*id.* at 5).

input could result in a different output, that output could not be said to have been selected or generated "for a given digital input." (D.I. 122 at 5). To hold otherwise would be to essentially rewrite the Court's prior construction, which was agreed upon by the parties. (*See supra* n.3).

Moreover, the specification supports the Court's construction that each input has to correspond to a single output. The specification explains that "*for each* input value, *the* output value for FIG. **2A** most closely approximating the corresponding theoretical linear response is determined . . . ." ('998 Patent at 7:53-56; '872 Patent at 7:45-48) (emphasis added). The use of "the" in the above-quoted sentence supports the Court's interpretation that each input value can correspond to only one output value. Additionally, the specification states that "the principles of the present invention may equally be applied to any case where a natural response of a modulator provides *a first function* and a desired response is *a different second function* . . . ." ('998 Patent at 8:65-9:01; '872 Patent at 8:57-60). A function is "[a] mathematical rule between two sets which assigns to each member of the first, *exactly one member of the second.*" *Function, McGraw Hill Dictionary of Scientific and Technical Terms* (6th ed. 2002) (emphasis added). Plaintiff has not identified, nor could the Court identify, an embodiment described by the specification of the Asserted Patents where the claimed "mapping" occurs in the absence of a functional relationship between the input and output of the digital-to-digital converter. Therefore, the Court finds that the specification of the Asserted Patents supports the Court's construction requiring each input to correspond to a single output.

The Court notes that, although it believes the claim language, its prior construction thereof, and specification of the Asserted Patents are sufficiently dispositive, extrinsic evidence further supports the Court's construction. *See Teva*, 574 U.S. at 331 ("In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to *consult extrinsic evidence in order*

*to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.*" (emphasis added)).  During the relevant time period, learned treatises explained that "[a] relation $R$ is called a *mapping (map)*, or a *function*, or a *transformation*, iff[ and only if] every element $x \in D_R$ has a *unique* $R$-relative, so that $R[x]$ consists of a *single* element.  This unique element is denoted by $R(x)$ and is called the *function value* at $x$ (under $R$).  Thus $R(x)$ is the only member of $R[x]$." Elias Zakon, Bradely J. Lucier & Tamara Zakon, *Mathematical Analysis Volume I* 10 (John Spiegelman, University of Windsor, 2011).  To put another way, the term "mapping," as used in the relevant art, refers to a function, where only one output corresponds to a given input.  *See id.*

Plaintiff's arguments to the contrary are unavailing.  First, Plaintiff points out that the shared specification states that "there is typically not a one-to-one mapping between bits of the input data and bits of the output data."  (D.I. 291 at 2 (quoting '872 Patent at 4:67-5:04); *see also* '998 Patent at 5:06-09)).  However, Plaintiff misreads this phrase.  The specification explains that there is no "one-to-one mapping between bits *of* the input data and bits *of* the output data," not that there is no requirement that a given input has to correspond to a certain output.  ('998 Patent at 5:06-09; *see also* '872 Patent at 4:67-5:04).  For example, if an input value to the system was (0011), the "mapping" requirement would not simply take each input *bit* and translate it to a new output *bit*, such as correlating a "0" input bit with a "1" output bit, and a "1" input bit with a "0" output bit, for an output of (1100).  The Court agrees that *this* interpretation of the "mapping" requirement in the Asserted Claims is improper.  However, mapping the input value *as a whole* to an output value, such as correlating (0011) exclusively to (1111), is entirely consistent with this language.

Plaintiff also identifies that the specification notes that, in one embodiment (where the number of bits in the input and output of the digital-to-digital converter are equal), "the output intensity is not uniquely defined for each input value." (D.I. 291 at 4 (quoting '872 Patent at 8:12-13); *see also* '998 Patent at 8:20-21). The Court, however, agrees with Defendants that this phrase means that multiple *inputs* would correspond to the same *output*, not vice-versa. (*See* D.I. 296 at 56:02-08) ("if M equals N, they are going to be the same, okay, is that you have to -- you have to -- for some examples like, let's see, this one here, the input has that output and then a different input will have a specific single never-changing output, but it's not unique; meaning another input would have it too.")). The Court's interpretation is supported by Figure 4 of the Asserted Patents:

## FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |

('872 Patent at FIG. 4; *see also* '998 Patent at FIG. 4). Figure 4 "is a table illustrating a digital-to-digital converter input and output where the input corresponds to the input data word and the output corresponds to the electrode actuation pattern for generating the outputs of FIGS. **2B** and **2C**," ('872 Patent at 6:07-11; '998 Patent at 6:13-17), which are the figures being described by Plaintiff's quoted sentence. (*See* '872 Patent at 7:31-8:20; '998 Patent at 7:39-8:28). Here, no two outputs correspond to the same input, but multiple inputs do correspond to the same output. (*See* '872 Patent at FIG. 4). Such a correspondence is allowable under the Court's construction.

Plaintiff also points to the Abstract of the Asserted Patents to rebut Defendants' proposition that "mapping," as used in the Asserted Claims, requires that the set of digital input data words and the set of digital output data words have a functional relationship. (D.I. 291 at 4). The portion of the Abstract that Plaintiff cites to in support recites that "[t]he digital-to-digital converter maps each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words." ('872 Patent at Abstract; '998 Patent at Abstract; *see also* D.I. 291 at 4; D.I. 296 at 30:03-16). Plaintiff attempts to assert that this sentence dictates that "there are a number of vectors available to represent each of" the digital input data words. (D.I. 296 at 30:18). Not so. Instead, the Court finds that this sentence means the opposite: that the digital-to-digital converter selects a single binary actuation vector to represent *each* of the input data words. (*See* '872 Patent at Abstract; '998 Patent at Abstract). To put another way, "the subset of binary actuation vectors" discussed by the Abstract is not the subset of binary actuation vectors *for a given input* (so that there would be multiple binary actuation vectors for each input data word), but the subset of binary actuation vectors available *for all inputs*. (*See* '872 Patent at Abstract; '998 Patent at Abstract; *see also* D.I. 296 at 55:07-08 ("Selecting a binary actuation vector from a subset of binary actuation vectors

available to represent each of the input data words. Plural. They're just talking about that whole list of outputs.")). This interpretation is supported by the Court's discussion of "mapping" as used in the specification *supra*, as well as its discussion regarding non-identical sets *infra* § (III)(C)(1)-(2). Because M is greater than N, or M is greater than or equal to N, for all Asserted Claims, (*see* '998 Patent at Claims; '872 Patent at Claims), and because the "decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical," (D.I. 122 at 5), it must be the case that the set of possible outputs is a subset of all possible combinations of bits in the M-bit space. That is the *subset* discussed in the Abstract of the Asserted Patents.

To be clear, the Court's construction does not require a "one-to-one mapping" as Plaintiff suggests. (*See* D.I. 244 at 7-8, 11; D.I. 291 at 2). A one-to-one mapping would require that no two inputs correspond to the same output, in addition to the requirement that no two outputs can correspond to the same input. *See* Elias Zakon, Bradely J. Lucier & Tamara Zakon, *Mathematical Analysis Volume I* 10 (John Spiegelman, University of Windsor, 2011) (explaining that a mapping is said to be "one-to-one" if for each input, there is only one output, and vice-versa). Instead, the Court's construction of "mapping" merely requires that the relation between the inputs and outputs of the digital-to-digital converter be a "mapping," or "functional," not that the inverse is such. As explained above, such a construction is supported by the portions of the shared specification quoted by Plaintiff.

Plaintiff further asserts that, given the Court's construction, mapping includes "generating a digital output, such as from a logic function or formula." (D.I. 244 at 11 (cleaned up)). As noted above, the Asserted Patents themselves describe the "mapping" as a function. (*See* '998 Patent at 8:65-9:01; '872 Patent at 8:57-60). Plaintiff goes on to state that "generating could be from a

function like $y_n = 5 \times x_n$, or it could be from a function $y_n = 5 \times x_n + 6 \times x_{n-1}$." (D.I. 244 at 11 (cleaned up)). The problem for Plaintiff, however, is that $y_n = 5 \times x_n + 6 \times x_{n-1}$ is not a function of $x_n$. As explained above, a function is "[a] mathematical rule between two sets which assigns to each member of the first, *exactly one member of the second.*" *Function, McGraw Hill Dictionary of Scientific and Technical Terms* (6th ed. 2002) (emphasis added). Therefore, if it is possible for $y_n$ to have more than one value for a given $x_n$, $x_n$ and $y_n$ cannot be said to have a functional relationship.

Plaintiff also cites a figure from Defendants' expert, Dr. MacFarlane, purportedly showing that the output $y_n$ of an FIR filter and its input signal $x_n$ directly correspond. (D.I. 244 at 8-9 (citing D.I. 245, Ex. T ¶ 73)). However, the caption of the figure clearly states that "each sample in the output signal, $y_n$, is found by multiplying *samples from the input signal, $x_n, x_{n-1}, x_{n-2}, \ldots$,* by the filter kernal coefficients, $a_0, a_1, a_2, a_3, \ldots$ and summing the products." (D.I. 244 at 8 (quoting D.I. 245, Ex. T at Figure 28-2) (emphasis added) (cleaned up)). Therefore, it is clear from Plaintiff's own briefing that "mapping" as used in the claim language requires that, for any given input, there can be only one output.

The Court notes that, in its construction of mapping, it is not simply "confining the claims to th[e] embodiments" present in the specification, *Phillips*, 415 F.3d at 1323, nor is it "arbitrarily pick[ing] and choos[ing] from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim," *Liebscher v. Boothroyd*, 258 F.2d 948, 951 (C.C.P.A. 1958). *See Mapping, McGraw Hill Dictionary of Scientific and Technical Terms* (6th ed. 2002) (mapping defined as "[a]ny function or multiple-valued relation."). Instead, the Court reads mapping "in view of the specification of which it is a part." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Ultimately, given the Court's prior

construction and accepted definitions of "mapping" in the art, when read in light of the specification (where no described embodiment lacks a functional relationship between the "N digital input data bits" and "M digital output data bits"), and given Plaintiff's reliance on inapposite quotes from the specification, the Court concludes its construction of "mapping" is proper. *See Renishaw*, 158 F.3d at 1250 ("Thus, where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning.").

Thus, the Court further construes "mapping" to require that, for any given "N digital input data bits," there can be only one "M digital output data bits." As discussed above, this construction is supported by the claims and specification of the Asserted Patents, the Court's prior construction, and extrinsic evidence. The Court will now turn to the application of the "mapping" element of the Asserted Claims to the undisputed functionality of the Accused Products.

### 2.    The Court grants Summary Judgment as to the Analog-Driven Products without MZEs

It is undisputed that a FIR filter functions by calculating an output $y_n$ using an input $x_n$ and "as many prior stored values of $x_{n-1}$, $x_{n-2}$, etc. as there are 'taps.'" (D.I. 246 ¶ 16 (cleaned up)). It is also undisputed that Plaintiff "accuses each individual input, or symbol, to the FIR [filter] as a respective 'plurality of N digital input bits.'" (D.I. 222 ¶ 18; *see also* D.I. 246 ¶ 18 (not disputing)). Therefore, when a "plurality of N digital input bits" (as defined by Plaintiff) are input into the FIR filter, the output varies based off the previous "plurality of N digital input bits." As explained above, the ability for the same "plurality of N digital input bits" to correspond to different outputs fails to satisfy the Court's construction of the "mapping" element in the Asserted Claims. (*See supra* § (III)(B)(I)).

Plaintiff's remaining arguments against summary judgment of noninfringement of the Analog-Driven Products without MZEs can be characterized as attempts to engineer factual disputes regarding the application of claim elements to the Accused Products. (*See, e.g.*, D.I. 244 at 7 ("The fact that the second function uses a prior stored value of x, changes and means nothing relative to the construed claims. Dr. MacFarlane and [Defendants] clearly think that it does, but [Plaintiff] and Professor Dallesasse dispute that."); *see also id.* at 13 ("[Defendants'] Motion is defeated by the fact that Professor Dallesasse has applied the plain language of the claims, and genuinely and materially disputes Dr. MacFarlane's take on it.")). However, as previously discussed, when "there is no dispute regarding the operation of the accused systems, that issue reduces to a question of claim interpretation and is amenable to summary judgment." *MyMail*, 476 F.3d at 1378. Plaintiff's remaining arguments are, therefore, unpersuasive. Because Plaintiff does not dispute that the FIR filters rely on previous inputs, they cannot infringe the "mapping" element present in all Asserted Claims. Defendants' Summary Judgment Motion as to the Analog-Driven Products without MZEs is therefore GRANTED.[6]

> 3. The Court Grants Summary Judgment as to the Analog-Driven Products with MZEs

As an alternative to the FIR filters, Plaintiff claims that the MZE component also performs the "mapping" function required by the claims. (*See* D.I. 245, Ex. E ¶ 118 ("the Pico MZE block provides a digital-to-digital mapping of the claims"); *see also id.* ¶ 55 ("digital mapping that meets Asserted Claims is performed by the Pico DSP . . . in the MZE block")). Defendants contend that

---

[6] Because the Court grants summary judgment as to the Analog-Driven Products without MZEs on the basis that this subset of the Accused Products does not meet the "mapping" limitation of the Asserted Claims as construed by the Court, the Court does not reach Defendants' arguments that Plaintiff's expert "had no basis to opine on whether the decimal values of the outputs were identical to decimal values of the inputs, or not," (D.I. 221 at 12), or that he failed to perform the required delta calculations, (*id.* at 12-13).

24

this component cannot perform the "mapping" function of the Asserted Claims, according to Plaintiff's infringement theories, because "Dr. Dallesasse never opined that 'N digital input data bits' are input into the MZE, and he never attempted to show any type of correspondence between an alleged 'N digital input data bits' and 'M digital output data bits' in an MZE." (D.I. 221 at 13-14). Plaintiff, in contrast, contends that "Professor Dallesasse did opine that the input at the MZE block *also* meets the 'N digital input data bits' of the claims." (D.I. 244 at 15).

However, Plaintiff has not pointed to any evidence where Professor Dallesasse opined that the input into the MZE could qualify, on its own, as the "N digital input data bits" which are mapped to the "M digital output data bits." Plaintiff cites to several portions of Professor Dallesasse's report, but none specify that the input into the MZE data block is the "N digital input data bits" recited in the claims.

*First*, Plaintiff cites to ¶¶ 111-12 of Dr. Dallesasse's report, which describes the data path of the Pico DSP (one of the Accused Products), as well as a high-level overview of the DSP data paths of the Jannu and Delphi (other Accused Products). (D.I. 244 at 15 (citing D.I. 245, Ex. E ¶¶ 111-12)). In these paragraphs, Dr. Dallesasse does not attempt to opine what portion(s) of the path could be classified as "N digital input data bits." (*Id.*). *Next*, Plaintiff cites to ¶¶ 116-18 of Dr. Dallesasse's report, (D.I. 244 at 15 (citing D.I. 245, Ex. E ¶¶ 116-18)), in which he opines that "the MZE . . . block of the Pico DSP uses a lookup table," (D.I. 245, Ex. E ¶ 116). Professor Dallesasse opines that, based on the functionality of the Pico DSP as described by "[Plaintiffs'] designated witness, Mr. Geyer," and "an interrogatory response from [Plaintiffs]," that "the Pico MZE block provides a digital-to-digital mapping of the claims." (D.I. 245, Ex. E ¶¶ 117-18). Professor Dallesasse does not, however, opine that the "N digital input data bits" and the input into the Pico MZE are one in the same. (*See* D.I. 245, Ex. E ¶¶ 116-18). *Lastly,* in terms of the Pico

DSP, Plaintiff cites to ¶¶ 181-83 of Professor Dallesasse's report. (D.I. 244 at 15 (citing D.I. 245, Ex. E ¶¶ 181-83)). These paragraphs, however, merely state that, in Professor Dallesasse's view, the Pico DSP, and more specifically the MZE, perform the additional "deltas" limitation present in the "mapping" requirement of the Asserted Claims. None of the cited paragraphs assert that the input into the Pico MZE can qualify as the "N digital input data bits" recited by the claims.

Plaintiff then cites to ¶¶ 119-22 and ¶¶ 176-77 of Professor Dallesasse's report, in support of the proposition that the Jannu transmit DSP data path infringes the "mapping" element "separate and apart from [Defendants'] discussion of FIR filters." (D.I. 244 at 14-15 (citing D.I. 245, Ex. E ¶¶ 119-22, 176-77)). This also misses the mark. Paragraphs 119-22 of Professor Dallesasse's report describe the Jannu transmit DSP data path at a high level, with Professor Dallesasse ultimately opining that "[t]he Jannu TNE block provides a digital-to-digital mapping of the claims." (D.I. 245, Ex. E ¶¶ 119-22). Dr. Dallesasse does not opine that the input into the Jannu TNE block is the "N-digital input data bits" required by the Asserted Claims. (*See* D.I. 245, Ex. E ¶¶ 119-22). And as with the later-cited paragraphs discussed in conjunction with the Pico DSP, ¶¶ 176-77 of Dr. Dallesasse's report simply contend that the Jannu TNE block practices the "deltas" element of the Asserted Claims. (D.I. 245, Ex. E ¶¶ 176-77). The cited paragraphs, again, do not mention whether the input into the Jannu TNE block qualifies as the "N digital input data bits" required by the Asserted Claims.

Lastly, Plaintiff cites to ¶¶ 409-15 and ¶¶ 450-57 of Professor Dallesasse's report, which discuss how Marvell DSPs infringe the "mapping" element of the Asserted Claims. (D.I. 244 at 15 (citing D.I. 245, Ex. E ¶¶ 409-15, 450-57)). However, these cited paragraphs do not seem to mention MZE or an MZE-equivalent functionality. (*See* D.I. 245, Ex. E ¶¶ 409-15, 450-57). Although they do discuss using look-up tables to satisfy the "mapping" element of the claims,

CONFIDENTIAL INFORMATION OMITTED

¶¶ 409-15 and ¶¶ 450-57 of Professor Dallesasse's report explain that the Marvell DSPs use prior "inputs" in generating their "output" during the alleging "mapping." (D.I. 245, Ex. E ¶ 410 ("[T]he DSP circuitry of the Porrima and Spica chips receives and operates on multiple bit symbols of digital input data in parallel."); see also id. ¶ 454 ("The Porrima transmit DSP functionality also uses ███████████████████████████ to adjust the frequency response of the transmitted symbol stream. This digital signal processing technique makes the value of a given symbol in the data stream depend on values of symbols that appear before and after it in the sequence.")). Therefore, Plaintiff's citations to the portion of Professor Dallesasse's report discussing the Marvell DSPs do not show that the input into an MZE can qualify as the "N digital input data bits" of the Asserted Claims.

The remainder of Plaintiff's citations are to discovery documents outlining the functionality of the Accused Devices, some of which use the word "input" to describe the data that enters the MZE block. (D.I 244 at 15 (citing D.I. 245, Exs. L, M, N & O)). These documents are likewise deficient. Merely because the data that enters the MZE block (or a block that performs MZE functionality) in an Accused Product can be described as an "input," in a general sense, does not make it reasonable for the Court to draw the inference that the input into the MZE block is the "N digital input data bits" required by the Asserted Claims.

Importantly, the discovery produced from Professor Dallesasse confirms this. Plaintiff cites to Professor Dallesasse's Reply Report as stating "the █-bit input to the Pico MZE block[.]" (D.I. 244 at 15 (citing D.I. 245, Ex. S ¶¶ 54-56)). However, the full sentence Plaintiff quoted recites: "But for example, as Dr. MacFarlane admits and even argues, the █-bit input to the Pico MZE block is the output of the TSS block, which 'takes in a ███-bit symbol as an input.'" (D.I. 245, Ex. S ¶ 55 (quoting D.I. 216, Ex. G ¶¶ 463-64)). A full examination of these paragraphs

CONFIDENTIAL INFORMATION OMITTED

shows that Professor Dallesasse was responding to Dr. MacFarlane's rebuttal report, where Dr. MacFarlane allegedly considered "one block, or sub-block, in isolation," and that, when viewed as a whole, the Acacia DSPs do perform "multiple digital mappings that meet the elements of the Asserted Claims," particularly the "M>N" limitation. (D.I. 245, Ex. S ¶¶ 54-56). Therefore, it is clear that Dr. Dallesasse was opining that the █-bit input to the TSS block could qualify as the "N digital input data bits" required by the Asserted Claims, and that way, when compared to the █-bit output from the MZE, the "M>N" limitation of the Asserted Claims would be satisfied. (D.I. 245, Ex. S ¶¶ 54-56; *see also* D.I. 245, Ex. T ¶ 473 ("[T]he MZE has *an █-bit input* and *an █-bit output* . . . .") (emphasis added)).[7]  Plaintiff has thus failed to identify any instance where Dr. Dallesasse opined "that the input at the MZE block *also* meets the 'N digital input data bits' of the claims." (D.I. 244 at 15 (emphasis in original)). This is confirmed in Dr. Dallesasse's deposition testimony:

> Q. And I believe it's actually paragraph 112 that indicates the map block, the TSS block, and the MZE, and a TEQ block.
> A. Transmit equalizer, yeah.
> Q. Got it. Okay. And do you see the line that runs from the TDS into the MZE?
> A. Yes.
> Q. Are the bits on that line, are those M, as in Mary, digital output data bits or N, as in Nancy, digital input data bits?
> A. The -- no, yeah. The Ms are the input to the DAC. *The Ns would go back further in that chain.*
> Q. Back further than the input to the MZE?
> A. Right.

(D.I. 223, Ex. 10 at 131:13-132:4 (emphasis added)). Although Plaintiff asserts that Dr. Dallesasse opined "that the input at the MZE block *also* meets the 'N digital input data bits' of the claims,"

---

[7]    At Oral Argument, when Plaintiff was asked what N and M would be if the "input into the MZE" block was the "N-bit digital input," Defendant's counsel again referred to the input into the TSS block. (D.I. 296 at 34:16-35:13 ("THE COURT: If input into the MZE was N digital input data bits, what would N and M be?  MS. DE MORY: Okay. So N is -- N was input *before the FIR Filter*. . . . So N came into the block *definitely before the TSS* .. . ." (emphasis added))).

(D.I. 244 at 15 (emphasis in original)), not only does Plaintiff fail to identify such an instance (*see supra*), but Plaintiff also fails to address the above deposition testimony and any inconsistencies resulting therefrom. This is insufficient to create a genuine issue of material fact. *Cf. Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)) ("[W]e have held that a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."). Nor can Plaintiff create a genuine issue of material fact with attorney arguments. *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006) ("Conclusory allegations and attorney arguments are insufficient to overcome a motion for summary judgment.").

Plaintiff is also unable to save this subset of Accused Products from summary judgment by claiming that both the TSS block and the MZE block, or both blocks in combination with other blocks in the transmit DSP chain, perform the "mapping" function as a whole. (*See* D.I. 245, Ex. S ¶¶ 54-56 (asserting that "digital mapping that meets Asserted Claims is performed by the Pico DSP, including in the equalization filter function of the TSS block, in the MZE block, in the two blocks considered together, and in the transmit DSP chain from, e.g., input to the symbol Mapper through output to the DAC and driver.")). This is because "a Transmit Signal Shaper (TSS) block . . . includes digital equalization via FIR filtering." (D.I. 245, Ex. E ¶ 112). Therefore, the "N digital input data bits" cannot be said to be "mapped" to the "M digital output data bits" because the output data bits will depend on prior input data bits, as discussed *supra* § (III)(B)(1)-(2). For the foregoing reasons, Defendants' Summary Judgment Motion as to the Analog-Driven Products with MZEs is GRANTED.

**C.   Defendants' Digital-Driven Devices Do Not Practice the "Digital-to-Digital" Mapping Element of the Asserted Claims**

Defendants also assert that their Digital-Driven Devices cannot infringe the Asserted Claims because these devices do not practice "digital-to-digital mapping." (D.I. 221 at 14). For the reasons set forth below, the Court agrees.[8]

        1.    The Court Construes "Mapping" to Require the Decimal Values of the Set of Possible Digital Inputs and the Decimal Values of the Set of Possible Digital Outputs to be Non-Identical, Irrespective of Order

The Court has previously construed the "mapping" requirement of the Asserted Claims to require that the "decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs" be "not identical." (D.I. 122 at 5). Defendants assert that "[t]he Court's construction is directed to 'decimal values **of the set**,' not the decimal values of any particular input or output in the set." (D.I. 221 at 17 (emphasis in original)). Defendants further contend that, according to the Court's prior construction, the order of the decimal values that appear in that set is "irrelevant." (*Id.*).

Plaintiff, for its part, disputes "that two sets of numbers can be in a different order but still be identical . . . ." (D.I. 244 at 16). Plaintiff asserts that, "because the experts disagree . . . this is a factual dispute for trial." (*Id.*).

The Court agrees with Defendants. As an initial matter, as discussed above, "[t]he purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro*, 521 F.3d at 1360 (Fed. Cir. 2008) (alteration in original) (quoting

---

[8]    Plaintiff points out that Defendants "styled its filing as a single Motion, but it actually presents three distinct motion arguments . . . without ranking them according to the Court's operative Scheduling Order . . . ." (D.I. 244 at 4 n.2). The Court agrees, and had it denied summary judgment as to the Analog-Driven devices, it would have ended its analysis there. However, because the Court granted summary judgment as to the Analog-Driven Devices, it will continue to the second of Defendants' motion arguments.

*Markman*, 52 F.3d at 976). Determining whether the sets of possible inputs and outputs must be ordered is an issue of claim construction; it determines whether the scope of the claims encompasses such unordered sets. This issue is therefore properly decided by the Court. *See id.*

Decimal numbers are simply another way of representing binary numbers. (D.I. 296 at 24:05-20; *id.* at 57:15-23). To calculate a decimal number from a binary number, you multiply each binary digit by $2^n$, where $n$ is the digit's position, and where the positions begin at 0 for the rightmost digit and increase by 1 as you move to the left, summing together each product. (D.I. 221 at 11 n.5). For example, to get the decimal number for (0101), you would perform the following calculation:

$$1 \times 2^0 + 0 \times 2^1 + 1 \times 2^2 + 0 \times 2^3 = 1 \times 2^0 + 1 \times 2^2 = 1 + 4 = 5$$

(*See* D.I. 221 at 11 n.5). Decimal numbers, therefore, are just a different way to represent the collection of bits in the input and collection of bits in the output. (*Id.*; *see also* D.I. 296 at 24:05-20; D.I. 296 at 57:15-23). Therefore, considering the order of decimal values within the set of possible digital outputs and the order of decimal values within the set of possible digital inputs when determining if the two sets are identical would not make sense. For the two sets to be non-identical, all the Court's construction requires is that there be one decimal value in the set of digital outputs that is not in the set of digital inputs. One way to accomplish this would be to have a binary output with more digits than the binary input, and where at least one of the possible outputs has a 1 as the left-most digit. This is expressly contemplated by certain Asserted Claims. (*See, e.g.*, '872 Patent at Claim 1 ("wherein M>N and N>1")).

Importantly, this construction of "mapping" comports with Plaintiff's own interpretation of "mapping" in an ex-parte reexam of U.S. Patent No. 10,270,535 ("the '535 Patent"), which is in the same family as the '872 and '998 Patents, (*see* '872 Patent at Related U.S. Application Data;

*see also* '998 Patent at Related U.S. Application Data). (D.I. 290 at 7-9 (citing D.I. 223, Ex. 14)).

Using the same Figure 4 as discussed *supra* § (III)(B)(1), Plaintiff explained that, for the sets of digital inputs and outputs to be not identical, there must be a value in one set not present in the other:

> Converting requires that the set of possible digital outputs for the M drive voltage values and the set of possible digital inputs for a given set of N bits of digital data are not identical. For example, in FIG. 4 of the '535 Patent, **the set of possible digital inputs is {0000, . . ., 1111}, i.e., binary representations of 0 to 15. The set of possible digital outputs does not include 0001, 0010, 1110, and 1111, i.e., binary representations of 1, 2, 14, and 15. Therefore, the set of possible digital inputs and the set of possible digital outputs for the converting are not identical.** None of the cited references discloses at least this feature of the independent claims.

(D.I. 223, Ex. 14 at 7 (emphasis added)). It is therefore clear, from Plaintiff's own prior interpretations, that determining whether the "set of possible digital inputs" and "set of possible digital outputs" are not identical is done without regard to ordering.

The Court notes that adopting this construction would necessitate certain claims being rendered unenabled. (*See, e.g.*, '872 Patent at Claim 13). For example, Claim 13 of the '872 Patent specifies that the set of possible digital outputs comprises $2^M$ outputs, which would be every possible combination of bits in an output comprised of M bits. (*See* '872 Patent at Claim 13 ("wherein the first digital output is one from a set of digital outputs that each has M bits of digital data, wherein the set of digital outputs comprises $2^M$ digital outputs"). Claim 13 also specifies that the set of possible digital inputs comprises $2^N$ inputs, which again, would be every possible combination of bits in an input comprised of N bits. (*See* '872 Patent at Claim 13 ("wherein the digital input is one from a set of $2^N$ digital inputs that each has N bits of digital data")). Claim 13 also expressly allows for M=N. (*See* '872 Patent at Claim 13 ("wherein M>=N")). Therefore, the decimal values of the sets of digital inputs and digital outputs would have to be identical, making

it impossible for this claim to enable its full scope given the Court's construction. However, the parties agreed on the language articulated by the Court in its original claim construction ruling, where it determined "that 'mapping/map/mapped/converting' refers to: 'selecting or generating a digital output from a set of possible digital outputs for a given digital input from a set of possible digital inputs, wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical.'" (D.I. 122 at 7 (quoting D.I. 100 at 2)). A plain reading of this construction necessitates that the decimal values of all the possible inputs (the "set of possible digital inputs") must be different than the decimal values of all possible outputs (the "set of possible digital outputs"). Put another way, the set of possible digital outputs must contain a decimal value not included in the set of possible digital inputs, or vice-versa. Requiring that the two sets be ordered the same for them to be found identical, despite the fact that the Court's construction does not articulate a requirement as to how the inputs or outputs are ordered within those sets, makes little sense.

The Court's present holding is further bolstered by the language it used in the original claim construction hearing. The Court did *not* state that the *sets* of decimal values of possible digital inputs and their *corresponding* digital outputs cannot be identical, nor did it say that the decimal values of an input must correspond to an output with a different decimal value. (*See* D.I. 122 at 5). The Court only stated that the *decimal values of those sets* cannot be identical. (D.I. 122 at 5) ("wherein the decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical"). Therefore, the Court maintains its prior construction and holds that the "wherein decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs are not identical" language therein does not impose an ordering requirement.

2.    The Court Construes "Mapping" to Require the Decimal Values of the Set of Possible Digital Inputs and the Decimal Values of the Set of Possible Digital Outputs to be Non-Identical, Regardless of the values of "N" and "M"

Plaintiff also asserts that "[a]ny mapping where the number of bits M is greater than the number of bits N will have *possible* values in one set that the other set does not." (D.I. 292 at 8 (citing D.I. 245, Ex. S ¶¶ 25 & 71)). In the portions of Professor Dallesasse's Reply Report cited by Plaintiff, Professor Dallesasse opines that "[a] mapping that only uses, *e.g.*, 4 of 8 possible output values is similarly not identical to an input set that only has 4 possible values." (D.I. 245, Ex. S ¶ 25). It therefore appears that Plaintiff is attempting to construe the "mapping" element as requiring identical *sets* of inputs and outputs, with the sets necessarily comprising all $2^N$ and $2^M$ possible input and output values that make up the N- and M-bit spaces. Not so.

The Court first notes that, in its original construction, it held that the "mapping" element required that the "decimal values of the set of possible digital outputs and decimal values of the set of possible digital inputs" be "not identical." (D.I. 122 at 5). The Court's use of the term "decimal value" in its construction evidences that the two sets can be identical, even if the number of bits increases from the set of possible inputs to the set of possible outputs. The Court's construction is concerned with the *value* represented by each possible input and output (in this case – the decimal value).

Moreover, Plaintiff's interpretation of the Court's construction is contrary to its plain meaning. If there exists a possible combination of "0s" and "1s" in the M-bit space, but that combination of "0s" and "1s" cannot be an output of the "mapping" function in an accused product, such a value cannot be said to be in the "set of possible digital outputs . . . ." (*See* D.I. 122 at 5). It would, in fact, be impossible for such a value to be an output. For example, if for any given input into a digital-to-digital mapping, there can be only four outputs, chosen from the set: (000),

(001), (011), and (111), it can hardly be said that (110) is included in the "set of possible digital outputs . . . ." (*See* D.I. 122 at 5).

Once again, Plaintiff's own interpretation concerning what is included in the "set of possible digital inputs" and the "set of possible digital outputs" during an ex-parte reexam of the '535 Patent cuts against its proposed construction in the instant case. As stated above, using the Figure 4 discussed *supra* § (III)(B)(1) as exemplary, Plaintiff explained that:

> Converting requires that the set of possible digital outputs for the M drive voltage values and the set of possible digital inputs for a given set of N bits of digital data are not identical. For example, in FIG. 4 of the '535 Patent, **the set of possible digital inputs is {0000, . . ., 1111}, i.e., binary representations of 0 to 15. The set of possible digital outputs does not include 0001, 0010, 1110, and 1111, i.e., binary representations of 1, 2, 14, and 15. Therefore, the set of possible digital inputs and the set of possible digital outputs for the converting are not identical.** None of the cited references discloses at least this feature of the independent claims.

(D.I. 223, Ex. 14 at 7 (emphasis added)). If the construction Plaintiff proposes was adopted, the set of possible digital outputs *would* include (0001), (0010), (1110), and (1111), as those values exist in the 4-bit space. However, as shown above, Plaintiff explicitly stated that "[t]he set of possible digital outputs *does not include* 0001, 0010, 1110, and 1111 . . . ." (D.I. 223, Ex. 14 at 7 (emphasis added)).

To further construe "mapping" in the manner proffered by Plaintiff would also run afoul of the doctrine of claim differentiation. Independent Claims 13 and 23 of the '872 Patent specify that "the set of digital outputs comprises $2^M$ digital outputs . . . ." ('872 Patent at Claims 13 & 23). Therefore, separate independent claims expressly define the size of the "set of digital outputs" to be all possible combinations of bits in the M-bit space. (*Id.*). Thus, it would be improper for this Court to read that limitation into the construction of different claims (such as Claim 1 of the

'872 Patent), where said limitation is not present.[9] *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant."); *see also Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 478, 496 (D. Del. 2001) ("In interpreting claims, it is improper for courts to read into an independent claim a limitation that is explicitly set forth in another claim." (citing *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985)). Therefore, the Court maintains its prior construction and clarifies that, for a decimal value to be included in the "set of possible digital inputs," an input with said decimal value must be capable of being inputted into the "mapping" function of an accused product. Furthermore, for a decimal value to be included in the "set of possible digital outputs," the mapping function of an accused product must be capable of producing an output with said decimal value.

3. The Court Grants Summary Judgment as to the Digital-Driven Products

a. **Plaintiff Waived its Argument that the DSP Output in the Digital-Driven Products is a Binary Value**

The Court, in seeking to "determine whether there is an *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) issue ('*02 Micro* issue'), which may be amenable to resolution at summary judgment," gave the parties an opportunity, after the close of summary judgment briefing, to file a letter brief with the Court "setting forth the material claim term(s) remaining in dispute and/or specific dispute(s) concerning the scope of the patent claim(s),

---

[9] Although the relevant claim limitation does not include the word "possible" when defining set of digital outputs, as opposed to the Court's construction of the term "mapping," where "possible" is included, the Court finds this distinction to be inconsequential. (*Contrast* '872 Patent at Claims 13 & 23 ("wherein the set of digital outputs comprises $2^M$ digital outputs"), *with* D.I. 122 at 5 ("the set of possible digital outputs")).

its proposed claim construction for each material claim term in dispute, its proposed scope of any patent claim identified as being in dispute, supporting argument for each of its proposed constructions and/or patent claim scope resolutions, and supporting authority." (D.I. 286 at 1-2). The Court also instructed the parties to file an answering letter brief "setting forth its opposition to the other side's proposed construction(s) for each material claim term in dispute, its proposed scope of any patent claim identified as being in dispute, supporting argument for each of its proposed constructions and/or patent claim scope resolutions, and supporting authority." (D.I. 286 at 2-3). Nowhere did the Court permit either side to raise new arguments regarding the operation or function of the Accused Products in their supplemental letter briefing. (*See* D.I. 285; D.I. 286).

However, despite the Court's instructions, Plaintiff appears to assert, for the first time, that the 3-bit output of the DSP in Defendant's Digital-Driven Products is a binary output, with decimal values of 0, 1, 3, and 7. (D.I. 292 at 8 ("The possible decimal values of a 3-bit binary output are 0, 1, 2, 3, 4, 5, 6, [and] 7 . . . ."); *see also id.* ("[T]he decimal values of the possible outputs actually used in the accused mapping above are non-identical to the inputs—input 10 (decimal 2) maps to output 111 (decimal 7).")). The Court cannot identify any instance of Plaintiff making this argument, either in its Answering Brief to Defendant's Summary Judgment Motion, (D.I. 244), or in its statements of facts submitted in opposition, (D.I. 246; D.I. 247). Moreover, during Oral Argument, Plaintiff did not address this seemingly new argument. (D.I. 296 at 29:19-52:17). When asked by the Court if Plaintiff intended to drop its argument (that output (111) represented a decimal value of 7 in the Digital-Driven Products), Plaintiff's counsel declined to "belabor" it. (D.I. 296 at 52:18-53:3). Therefore, the Court finds Plaintiff's new argument – that the digital outputs of the DSP in Defendant's Digital-Driven Products are binary values corresponding to decimal values (0, 1, 3, and 7), (D.I. 292 at 7-8) – to be waived.

**b.    There is No Genuine Issue of Material Fact That Defendants' Products Do Not Practice the Asserted Claims**

Plaintiff accuses the Digital-Driven Products of infringing the "mapping" element of the Asserted Claims. The accused Digital-Driven Products perform the "mapping" element, according to Plaintiff, by virtue of the combined effect of subsequent gray and thermometer encodings. (D.I. 244 at 16). This process is described in Professor Dallesasse's report as follows:

> This transmit DSP function provides a number of encodings, which when combined produce a mapping according to the claims. . . . The DSP specification describes grey coding wherein the PAM-4 symbols ({0,0}, {0,1}, {1,0}, {1,1}) are mapped to 0, 1, 3, 2, and then those values are thermometer encoded to output symbols ({0,0,0}, {0,0,1}, {1,1,1}, {0,1,1}). . . . The combined effect of the applied codings swaps some 2-bit symbols in order and shifts their position relative to where they would occur in a straight translation to, e.g., equally spaced symbols in the 3-bit space.

(D.I. 223, Ex. 1 ¶ 484). Although the combined encoding process "swaps some 2-bit symbols in order and shifts their position," (*id.*), that does not render the set of decimal values of possible digital inputs and the set of decimal values of possible digital outputs not identical. As discussed above, the Court's construction of "mapping" focuses on the decimal values of the set possible inputs and decimal values of the set possible outputs, not the actual sets of inputs and outputs.

Had the Court considered Plaintiff's untimely argument regarding the decimal values for the set of possible outputs of the DSP in Defendants' Digital-Driven Products – that the outputs are binary values and therefore the decimal values corresponding to the set of possible outputs are (0, 1, 3, and 7) – on the merits, it would likewise fail to create a genuine issue of material fact. The Court cannot identify any evidence that the relevant decimal values (0, 1, 3, and 7) were ever used in describing the decimal values of the possible outputs in Defendants' Digital-Driven Products. When pressed at oral argument, Plaintiff's counsel likewise could not identify anywhere that "7" was used to describe a possible decimal value in the set of possible decimal values of the

outputs for Defendants' Digital-Driven Products. (D.I. 296 at 61:17-63:14). Instead, after a thorough review of the record, it seems that Plaintiff consistently opined that the decimal values for the outputs of the DSP in Defendants' Digital-Driven Products are thermometer encoded. (*See* D.I. 245, Ex. E ¶ 484 ("The DSP specification describes grey coding wherein the PAM-4 symbols ({0,0}, {0,1}, {1,0}, {1,1}) are mapped to 0, 1, 3, 2, and then **those values are thermometer encoded** to output symbols ({0,0,0}, {0,0,1}, {1,1,1}, {0,1,1})." (emphasis added))). Most persuasively, when Professor Dallesasse opined that Defendants' Digital-Driven Products[10] met the "deltas" element in certain Asserted Claims, he stated that there included a "subset of outputs [consisting of the decimal values] (1, 3, 2)." (D.I. 223, Ex. 7 ¶ 36). However, if Plaintiff is correct in its assertion that said outputs are binary values, the set of decimal values of the outputs would not include "2"[11]. (D.I. 292 at 8 ("input 10 (decimal 2) maps to output 111 (decimal 7)")). It is therefore clear that Plaintiff is attempting to manufacture a fact issue using attorney argument, which is impermissible. *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006) ("Conclusory allegations and attorney arguments are insufficient to overcome a motion for summary judgment.").

All available evidence in the summary judgment record shows that "'the decimal values of the set of possible digital inputs' in the Digital-Driven Products consist of only four decimal values: 0, 1, 2 and 3." (D.I. 258 at 10 (citing D.I. 236, Ex. 1 ¶ 484)). Similarly, all available evidence in the summary judgment record shows "that 'the decimal values of the set of possible

---

[10]  Specifically, Professor Dallesasse was opining about Defendants' "silicon photonics 100G 'single lambda' Accused Products . . . ." (D.I. 236, Ex.7 ¶ 36).

[11]  When the decimal values for the set of possible digital outputs are calculated as if said outputs are binary values, using the method both parties agree is correct, (*see supra* § (III)(C)(1)), said decimal values are: (0, 1, 3, and 7).

39

digital outputs' in the Digital-Driven Products [also] consist of only those same four decimal values (0, 1, 2, 3)." (*Id.* (citing D.I. 236, Ex. 1 ¶ 484; D.I. 236, Ex. 7 ¶ 36); *see also* D.I. 244 at 16 (not disputing that the only difference between the decimal values of the sets of possible digital inputs and outputs have the same values in different orders, but instead only disputing that whether or not such sets are identical.)). The Court agrees with Defendants that "[t]hose are the only facts needed for summary judgment." (D.I. 258 at 10). That the sets are differently ordered, or that the sets comprise a different number of bits, is without consequence for the present motion. (*See supra* § (III)(C)(1)-(2)). Defendants' Summary Judgment Motion of Noninfringement as to the Digital-Driven Products is therefore GRANTED.[12]

### D.   The Accused Products Do Not Infringe the "Deltas" Limitation Present in Some of the Asserted Claims

Although, because summary judgment of noninfringement was already granted as to all Accused Products for all Asserted Claims, the Court is not required to analyze Defendants' argument that the Accused Products do not practice the "Deltas" limitation present in some of the Asserted Claims. However, in the interest of developing a more fulsome record, it does so. For the reasons stated below, the Court agrees with Defendants that Plaintiff failed to show sufficient evidence for a jury to find that the Accused Products infringe the Asserted Claims with the "Deltas" limitation.

#### 1.   The "Deltas" limitation requires at least three Deltas

"Independent claims 1 and 58 of the '998 [P]atent, and claim 23 of the '872 [P]atent, each include a pair of 'deltas' limitations." (D.I. 221 at 20; *see also* '998 Patent at Claims 1 & 58; '872 Patent at Claim 23). As noted above, these limitations recite:

---

[12]   Because the Court grants summary judgment of noninfringement as to the Digital-Driven Products, it declines to adopt the negative limitation proposed by Defendants. (*See* D.I. 221 at 18-20).

> wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease; and
>
> wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase.

(*See, e.g.*, '998 Patent at Claim 1)[13]. "The parties agree that a 'delta' is the difference between two numerical values." (D.I. 221 at 20). However, the parties disagree as to how many "deltas" are required to show that said "deltas" in the first subset decrease and, in the second subset, increase. (*Contrast* D.I. 221 at 24 ("there must be successive decreasing deltas and successive increasing deltas"), *with* D.I. 244 at 19 ("The thing that has to be increasing or decreasing is the two deltas . . . .")).

The Court agrees with Defendants. The plain language of the Asserted Claims (where this limitation is present) requires that there be at least three deltas for each subset. For the first subset, the "deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease." (*See, e.g.*, '998 Patent at Claim 1). The Court construes this claim element as requiring at least *two* deltas that *decrease* compared to the prior delta. To have two deltas decrease, there must be three total deltas. This way, the second delta will have decreased when compared to the first delta, and the third delta will have decreased when compared with the second delta.

---

[13]    Claim 23 of the '872 Patent contains a slightly different "deltas" limitation, but the changes between the "deltas" limitation in the '872 Patent and the '998 Patent are inconsequential to the Court's analysis.

The above logic is equally applicable as to the deltas relating to the second subset of successively increasing digital input values. Because this limitation also requires that "deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase," there must be at least two deltas that increase, and thus there must be three total deltas corresponding to this subset as well. (*See, e.g.*, '998 Patent at Claim 1).

Notably, the Court finds this construction to be consistent with Plaintiff's expert's opinions on the term. Plaintiff cites to a paragraph in Professor Dallesasse's Reply Report where he discusses this limitation:

> 36.    Similarly, the mapping Dr. MacFarlane discusses for the silicon photonics 100G "single lambda" Accused Products meets the actual requirements of the deltas elements. *See, e.g.*, [D.I. 242, Ex. 7] ¶ 693. It includes a subset of increasing inputs (0, 1, 2), with a subset of outputs (0, 1, 3) *in which the deltas between outputs (1, 2) are increasing*. Those values also include a second subset of increasing inputs (1, 2, 3), with a second subset of outputs (1, 3, 2) *in which the deltas between outputs (2, 1) are decreasing*. *Id.*

(D.I. 245, Ex. S ¶ 36 (emphasis added)). Professor Dallesasse opines that the deltas between outputs in the first subset are increasing, and that the deltas between outputs in the second subset are decreasing. (*Id.*). However, the Court finds that Professor Dallesasse cannot determine whether or not values are increasing or decreasing based solely on two numbers. Clearly, deltas between outputs in the first subset have *increased*, and the deltas between outputs in the second subset have *decreased*, but without a trend (which requires at least three values) such values cannot be said to be *increasing* and *decreasing*. Professor Dallesasse's report seemingly recognizes such a requirement in the claims.

Therefore, the Court holds that to meet the "deltas" limitations present in some of the Asserted Claims, there must be at least three such "deltas" in each of the two subsets.

2.      The Court Grants Summary Judgment as to the Accused Devices for the Asserted Claims Containing the "Deltas" Limitation

Here, Plaintiff does not appear to contest that any of the Accused Devices have deltas between outputs in the first subset that are increasing, and deltas between outputs in the second subset that are decreasing, that fall within the scope of the Court's construction. (*See* D.I. 244 (Plaintiff failing to identify any three deltas that are increasing or decreasing in accordance with the subsets specified by the claims)). Instead, Plaintiff attempts to create a genuine issue of material fact by alleging disputes over claim construction. (*See, e.g.,* D.I. 244 at 18 (Defendants' "interpretation of the claim language is disputed – and so cannot support summary judgment" for Defendants)). Therefore, the Court also grants summary judgment for all Accused Products as to the Asserted Claims containing the "deltas" limitations.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment of No Infringement (D.I. 220) is GRANTED. An appropriate Order will follow.

Because this Memorandum Opinion is filed under seal, the parties shall meet and confer and, no later than twenty-one (21) days after entry of this Memorandum Opinion, submit a joint proposed redacted version of this Memorandum Opinion accompanied by a supporting memorandum, detailing how, under applicable law, the Court may approve any requested redactions. In the absence of a timely, compliant request, the Court will unseal the entire Memorandum Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMOT AT TEL AVIV UNIVERSITY
LTD.,

                Plaintiff,

                v.

CISCO SYSTEMS, INC. and
ACACIA COMMUNICATIONS, INC.,

                Defendants.

C.A. No. 22-674-GBW (consolidated)

## ORDER

AND NOW, this 18th day of November 2025 and based on the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment of No Infringement (D.I. 220) is **GRANTED.**

2. For the reasons stated in the Memorandum Opinion issued with this Order, Final Judgment of Noninfringement is entered in favor of Defendants and against Plaintiff with respect to claims 1, 5, 7, 10, 11, 15, 20, 23, and 27 of U.S. Patent No. 11,133,872 and claims 1, 4, 13, and 58 of U.S. Patent No. 11,342,998.

3. The parties' following motions are **DENIED AS MOOT**:

   a. Plaintiff's Motion to Preclude Expert Testimony from Dr. Duncan MacFarlane (D.I. 209);

   b. Plaintiff's Motion to Preclude Expert Testimony from Mr. Christopher Martinez (D.I. 210);

Appx92

    c.  Defendants' Motion to Exclude the Opinions and Testimony of Stephen E. Dell (D.I. 217); and

    d.  Plaintiff's Motion for Reconsideration (D.I. 289).

4.  Given the grant of summary judgment of noninfringement in Defendants' favor, the Court intends to cancel the five (5) day jury trial scheduled to begin on December 1, 2025 in this action, unless otherwise notified by the parties of the need for the trial to proceed on some remaining issue(s). Therefore, the parties shall meet and confer and, by no later than November 25, 2025, file with the Court a joint status report informing the Court of any remaining issue(s) that need to tried in this consolidated action on December 1, 2025, or whether the parties agree that the trial scheduled to begin on December 1, 2025 can be cancelled without prejudice to any rights to appeal the summary judgment ruling.

5.  Because the Memorandum Opinion issued with this Order was filed under seal, the parties shall meet and confer and, no later than twenty-one (21) days after entry of this Order, submit a joint proposed redacted version of the Memorandum Opinion issued with this Order, accompanied by a supporting memorandum, detailing how, under applicable law, the Court may approve any requested redactions. In the absence of a timely, compliant request, the Court will unseal the entire Memorandum Opinion.

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

2

Appx93

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RAMOT AT TEL AVIV UNIVERSITY LTD., )
                                         )
            Plaintiff,            )
                                           )
    v.                            )    C.A. No. 22-674 (GBW)
                                           )    CONSOLIDATED
CISCO SYSTEMS, INC. and            )
ACACIA COMMUNICATIONS, INC.,     )
                                           )
           Defendants.        )

**FINAL JUDGMENT**

WHEREAS, on September 28, 2021, Cisco Systems, Inc. and Acacia Communications, Inc. filed a complaint for declaratory judgment of non-infringement of U.S. Patent No. 11,133,872 ("the '872 Patent") (C.A. No. 21-1365, D.I. 1) ("the 21-1365 Action");

WHEREAS, on February 7, 2022, Ramot at Tel Aviv University Ltd. filed a counterclaim of infringement of the '872 Patent (C.A. No. 21-1365, D.I. 8);

WHEREAS, on May 24, 2022, Cisco Systems, Inc. and Acacia Communications, Inc. filed a complaint for declaratory judgment of non-infringement of U.S. Patent No. 11,342,998 ("the '998 Patent") (C.A. No. 22-674, D.I. 1) ("the 22-674 Action");

WHEREAS, on July 29, 202, Ramot at Tel Aviv University Ltd. filed a counterclaim of infringement of the '998 Patent (C.A. No. 22-674, D.I. 10);

WHEREAS, Ramot At Tel Aviv University Ltd. filed an action against Defendants for infringement of the '998 Patent in the Eastern District of Texas, which was transferred to this District (*see* C.A. No. 23-12, D.I. 52, 54) and consolidated with the 22-674 Action (*see* D.I. 50)[1];

WHEREAS, the 21-1365 and 22-674 Actions were consolidated, and the parties were re-

---

[1]     All docket citations are to C.A. No. 22-674, unless otherwise noted.

aligned to have Ramot as "Plaintiff" and Cisco and Acacia as "Defendants" (*see* D.I. 275; *see also* D.I. 305 at 1 n.1);

WHEREAS, on November 18, 2025, the Court granted Defendants' motion for summary judgment of no infringement of claims 1, 5, 7, 10, 11, 15, 20, 23, and 27 of the '872 Patent and claims 1, 4, 13, and 58 of the '998 Patent (D.I. 305, 306);

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.    Final Judgment of non-infringement of claims 1, 5, 7, 10, 11, 15, 20, 23, and 27 of the '872 Patent and claims 1, 4, 13, and 58 of the '998 Patent is entered in favor of Defendants and against Plaintiff;

2.    Any assessment of costs, including under Federal Rule of Civil Procedure 54(d) and Local Rule 54.1, or motion seeking attorneys' fees, including under Federal Rule of Civil Procedure 54 (d) and Local Rule 54.3, shall be deferred until all appeals relating to this litigation have been exhausted.  If Ramot does not file an appeal in this litigation, Defendants' deadline for filing such motions and their bills of costs shall be extended to 30 days after the deadline for Ramot to file an appeal has lapsed.

SO ORDERED, this 1st day of December, 2025

_____
The Honorable Gregory B. Williams

- 2 -

Appx95



US011133872B2

## (12) United States Patent
### Ehrlichman et al.

(10) **Patent No.:** US 11,133,872 B2
(45) **Date of Patent:** Sep. 28, 2021

(54) **LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR**

(71) Applicant: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Yossef Ehrlichman**, Nazareth Ilit (IL); **Ofer Amrani**, Tel Aviv (IL); **Shlomo Ruschin**, Herzliya (IL)

(73) Assignee: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/532,567**

(22) Filed: **Aug. 6, 2019**

(65) **Prior Publication Data**

US 2019/0363798 A1 Nov. 28, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/386,391, filed on Apr. 17, 2019, now Pat. No. 10,461,866, which is a

(Continued)

(51) **Int. Cl.**
**H03M 3/00** (2006.01)
**H04B 10/516** (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... **H04B 10/516** (2013.01); **G02F 1/0121** (2013.01); **G02F 1/225** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. H04B 10/516; H04B 10/2575; H04B 10/2504; H04B 10/556; H04B 10/505;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,288,785 A | 9/1981 | Papuchon et al. | |
| 4,613,204 A | 9/1986 | Verber et al. | |
| | (Continued) | | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 602005000276 | 5/2007 |
| EP | 0020216 | 12/1980 |
| | (Continued) | |

OTHER PUBLICATIONS

International Search Report dated May 24, 2019 From the International Searching Authority Re. Application No. PCT/KR2019/001610. (3 Pages).

(Continued)

*Primary Examiner* — Jean B Jeanglaude
(74) *Attorney, Agent, or Firm* — Artegis Law Group, LLP

(57) **ABSTRACT**

In a system for converting digital data into a modulated optical signal, an electrically controllable device having M actuating electrodes provides an optical signal that is modulated in response to binary voltages applied to the actuating electrodes. A digital-to-digital converter provides a mapping of input data words to binary actuation vectors of M bits and supplies the binary actuation vectors as M bits of binary actuation voltages to the M actuating electrodes, where M is larger than the number of bits in each input data word. The digital-to-digital converter maps each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words.

**30 Claims, 13 Drawing Sheets**



## Related U.S. Application Data

continuation of application No. 16/234,635, filed on Dec. 28, 2018, now Pat. No. 10,270,535, which is a continuation of application No. 15/298,373, filed on Oct. 20, 2016, now Pat. No. 10,205,527, which is a continuation of application No. 14/922,165, filed on Oct. 25, 2015, now Pat. No. 9,479,191, which is a continuation of application No. 14/662,343, filed on Mar. 19, 2015, now Pat. No. 9,203,425, which is a continuation of application No. 14/325,486, filed on Jul. 8, 2014, now Pat. No. 9,031,417, which is a continuation of application No. 13/280,371, filed on Oct. 25, 2011, now Pat. No. 8,797,198, which is a continuation of application No. 12/636,805, filed on Dec. 14, 2009, now Pat. No. 8,044,835, which is a continuation-in-part of application No. PCT/IL2008/000805, filed on Jun. 12, 2008.

(60) Provisional application No. 60/943,559, filed on Jun. 13, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G02F 1/01* | (2006.01) |
| *G02F 7/00* | (2006.01) |
| *G02F 1/225* | (2006.01) |
| *H04B 10/50* | (2013.01) |
| *H04B 10/25* | (2013.01) |
| *H04B 10/2575* | (2013.01) |
| *H04B 10/556* | (2013.01) |
| *H03M 1/70* | (2006.01) |
| *H04B 10/54* | (2013.01) |
| *H03M 1/00* | (2006.01) |
| *G02F 1/015* | (2006.01) |
| *G02F 1/21* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G02F 7/00* (2013.01); *H03M 1/002* (2013.01); *H03M 1/70* (2013.01); *H04B 10/2575* (2013.01); *H04B 10/25891* (2020.05); *H04B 10/505* (2013.01); *H04B 10/541* (2013.01); *H04B 10/556* (2013.01); *G02F 1/015* (2013.01); *G02F 1/212* (2021.01); *G02F 2203/19* (2013.01); *H04B 10/5055* (2013.01)

(58) **Field of Classification Search**
CPC ..... H04B 10/541; H04B 10/5055; G02F 7/00; G02F 1/225; G02F 1/0121; G02F 2001/212; G02F 2203/19; G02F 1/015; H03M 1/002; H03M 1/70
USPC .................................................. 341/143, 137
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,649,505 | A | 3/1987 | Zinser, Jr. et al. |
| 5,137,359 | A | 8/1992 | Steele |
| 5,418,976 | A * | 5/1995 | Iida ........................ G06F 9/3879 |
| | | | 712/38 |
| 5,543,952 | A | 8/1996 | Yonenaga et al. |
| 5,625,722 | A * | 4/1997 | Froberg ............... H04B 10/505 |
| | | | 341/68 |
| 5,694,504 | A | 12/1997 | Yu et al. |
| 5,724,178 | A | 3/1998 | Grandpierre et al. |
| 5,917,638 | A | 6/1999 | Franck et al. |
| 6,760,111 | B1 | 7/2004 | Mark et al. |
| 6,781,537 | B1 | 8/2004 | Taraschuk et al. |
| 6,781,741 | B2 | 8/2004 | Uesaka |
| 7,061,414 | B2 | 6/2006 | Chen et al. |

| | | | |
|---|---|---|---|
| 7,146,109 | B2 | 12/2006 | Chen et al. |
| 7,167,651 | B2 * | 1/2007 | Shpantzer .......... H04B 10/2543 |
| | | | 398/152 |
| 7,203,552 | B2 | 4/2007 | Solomon |
| 7,212,292 | B2 | 5/2007 | Van Brocklin et al. |
| 7,277,603 | B1 * | 10/2007 | Roberts ................. G02F 1/0121 |
| | | | 385/1 |
| 7,308,210 | B2 * | 12/2007 | Khayim ............... H04B 10/505 |
| | | | 398/198 |
| 7,403,711 | B2 | 7/2008 | Chen et al. |
| 7,483,597 | B2 | 1/2009 | Shastri et al. |
| 7,536,112 | B2 | 5/2009 | Yonenaga et al. |
| 7,609,935 | B2 * | 10/2009 | Burchfiel ............. H04B 10/505 |
| | | | 385/147 |
| 7,792,398 | B2 | 9/2010 | Tanaka et al. |
| 7,873,284 | B2 | 1/2011 | Chen et al. |
| 7,978,390 | B2 | 7/2011 | Kikuchi |
| 8,044,835 | B2 | 10/2011 | Ehrlichman et al. |
| 8,797,198 | B2 * | 8/2014 | Ehrlichman .......... G02F 1/0121 |
| | | | 341/137 |
| 9,031,417 | B2 | 5/2015 | Ehrlichman et al. |
| 9,203,425 | B2 | 12/2015 | Ehrlichman et al. |
| 9,490,902 | B2 | 11/2016 | Goodwill |
| 9,991,966 | B1 | 6/2018 | Celo et al. |
| 10,033,465 | B2 | 7/2018 | Ehrlichman et al. |
| 10,205,527 | B2 | 2/2019 | Ehrlichman et al. |
| 10,270,535 | B1 * | 4/2019 | Ehrlichman ......... H04B 10/541 |
| 10,461,866 | B2 * | 10/2019 | Ehrlichman .............. G02F 7/00 |
| 10,635,535 | B2 * | 4/2020 | Cha ...................... G11C 11/4093 |
| 2003/0076570 | A1 | 4/2003 | Schemmann et al. |
| 2004/0208614 | A1 | 10/2004 | Price |
| 2004/0213170 | A1 | 10/2004 | Bremer |
| 2005/0238367 | A1 | 10/2005 | Chen et al. |
| 2007/0212076 | A1 | 9/2007 | Roberts et al. |
| 2008/0018513 | A1 * | 1/2008 | Frazier ...................... G02F 7/00 |
| | | | 341/144 |
| 2008/0187015 | A1 | 8/2008 | Yoshikawa et al. |
| 2010/0156679 | A1 * | 6/2010 | Ehrlichman ......... G02F 1/0121 |
| | | | 341/50 |
| 2012/0081245 | A1 * | 4/2012 | Ehrlichman ......... G02F 1/0121 |
| | | | 341/137 |
| 2012/0213531 | A1 | 8/2012 | Nazarathy et al. |
| 2012/0301149 | A1 | 11/2012 | Pinguet et al. |
| 2014/0321857 | A1 | 10/2014 | Ehrlichman et al. |
| 2015/0194982 | A1 | 7/2015 | Ehrlichman et al. |
| 2016/0043732 | A1 * | 2/2016 | Ehrlichman ......... G02F 1/0121 |
| | | | 341/137 |
| 2016/0269121 | A1 | 9/2016 | Lee et al. |
| 2017/0294968 | A1 | 10/2017 | Ehrlichman et al. |
| 2017/0302291 | A1 | 10/2017 | Ehrlichman et al. |
| 2019/0273561 | A1 | 9/2019 | Ehrlichman et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0957596 | 11/1999 |
| EP | 1036302 | 9/2000 |
| EP | 2896993 | 7/2015 |
| JP | 2012-114185 | 6/2012 |
| KR | 10-2004-0054217 | 6/2004 |
| KR | 10-1086788 | 11/2011 |
| KR | 10-1818725 | 1/2018 |
| KR | 10-2018-0015630 | 2/2018 |
| WO | WO 2004/074914 | 9/2004 |
| WO | WO 2008/152642 | 12/2008 |
| WO | WO 2016/198282 | 12/2016 |

### OTHER PUBLICATIONS

Applicant-Initiated Interview Summary Dated Jul. 29, 2015 From the US Patent and Tradmark Office Re. U.S. Appl. No. 14/662,343.
Applicant-Initiated Interview Summary Dated Jul. 29, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/662,343.
Brief Communication Oral Proceedings on Sep. 18, 2014 dated Aug. 25, 2014 From the European Patent Office Re. Application No. 08763563.7.
Communication Pursuant to Article 94(3) EPC dated Jul. 12, 2013 From the European Patent Office Re. Application No. 08763563.7.

(56) **References Cited**

OTHER PUBLICATIONS

Communication Pursuant to Article 94(3) EPC dated Apr. 25, 2018 From the European Patent Office Re. Application No. 15157901.8. (4 Pages).

Communication Pursuant to Article 94(3) EPC dated Apr. 26, 2010 From the European Patent Office Re. Application No. 08763563.7.

Communication Pursuant to Article 94(3) EPC dated Jul. 30, 2018 From the European Patent Office Re. Application No. 15157901.8. (4 Pages).

European Search Report and the European Search Opinion dated Apr. 9, 2015 From the European Patent Office Re. Application No. 15157901.8.

Ex Parte Quayle OA Dated Jul. 22, 2019 From the US Patent and Trademark Office Re. U.S. Appl. No. 16/386,391. (10 pages).

International Preliminary Report on Patentability dated Dec. 7, 2009 From the International Bureau of WIPO Re. Application No. PCT/IL2008/000805.

International Search Report and the Written Opinion dated Nov. 3, 2008 From the International Searching Authority Re. Application No. PCT/IL2008/000805.

Notice of Allowance dated Mar. 18, 2019 From the US Patent and Trademark Office Re. U.S. Appl. No. 16/234,635. (8 pages).

Official Action dated Nov. 4, 2013 From the US Patent and Trademark Office Re. U.S. Appl. No. 13/280,371.

Official Action dated Jun. 7, 2018 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,373. (10 pages).

Official Action dated Aug. 14, 2017 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,327. (12 pages).

Official Action dated Dec. 14, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/922,165.

Official Action dated Feb. 16, 2011 From the US Patent and Trademark Office Re. U.S. Appl. No. 12/636,805.

Official Action dated May 22, 2015 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/662,343.

Official Action dated Oct. 24, 2017 From the US Patent and Trademark Office Re. U.S. Appl. No. 15/298,373. (18 pages).

Official Action dated Oct. 30, 2014 From the US Patent and Trademark Office Re. U.S. Appl. No. 14/325,486.

Provision of A Copy of the Minutes in Accordance With Rule 124(4) EPC dated Sep. 30, 2014 From the European Patent Office Re. Application No. 08763563.7.

Summons to Attend Oral Proceedings Pursuant to Rule 115(1) EPC dated Apr. 28, 2014 From the European Patent Office Re. Application No. 08763563.7.

Ehrlichman et al. "Generation of M-Ary Signals Using A Single Mach Zehnder Interfrometer", SPIE Digital Library, 7218, Integrated Optics: Devices, Materials, and Technologies XIII, 72180L, 5 Pages, Feb. 9, 2009.

Ehrlichman et al. "Generation of M-Ary Signals Using a Single MZI", School of Electrical Engineering Tel Aviv University, Israel,: 14 Pages, Presented at Photonics West 2009.

Ehrlichman et al. "Improved Digital-to-Analog Conversion Using Multi-Electrode Mach-Zehnder Interferometer", Journal of Lightwave Technology, 26(21): 3567-3575, Nov. 1, 2008.

Ehrlichman et al. "Multi-Electrode Approach for Interfacing Optical Computing Devices", School of Electrical Engineering Tel Aviv University, Israel, p. 1-25, Published in Vienna, Austria, Aug. 28, 2008.

Leven et al. "A 12.5 GSample/s Optical Digital-to-Analog Converter With 3.8 Effective Bits", The 17th Annual Meeting of the IEEE, Lasers and Electro-Optics Society 2004, LEOS 2004, 1: 270-271, Nov. 2004.

Vawter et al. "Digital Optical Phase Control in Ridge-Waveguide Phase Modulators", IEEE Photonics Technology Letters, XP000362933, 5(3): 313-315, Mar. 1, 1993.

Wang et al. "Research on the Modulation Phase Distortion Error Character of Y Wave-Guide in Fiber Optic Gyroscope", Proceedings of the 2008 International Symposium on Intelligent Information Technology Applications Workshop, IITAW '08, Shanghai, China, Dec. 21-22, 2008, p. 847-850, Dec. 21, 2008.

Yacoubian et al. "Digital-to-Analog Conversion Using Electrooptic Modulators", IEEE Photonics Technology Letters, 15(1): 117-119, Jan. 2003.

Zumbahlen "Basic Linear Design: Digital-to-Analog Converter Architectures: Intentionally Nonlinear DACs", Analog Devices Ltd., Section 6.1: 6.37-6.39, 2007.

U.S. Appl. No. 60/943,559, filed May 16, 2008, Ehrlichman.

Complaint for Patent Infringement Dated Jun. 12, 2019 in the US District Court for the Eastern District of Texas Marshall Division, Ramot at Tel Aviv University Ltd. v. Cisco Systems, Inc. (28 pages).

Curriculum Vitae of Professor Daniel J. Blumenthal, 43 P.

Declaration of Daniel Blumenthal Dated Nov. 4, 2019 Under 37 C.F.R. § 1.68 in Support of Petition for Inter Partes Review (U.S. Pat. No. 10,270,535). (134 pages).

Declaration of Daniel Blumenthal Dated Nov. 4, 2019 Under 37 C.F.R. § 1.68 in Support of Petition for Inter Partes Review for U.S. Pat. No. 10,033,465. (135 Pages).

Declaration of Daniel Blumenthal Dated Jan. 30, 2020 Under 37 C.F.R. § 1.68 in Support of Petition for Inter Partes Review for U.S. Pat. No. 10,461,866. (138 Pages).

Declaration of Ingrid Hsieh-Yee, PHD, Dated Oct. 31, 2019 Under 37 C.F.R. § 1.68 in Support of Petition for Inter Partes Review (U.S. Pat. No. 10,033,465 and U.S. Pat. No. 10,270,535). (83 Pages).

File History for U.S. Appl. No. 12/636,805 (U.S. Pat. No. 8,044,835). (292 Pages).

File History for U.S. Appl. No. 14/662,343 (U.S. Pat. No. 9,203,425). (470 Pages).

File History for U.S. Appl. No. 16/386,391 (U.S. Pat. No. 10,461,866). (421 Pages).

Petition for Inter Partes Review Under 35. U.S.C. § 312 and 37 C.F.R. § 42.104—IPR2020-00122 Dated Nov. 5, 2019 Before the Patent and Appeal Board of the US Patent and Trademark Office Re. U.S. Pat. No. 10,033,465. (84 Pages).

Petition for Inter Partes Review Under 35. U.S.C. § 312 and 37 C.F.R. § 42.104—IPR2020-00123 Dated Nov. 5, 2019 Before the Patent and Appeal Board of the US Patent and Trademark Office Re. U.S. Pat. No. 10,270,535. (82 Pages).

Petition for Inter Partes Review Under 35. U.S.C. § 312 and 37 C.F.R. § 42.104—IPR2020-00484 Dated Jan. 31, 2020 Before the Patent Trial and Appeal Board of the US Patent and Trademark Office Re. U.S. Pat. No. 10,461,866. (80 Pages).

Prosecution History for U.S. Appl. No. 16/234,635 (U.S. Pat. No. 10,270,535). (325 Pages).

Prosecution History of U.S. Appl. No. 15/298,327 (U.S. Pat. No. 10,033,465). (380 Pages).

Ackerman et al. "Bias Controllers for External Modulators in Fiber-Optic Systems", Lightwave, 18(5): 1-15, May 1, 2001.

Agrawal "Optical Transmitters: Semiconductor Lasers", Fiber-Optic Communication Systems, 3rd Ed., Chaps.3, 4, 8, 2002.

Bridges et al. "Distortion in Linearized Electrooptic Modulators", IEEE Transactions on Microwave Theory and Techniques, 43(9): 2184-2197, Sep. 1995.

Gnauck et al. "Comparison of Direct and External Modulation for CATV Lightwave Transmission at 1•5 mu m Wavelenght", Electronics Letters, 28(20): 1875-1876, Sep. 24, 1992.

Ho "Phase-Modulated Optical Communication Systems", Springer Science & Business Media, p. 2-4, 10, 14, 22, 40-41, 303-316, 430, 2005.

IEEE "The Authoritative Dictionary of IEEE Standards Terms", The Institute of Electrical and Electronics Engineering, IEEE, Standards Information Network, 7th Edition, 11 pages, 2000.

Kaminow et al. Optical Fiber Telecommunications, B: Systems and Networks, Chap.2 ff: 27, 34, 43, 2008.

Saleh et al. Fundamentals of Photonics, John Wiley & Sons, p. 65-67, 240, 261, 273, 531-536, 616, 1994.

Order Granting Request for Ex Parte Reexamination Dated Jul. 20, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,527. (25 Pages).

Claim Construction Memorandum Opinion and Order Dated May 15, 2020 Submitted to the US Patent and Trademark Office Re. Request for Ex Parte Reexamination U.S. Pat. No. 10,033,465. (33 pages).

(56) **References Cited**

OTHER PUBLICATIONS

Decision Denying Institution of Inter Partes Review 35 U.S.C. § 314 Dated May 15, 2020 for IPR2020-00122. (26 pages).
Decision Denying Institution of Inter Partes Review 35 U.S.C. § 314 Dated May 15, 2020 for IPR2020-00123. (26 pages).
Ex Parte Reexamination Interview Summary—Pilot Program for Waiver of Patent Owner's Statement Dated Jun. 18, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,527. (3 Pages).
Ex Parte Reexamination Interview Summary—Pilot Program for Waiver of Patent Owner's Statement Dated Jun. 18, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,528. (3 Pages).
Ex Parte Reexamination Interview Summary—Pilot Program for Waiver of Patent Owner's Statement Dated Jun. 25, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,526 (3 Pages).
File History for U.S. Appl. No. 13/280,371 (U.S. Pat. No. 8,979,198). (374 Pages).
File History for U.S. Appl. No. 14/325,486 (U.S. Pat. No. 9,031,417). (427 Pages) Part I.
File History for U.S. Appl. No. 14/325,486 (U.S. Pat. No. 9,031,417). (427 Pages) Part II.
File History for U.S. Appl. No. 14/922,165 (U.S. Pat. No. 9,479,191). (333 Pages).
File History for U.S. Appl. No. 15/298,373 (U.S. Pat. No. 10,205,527). (390 Pages) Part I.
File History for U.S. Appl. No. 15/298,373 (U.S. Pat. No. 10,205,527). (390 Pages) Part II.
Notice of Assignment of Reexamination Request dated Jun. 11, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,527. (1 Page).
Notice of Assignment of Reexamination Request dated Jun. 12, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,528. (1 Page).
Notice of Assignment of Reexamination Request dated Jun. 17, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,526. (1 Page).
Notice of Reexamination Request Filing Date (Third Party Requester) Dated Jun. 17, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,526. (1 Page).
Notice of Reexamination Request Filing Dated (Third Party Requester) Dated Jun. 11, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,527. (1 Page).
Notice of Reexamination Request Filing Dated (Third Party Requester) Dated Jun. 12, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,528. (1 Page).
Order Granting Request for Ex Parte Reexamination Dated Jul. 10, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,526. (15 Pages).
Order Granting Request for Ex Parte Reexamination Dated Jun. 25, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,528. (37 Pages).
Request for Ex Parte Reexamination Dated Jun. 9, 2020 Submitted to the US Patent and Trademark Office Re. U.S. Pat. No. 10,033,465. (76 pages).
Request for Ex Parte Reexamination Dated Jun. 9, 2020 Submitted to the US Patent and Trademark Office Re. Patent No. 10,270,535. (76 pages).
Request for Ex Parte Reexamination Dated Jun. 9, 2020 Submitted to the US Patent and Trademark Office Re. U.S. Pat. No. 10,461,866. (71 pages).
Decision Denying Institution of Inter Partes Review Under 35. U.S.C. § 314—IPR2020-00484 Dated Aug. 18, 2020 Before the Patent Trial and Appeal Board of the US Patent and Trademark Office Re. U.S. Pat. No. 10,461,866. (21 Pages).
Office Action in Ex Parte Reexamination dated Oct. 13, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,528. (51 Page).
Claim Construction Order Dated May 15, 2020 from the US District Court for the Eastern District of Texas Marshall Division Re. Case No. 2:19-cv-00225-JRG. (33 pages).
Decision Denying Institution of Inter Partes Review 35 U.S.C. § 314 Dated Aug. 18, 2020 for IPR2020-00484. (22 pages).
Declaration of Gerard P. Grenier Dated Jul. 31, 2020 Submitted to the US District Court for the Eastern District of Texas Marshall Division Re. Case No. 2:19-cv-00225-JRG. (54 Pages).
Ex Parte Reexamination Official Action Dated Nov. 27, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,527. (26 Pages).
Ex-Parte Reexamination Interview Summary Dated Nov. 18, 2020 from the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,608. (3 pages).
File History for U.S. Reexamination 90/014,526 (U.S. Pat. No. 10,461,866). (468 Pages).
File History for U.S. Reexamination 90/014,527 (U.S. Pat. No. 10,270,535). (387 Pages).
Notice of Assignment of Reexamination Request dated Nov. 18, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,608. (1 Page).
Notice of Reexamination Request Filing Date (Third Party Requester) Dated Nov. 18, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,608. (1 Page).
Patent Owner's Preliminary Sur-Reply Dated Jun. 12, 2020 Submitted to the US Patent and Trademark Office Re. Case TPR2020-0484 (U.S. Pat. No. 10,461,866). (7 pages).
Office Action in Ex Parte Reexamination dated Oct. 20, 2020 From the US Patent and Trademark Office Re. U.S. Appl. No. 90/014,526. (17 Page).

* cited by examiner

FIG. 1





FIG. 2A
(PRIOR ART)

FIG. 2B

FIG. 2C



FIG. 3A

FIG. 3B

## FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |

## FIG. 5

| N=4 | | | N=8 | | | |
|-----|---|---|-----|---|---|---|
| U | O | | U | O | | |
| M=4-5 | M=4 | M=5 | M=8-10 | M=8 | M=9 | M=10 |
| 0.5 | 0.4073 | 0.4957 | 0.5 | 0.3871 | 0.5001 | 0.5 |
| 0.25 | 0.2443 | 0.2451 | 0.25 | 0.2243 | 0.25 | 0.2501 |
| 0.125 | 0.1506 | 0.1304 | 0.125 | 0.1311 | 0.125 | 0.1249 |
| 0.0625 | 0.0989 | 0.0527 | 0.0625 | 0.0799 | 0.0625 | 0.0625 |
| 0.0313 | | 0.038 | 0.0313 | 0.0527 | 0.0313 | 0.0312 |
| | | | 0.0156 | 0.0385 | 0.0155 | 0.0156 |
| | | | 0.0078 | 0.0312 | 0.0078 | 0.0079 |
| | | | 0.0039 | 0.0275 | 0.0038 | 0.004 |
| | | | 0.002 | | 0.002 | 0.0019 |
| | | | 0.001 | | | 0.001 |
| M=4: 0.9375 M=5: 0.9688 | 0.9011 | 0.9619 | M=8: 0.9961 M=9: 0.9981 M=10: 0.9991 | 0.9723 | 0.598 | 0.9991 |



FIG. 6A
(PRIOR ART)

FIG. 6B

FIG. 6C



FIG. 7A



FIG. 7B



FIG. 8



FIG. 9



FIG. 10



FIG. 11B

FIG. 11A



FIG. 12B

256-QAM



FIG. 12A

64-QAM





FIG. 14 (PRIOR ART)

# LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/386,391, filed Apr. 17, 2019, which is a continuation of U.S. patent application Ser. No. 16/234,635 filed on Dec. 28, 2018, now U.S. Pat. No. 10,270,535, which is a continuation of U.S. patent application Ser. No. 15/298, 373 filed on Oct. 20, 2016, now U.S. Pat. No. 10,205,527, which is a continuation of U.S. patent application Ser. No. 14/922,165 filed on Oct. 25, 2015, now U.S. Pat. No. 9,479,191, which is a continuation of U.S. patent application Ser. No. 14/662,343 filed on Mar. 19, 2015, now U.S. Pat. No. 9,203,425, which is a continuation of U.S. patent application Ser. No. 14/325,486 filed on Jul. 8, 2014, now U.S. Pat. No. 9,031,417, which is a continuation of U.S. patent application Ser. No. 13/280,371 filed on Oct. 25, 2011, now U.S. Pat. No. 8,797,198, which is a continuation of U.S. patent application Ser. No. 12/636,805, filed on Dec. 14, 2009, now U.S. Pat. No. 8,044,835, which is a continuation-in-part of PCT Patent Application No. PCT/IL2008/000805 filed on Jun. 12, 2008, which claims the benefit of priority of U.S. Provisional Patent Application No. 60/943, 559 filed on Jun. 13, 2007.

The contents of the above applications are all incorporated by reference as if fully set forth herein in their entirety.

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to optical modulators and, in particular, it concerns a linearized optical digital-to-analog modulator.

There is a tangible need for high-performance and large bandwidth digital to analog signal conversion. Furthermore, as the RF and digital domains converge, entirely new solutions will be needed to enable multi-GHz mixed-signal systems. Probably the most prominent area to benefit is the wireless communication industry. The ever increasing thirst for bandwidth will require data converters to deliver greatly increased performance. For example, analog signals are transmitted in cable television (CATV) via optical fibers and the demand for increasing bandwidth is driving technology to speed-up the processing of signals as well as the transmission. High performance digital to analog conversion is also required to address the growing demands of wireless carriers for supporting the heavy traffic expected in the base station. Additional specific areas to benefit include: the defense and government industries that concentrate on deploying multi-function, dynamically reconfigurable systems (RADAR, electronic warfare, and surveillance applications); medical imaging; and hyper/super-computer communications.

One of the most widely deployed devices for analog optics modulation is the Mach-Zehnder Interferometer modulator (MZI). For binary digital signals, it is today the preferred device for long-haul fiber-optic communication, leading to chirp-free pulses which can reach hundreds of kilometers in optical fibers without the need for regeneration. For analog applications, however, a serious problem is encountered due to the inherent non-linear response of the modulator. Specifically, since the modulating voltage via the electro-optic effect controls the optical phase delay in a basically linear fashion and the attenuation varies as the cosine of the phase difference between the two branches of the device, a linear variation in phase difference and thus in applied voltage results in a cosine-shaped output variation, as seen in the pattern of points in FIG. 2A. The common solutions for this problem are either the biasing of the device to a quasi linear regime coupled with reducing the modulation range to reduce distortion, or use of an analog pre-distortion circuit to feed the modulator. Since in practically all present systems signals are processed digitally, a multi-bit Digital-to-Analog Converter (DAC) device is needed with fast processing capabilities.

A DAC based on a multi-electrode MZI modulator concept was proposed many years ago by Papuchon et al. and is described in U.S. Pat. No. 4,288,785. In that device, the electrodes' sectioning length followed a conventional power-of-two digital sequence, which did not solve the non-linearity problem, and thus suffered from severe limitation in the dynamic range, and subsequently the attainable resolution. More recently, much more complex devices have been presented to cope with these problems: Yacoubian et al. ("*Digital-to-analog conversion using electrooptic modulators*," IEEE Photonics Technology Letters, vol. 15, pp. 117-119, January 2003), proposed the employment of one MZI modulator for each and every bit. A recently reported design by Leven et al. ("*A 12.5 gsamples/s optical digital-to-analog converter with 3.8 effective bits*," Lasers and Electro-Optics Society, 2004. LEOS 2004. The 17th Annual Meeting of the IEEE, vol. 1, pp. 270-271, November 2004), also the subject of U.S. Pat. No. 7,061,414 entitled "Optical Digital-To-Analog Converter" to Y K Chen et al., employs a single modulator for every 2 bits and is highly nonlinear; it yields only 3.8 effective bits for a 6 bit design.

There is therefore a need for a digital to analog converter which would offer improved linearity of response without sacrificing efficiency or dynamic range.

## SUMMARY OF THE INVENTION

The present invention is a linearized optical digital-to-analog modulator.

According to the teachings of the present invention there is provided, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuating device includes a digital-to-digital converter.

According to a further feature of the present invention, the modulator is a modulated semiconductor light generating device. According to an alternative feature of the present invention, the modulator is an electro-absorption modulator. According to yet a further alternative, the modulator is a Mach-Zehnder modulator.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the modulator includes M actuating electrodes on each of two waveguide branches of the modulator. In certain preferred cases, M is greater than N.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the optical signal according to a QAM (Quadrature Amplitude Modulation) modulation scheme with at least 16 constellation points.

According to a further feature of the present invention, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the optical signal to a minimum amplitude for a return-to-zero signal between successive input data words.

According to a further feature of the present invention, the modulator has a maximum dynamic range, and wherein the electrode actuating device is configured to actuate the actuating electrodes so as to generate modulation of the optical signal spanning a majority of the dynamic range.

According to a further feature of the present invention, the electrode actuating device is configured to apply one of two common actuating voltages to the actuating electrodes.

According to a further feature of the present invention, the actuating electrodes have differing effective areas. According to one set of applications, the differing effective areas form a set, members of the set being interrelated approximately by factors of two. In other preferred cases, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, the modulator has a non-linear response, and the electrode actuating device is configured to actuate the actuating electrodes so as to generate an improved approximation to a linear modulation of the optical signal as a function of the input data word.

According to a further feature of the present invention, there is also provided an optical to electrical converter deployed so as to generate an electrical signal as a function of intensity of the modulated optical signal.

There is also provided according to a further feature of the present invention, an apparatus comprising a digital-to-analog converter, the converter comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

There is also provided according to the teachings of the present invention, a method for converting a digital data input word of N bits into an analog signal comprising: (a) processing the digital data input word to generate an electrode actuation vector of M values where M N; and (b) applying M voltage values corresponding to the actuation vector values to M actuating electrodes of an electrically controllable modulator for modulating the intensity of an optical signal, wherein at least one value of the actuation vector varies as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuation vector is a binary vector, and wherein the M voltage values are selected from two voltage levels according to the M binary values.

According to a further feature of the present invention, the processing is performed by a digital-to-digital converter.

According to a further feature of the present invention, an electrical output is generated as a function of the intensity of the modulated optical signal.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) a semiconductor light generating device for generating an optical signal of variable intensity, the semiconductor light generating device including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the semiconductor light generating device, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, thereby generating an output intensity corresponding substantially to the input data word.

According to a further feature of the present invention, the actuating electrodes have differing effective areas.

According to a further feature of the present invention, the differing effective areas form a set, members of the set being interrelated approximately by factors of two.

According to a further feature of the present invention, the differing effective areas form a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, M=N.

According to a further feature of the present invention, the semiconductor light generating device is a semiconductor laser.

According to a further feature of the present invention, the semiconductor laser further includes a threshold electrode configured to provide a threshold actuation current.

According to a further feature of the present invention, the semiconductor light generating device is a light emitting diode.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the actuating electrodes have differing effective areas, the differing effective areas forming a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

At this point, it will be useful to define various terminology as used herein in the description and claims. The terms "digital" and "analog" are used in their normal senses as common in the field. Specifically, "digital" refers to a form of data where values are stored or processed numerically, typically broken up into bits of a binary number for machine processing, whereas "analog" refers to a form of data in which values are represented by different levels within a range of values of an essentially continuously variable parameter.

The phrase "digital-to-digital converter" is used to refer to a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical. The "digital-to-digital converter" employed by certain embodiments of the present

5

6

invention is a non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data, as will be clear from the description following.

The term "binary" is used to refer to values, voltages or other parameters which assume one or other of only two possible values, and modes of operation which use such parameters. In this context, voltage levels are referred to as "common" to a number of electrodes if activation of the electrodes is performed by switching connection of each of the electrodes between the voltage values in question.

The term "electrode" is used to refer to the electrical connections of an optical modulator device through which the device is controlled. In the case of an electrode which applies an electric field to affect the optical properties of an adjacent material, reference is made to an "effective area" which is used as an indication of the relative influence of the electrode compared to that of other electrodes on the optical properties of the underlying waveguide if actuated by a similar voltage. In many cases, the actuating electrodes are all of the same effective width, for example where they overlie a long narrow waveguide. The "effective area" may then be referred to as an "effective length", corresponding to the length of waveguide overlaid by the corresponding electrode and related to the "effective area" by a constant scaling factor. This scaling factor will vary according to variations in shape, width, waveguide properties or other design parameters. Any part of the electrode not overlying the active part of the modulator device or otherwise ineffective for generating modulation of an optical signal is not included in the "effective area".

The term "modulator" is used to refer to any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified.

The term "optical power" is used to refer to the quantitative manifestation of the analog optical signal.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

The invention is herein described, by way of example only, with reference to the accompanying drawings, wherein:

FIG. 1 is a schematic representation of a modulator device, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical or electrical signal;

FIG. 2A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing four electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 2B is a graph showing an intensity output generated according to an implementation of the present invention employing a full-range Mach-Zehnder modulator with four electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 2C is a graph similar to FIG. 2B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 3A is a graph showing the intensity output achieved by the modulator of the present invention implemented with five actuating electrodes for a four bit input word, where the five electrodes have lengths interrelated by factors of two;

FIG. 3B is a graph similar to FIG. 3A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 4 is a table illustrating a digital-to-digital converter input and output where the input corresponds to the input data word and the output corresponds to the electrode actuation pattern for generating the outputs of FIGS. 2B and 2C;

FIG. 5 is a table illustrating unoptimized and optimized normalized electrode lengths for cases on input words of 4 and 8 bits and numbers of electrodes of 4, 5, 8, 9 and 10;

FIG. 6A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing eight electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 6B is a graph showing an intensity output generated according to an implementation of the present invention employing a Mach-Zehnder modulator with eight electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 6C is a graph similar to FIG. 6B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 7A is a graph showing the intensity output achieved by the modulator of the present invention implemented with nine actuating electrodes for an eight bit input word, where the nine electrodes have lengths interrelated by factors of two;

FIG. 7B is a graph similar to FIG. 7A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 8 is a schematic representation of an alternative implementation of the present invention based upon an electro-absorption modulator (EAM);

FIG. 9 is a schematic representation of yet another alternative implementation of the present invention based upon a semiconductor laser;

FIG. 10 is a schematic representation of a modulator device, similar to the device of FIG. 1, implemented as a 16-QAM modulator;

FIG. 11A is a constellation diagram for the device of FIG. 10 illustrating a choice of constellation points, and corresponding electrode actuation patterns, for implementing a 16-QAM modulator;

FIG. 11B is a graph showing the symbol error rate performance for the devices of FIG. 12A implemented with different numbers of electrodes;

FIGS. 12A and 12B are simplified constellation diagrams showing only closest matching points for implementation of a 64-QAM using two sets of 7 electrodes and a 256-QAM using two sets of 10 electrodes, respectively;

FIGS. 13A and 13B are graphs showing the symbol error rate performance for the devices of FIGS. 12A and 12B, respectively; and

FIG. 14 is a schematic representation of a prior art Mach-Zehnder modulator configured as a DAC.

## DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present invention is a modulator device for converting digital data into analog modulation of an optical signal.

The principles and operation of modulator devices according to the present invention may be better understood with reference to the drawings and the accompanying description.

Referring now to the drawings, FIG. **1** shows schematically a modulator device, generally designated **10**, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical signal. Generally speaking, modulator device **10** has an electronic input **12** for receiving an input data word D of N bits and an electrically controllable modulator **14** for modulating the intensity of an optical signal represented by arrow **16**. Modulator **14** includes M actuating electrodes **18** where M N. Modulator device **10** also includes an electrode actuating device **20** responsive to the input data word D to supply an actuating voltage to the actuating electrodes **18**. It is a particular feature of a first aspect of the present invention that electrode actuating device **20** actuates at least one of actuating electrodes **18** as a function of values of more than one bit of the input data word D. In other words, at least one of the electrodes is actuated in a manner differing from a simple one-to-one mapping of data bits to electrode voltage, thereby providing freedom to choose the electrode actuation pattern which best approximates a desired ideal output for the given input. According to a second complementary, or alternative, aspect of the present invention, the effective areas of actuating electrodes are optimized so that at least some of the electrode effective areas differ from a simple factor-of-two series.

The basic operation of a first preferred implementation of modulator device **10** will be understood with reference to FIGS. **2**A and **2**B. FIG. **2**A shows the output intensity values which would be obtained by supplying a voltage sufficient to generate full dynamic range modulation to a set of four electrodes according to a direct mapping of each bit of a 4-bit input data word to a corresponding electrode. The full range of input values 0000 through 1111 and the corresponding output intensities have been normalized to the range 0-1. The marked deviation from linearity in the form of a cosine variation is clearly visible. In contrast, FIG. **2**B shows the output intensity using the same four electrodes after the input data has been mapped according to the teachings of the present invention to a pattern of electrode actuation approximating more closely to a linear response. In other words, for each input value, the output value from FIG. **2**A most closely approximating the corresponding theoretical linear response is determined, and the corresponding pattern of electrode actuation is applied. By way of example, in FIG. **2**A, it will be noted that output point **22** corresponding to an input of 0011 is higher than desired for the ideal linear response. The outputs generated by electrode actuation patterns corresponding to value 0100 (point **24**) is closer to the required value, and 0101 (point **26**) is even closer. An output pattern of 0101 is thus chosen to correspond to an input of 0011. The overall result is an output which much more closely approximates to a linear response as shown.

Most preferably, electrode actuating device **20** includes a digital-to-digital converter. It will be appreciated that such a converter may be implemented from very straightforward and high-speed logic components which make it feasible to employ the present invention in high frequency systems. Electronic input **12** may be simply the input pins of digital-to-digital converter **20**. FIG. **4** illustrates a preferred implementation of the digital-to-digital mapping employed to generate the output of FIG. **2**B. A digital-to-digital converter suitable for implementing the various embodiments of the present invention may readily be implemented using commercially available high-speed Application Specific Integrated Circuits ("ASIC"), as will be clear to one ordinarily skilled in the art.

The first implementation described thus far features N=M=4 with lengths of the electrodes retaining the conventional ratios of factors of two and employing simple on-off level voltage switching of a common actuating voltage to all currently actuated actuating electrodes. While such an implementation offers markedly improved linearity of response compared to the unmodified response of FIG. **2**A, it should be noted that the output intensity is not uniquely defined for each input value. Where uniqueness of the output values is required, or where a higher degree of linearity is needed, further modification may be required. Various forms of further modification may be employed including, but not limited to: use of multiple actuating voltage levels; use of modified electrode lengths; and addition of additional electrodes (i.e., M>N). These different options will be discussed below.

One option for further modification of the output is to modify the actuating voltage applied to each electrode, such as by switching between different distinct voltage levels.

An alternative preferred option for modifying the output to achieve a better approximation to a linear output is modification of the electrode lengths relative to the factor of two series assumed above. A non-limiting example of an approach for determining preferred electrode proportions will be presented below in the context of a Mach-Zehnder modulator. A corresponding practical example of electrode length values for N=M=4 is shown in the second column of FIG. **5**. FIG. **2**C illustrates the intensity output employing electrodes with lengths in the proportions listed. A comparison of the root-mean-square error from linearity for FIGS. **2**B and **2**C shows that the adjustment of electrode lengths results in an additional slight improvement to linearity.

A further option for modifying the performance of modulator device **10** is the addition of one or more additional electrodes, i.e., M>N. This provides an additional degree of freedom for correcting non-linearity of the response. In the case of unmodified electrode dimensions related by factors of two, each additional electrode is typically half the dimension of the previously smallest electrode. Where the electrode dimensions are further modified, the additional electrode dimension is preferably included within an optimization process in order to determine a preferred dimension for the additional electrode(s) along with the other electrodes. FIGS. **3**A and **3**B show outputs from the device of the present invention for an example of N=4 and M=5, with and without modification of the electrode dimensions, respectively. The electrode lengths are shown for the unmodified series in the first column of FIG. **5** and for the optimized length electrodes in the third column of FIG. **5**.

Parenthetically, although the present invention is described herein in the context of a preferred example of linearization of a modulator device which inherently has a non-linear response, the principles of the present invention may equally be applied to any case where a natural response of a modulator provides a first function and a desired response is a different second function which may be linear or non-linear. Thus, the present invention may be employed to convert a digital input into an analog output approximating to any desired response curve within the dynamic range of the modulator. Non-limiting examples include where a desired output response curve is sinusoidal or exponential, or where it is desired to increase the resolution or "contrast" of the output within a specific range of input values.

Clearly, the present invention is not limited to applications with 4-bit data input, and can be implemented with substantially any number of data bits commensurable with other limitations of the system, such as signal-to-noise requirements. By way of example, FIGS. **6A-6C**, **7A** and **7B** illustrate a number of implementations with 8-bit input data words. Specifically, for purpose of reference, FIG. **6A** shows the unmodified output of an 8-bit arrangement where each data bit is applied directly to a corresponding electrode, again showing the underlying cosine response of the modulator. FIG. **6B** illustrates the output of an implementation according to the teachings of the present invention with N=M=8 and standard lengths of electrodes interrelated by factors of 2, as in the fourth column of FIG. **5**. FIG. **6C** shows output for a similar device where the electrode lengths have been modified according to the values shown in the fifth column of FIG. **5**. FIGS. **7A** and **7B** show the output of similar devices for N=8 but with an extra electrode, i.e., M=9. In the case of FIG. **7A**, the device has unmodified electrode lengths as shown in the fourth column of FIG. **5**, while in the device of FIG. **7B**, the electrode lengths are modified according to the proportions shown in the sixth column of FIG. **5**.

### Example I—Mach-Zehnder Modulator

By way of example, there will now be presented a theoretical treatment of one particularly preferred example of modulator device **10** implemented using a Mach-Zehnder modulator, also referred to as a Mach-Zehnder Interferometer or "MZI". This theoretical treatment is presented to facilitate an understanding of the present invention and as a suggested technique for calculating certain parameters. However, it should be noted that the invention as described above has been found to be effective, independent of the accuracy or otherwise of this theoretical treatment.

The Mach-Zehnder modulator is an active integrated waveguide device consisting of a higher index guide region that splits into two paths which are combined again after a certain distance. Each of these paths is referred to as a leg or branch. When used as a switch, the MZI may be turned "off" by raising or lowering the index of refraction in one of the legs. This is achieved by employing the electro-optic effect to produce a 180-degree change in phase by means of optical-path length. Intermediate optical attenuation levels can be obtained by inducing changes other than 180 degrees.

In the case described above of FIG. **1**, a 4-bit Digital-to-Analog Converter, based on a Multi-Electrode (ME) Mach-Zehnder Interferometer, is presented. The input to the device consists of 4 bits. Using the Digital-to-Digital converter, which may be thought of as a look-up table, the 4 data bits are mapped to 5 electrodes as this realization is equipped with a single excess electrode. According to one option, if an electrical rather than optical output is desired, the optical signal at the output is detected and converted to an electrical (analog) signal.

It should be noted that, in the context of a MZI, it is common to split the electrodes to act in an opposite manner on the two legs of the device, for example, one side raising and the other lowering the refractive index of the material, thereby reducing the actuation voltage required. In such cases, the value M is the number of actuating electrodes on each of the two waveguide branches of the modulator.

Mathematical Description

The properties of the MZI may be described mathematically as follows. Let l denote a vector of electrode lengths. The number of elements in l is M. Also let V denote a

corresponding vector (of length M) of electrode control-voltages. When applying a voltage $V_j$ only to electrode $e_j$, whose length is $l_j$, the phase of light propagating in the modulating leg, shifts by

$$\pi \frac{V_j \cdot l_j}{v_\pi \cdot l_\pi},$$

where $v_\pi \cdot l_\pi$ corresponds to the voltage-length product leading to a $\pi$ shift in the phase. It is used as a merit figure of the MZI modulator. We define new normalized electrode length by:

$$L_j = \frac{l_j}{l_\pi} \tag{1}$$

Gathering the total contribution from all electrodes, the following transmission function of the MZI is obtained:

$$T(V, L) = \cos^2\left(\frac{\pi}{2} \frac{V \cdot L^T}{v_\pi}\right), \tag{2}$$

where the superscript T denotes transposition. The contribution from each electrode $e_j$, j=1, 2, ... M, to the total phase shift, is permitted by applying some non-zero voltage $V_j$=v. We chose to work with binary values for all electrode voltages, $V_j$=0, v, a clearly desirable requirement which, moreover, makes the design simpler as discussed next. Note that by setting the lower voltage to a value greater than zero, the maximum output level of the MZI is decreased thus reducing the dynamic range. Let $D_i$ denote a digital binary input vector of length N, where i=1, ..., $2^N$. For each digital vector $D_i$, the DDC component in FIG. **1** produces a corresponding binary vector $B_i$, of length M. $B_i$ multiplied by v, represents the actual (internal) vector of voltages controlling the M electrodes. When multiplying a real number, $B_i$ should be interpreted as binary vector whose elements are the real numbers {0,1}. With respect to (2), this means that when $V_j$=V, then $B_{ij}$=1, and when $V_j$=0, $B_{ij}$=0; $B_{ij}$ being the j-th element of the control vector $B_i$. At this time we define B to be a matrix of size $2^N \times M$ whose rows consist of the set of binary control vectors $B_i$, each of length M. Hence, (2) can be rewritten as

$$T(B_i, L) = \cos^2\left(\frac{\pi}{2} \frac{v}{v_\pi} \sum_{j=1}^{M} B_{ij} L_j\right) \tag{3}$$

Without loss of generality V=$V_\pi$ will be assumed henceforth. (Preferably $V_j$=$v_\pi$ to ensure full coverage of the modulating range and efficient use of the input optical power.) When the number of electrodes equals the number of data bits, i.e. when M=N, an implementation in a standard approach according to the system of FIG. **10** while trying to exploit the dynamic range of the transfer function (3) to its fullest results in high nonlinearity errors. This is demonstrated in FIG. **2A** for M=N=4. For this demonstration it is assumed that an unoptimized straightforward selection is made, where B is the set of all 16 binary 4-tuples, i.e. $B^T$={0000, ..., 1111} and L is taken as {0.5, 0.25, 0.125,

0.0625}. In the next section, one suggested approach to optimizing L and B will be proposed.

Optimization of B and L

In order to improve the linearity as well as the dynamic range of the conversion process, we propose that the lengths of the elements of L and the control vectors B be optimized. As described above, it is possible to optimize one or both of B and L. In practice, optimization of L alone may provide a non-monotonic variation of output together with some improvement in linearity and dynamic range. This may be sufficient for applications in which the non-linearity is relatively small, such as the semiconductor laser embodiments to be discussed below. For more significantly non-linear devices, the options of optimized B with unoptimized L, and optimized B and L are typically more suitable.

We consider these options separately since their implementation require different hardware. An unoptimized set of electrode lengths L consists of

$L_j=2^{-j}$, with j–1 . . . M. An unoptimized matrix B will consist of all $2^N$ binary N-tuples. In that case, with a slight abuse of notations we have that $B_i=D_i$; i=0, 1, 2, . . . $2^N-1$. Hence, designs with optimized B require Digital-to-Digital conversion while designs with optimized L only do not. Whenever B is optimized, and for any number of electrodes M; M≥N, it is understood that a binary input data vector $D_i$ has to be mapped to a control vector $B_i$, yet $B_i \neq D_i$. The DDC, implemented as all-electronic, shall perform this mapping operation.

As the optimization criterion we shall use the root mean square error (RMSE) between an ideal output, represented by a straight line, and the converter output. Let

$$U_i = \frac{i}{2^N}$$

denote the ideal analog value required for representing the digital input $D_i$. The RMSE is defined as follows:

$$g(B, L) = \sqrt{\frac{1}{2^N} \sum_{i=1}^{2^N} \left[ U_i - \cos^2\left( \frac{\pi}{2} \sum_{j=1}^{M} B_{ij}L_j \right) \right]^2} \tag{4}$$

The optimization problem can now be formulated as minimizing the values of g(B,L) for all possible values of the matrix B and the vector L.

Note that this optimum solution is aimed at minimizing the average (squared) deviation between the desired output and the converter output. Clearly, this is only one non-limiting example, and various other linearity measures may equally be used. Similarly, as mentioned earlier, the desired output response function itself may take any desired form, and for each function, a suitable optimization criterion must be selected.

Approaching (4) as a global optimization problem with an order of $O(2^N \times M)$ variables, is quite involved, especially since the variables are of mixed type, B is binary while L is real. (It is related to a nonlinear mixed integer zero-one optimization problem.) It is therefore typically preferred to employ a near-optimum two-step approach. First, B is determined assuming an unoptimized set of electrodes L, $L_j=2^{-j}$, with j=1 . . . M. The obtained matrix is denoted by $\tilde{B}$. Then, given $\hat{B}$, L is obtained such that (4) is minimized.

If L is an unoptimized set of electrodes, $L_j–2^{-j}$. Then, the output of the converter as given by (3) is a function of the control $B_i$ only. Since one aims at obtaining a straight line, whose quantized values are given by $U_i$, then it is not difficult to verify that the best approximated selection of $\hat{B}_i$ is given by

$$\hat{B}_i = Dec2Bin_M\left( \frac{2}{\pi} \arccos\left( \sqrt{U_i} \right) \right), \tag{5}$$

where the function $Dec2Bin_M(x)$ maps a real value x, 0<x≤1, to its closest M-bit binary representation. Note that this, in effect quantization, process may result in several input data vectors having the same analog representation. In applications in which this duplicate representation is considered problematic, it is effectively mitigated by choosing M>N.

Given $\hat{B}$, we proceed to optimize L. Assuming there exists a set of electrodes L such that

$$\cos^2\left( \frac{\pi}{2} \sum_{j=1}^{M} \hat{B}_{ij}L_j \right) \approx U_i; \forall i,$$

then as an alternative to (4), we may define an equivalent cost function, which is easier to handle mathematically:

$$h(L) = \left\{ \sum_{i=1}^{2^N} \left[ \frac{2}{\pi} \arccos\left( \sqrt{U_i} \right) - \sum_{j=1}^{M} \hat{B}_{ij}L_j \right]^2 \right\}. \tag{6}$$

To minimize this cost function, one needs to differentiate h(L) with respect to L and equate to 0:

$$\frac{\partial h}{\partial L_k} = 2\left\{ \sum_{i=1}^{2^N} \hat{B}_{ik}\left[ \frac{2}{\pi} \arccos\left( \sqrt{U_i} \right) - \sum_{j=1}^{M} \hat{B}_{ij}L_j \right] \right\} = 0; \forall k. \tag{7}$$

The following equation (more precisely set of equations) is obtained

$$\sum_{i=1}^{2^N} \sum_{j=1}^{M} \hat{B}_{ik} \hat{B}_{ij}L_j = \sum_{i=1}^{2^N} \hat{B}_{ik} \frac{2}{\pi} \arccos\left( \sqrt{U_i} \right), \tag{8}$$

where k=1, 2 . . . M. In matrix notation the set of equation translates to a simple expression

$$L = \left( \hat{B}^T \hat{B} \right)^{-1} \frac{2}{\pi} \left[ \arccos\left( \sqrt{U} \right) \hat{B} \right]^T, \tag{9}$$

where $\sqrt{U}$ amounts to a component-wise square root. The solution above grants us an optimized vector of lengths L.

Example II—Electro-Absorption Modulator

As mentioned earlier, the present invention is not limited to implementations based on Mach-Zehnder modulators,

13
14

and can be implemented using any device which modulates light intensity as a function of applied voltage. By way of one additional non-limiting implementation, FIG. **8** shows an analogous implementation of the present invention using an electro-absorption modulator.

An electro-absorption modulator (EAM) is a semiconductor device which allows control of the intensity of a laser beam via an electric voltage. Its operational principle is typically based on the Franz-Keldysh effect, i.e., a change of the absorption spectrum caused by an applied electric field, which usually does not involve the excitation of carriers by the electric field.

By realizing N or more electrodes we can use the EAM as a high speed electro-optical Digital-to-Analog converter, in a similar fashion as we used the MZI. As in modulator device **10** described above, this device includes an electronic input **12** for receiving an input data word D of N bits and an electrically controllable modulator **14** with M electrodes for modulating the intensity of an optical signal represented by arrow **16**. An electrode actuating device **20** is responsive to the input data word D to supply an actuating voltage to the actuating electrodes **18**.

Here too, to mitigate the non-linear behavior of the device, electrode actuating device **20** serves as a Digital-To-Digital Converter is employed to map an N bit input to a set of M electrodes, determining which of the M electrodes is actuated for each input value. The particular mapping varies according to the response characteristic of the particular modulator, but the principles of operation are fully analogous to those described above in the context of the Mach-Zehnder modulator implementation.

### Example III—Modulated Light Generation Device

The present invention is applicable also to other devices where digital information carried by voltage or current is translated into analog optical signals in the form of optical power. This includes also light generation devices like Light Emitting Diodes (LED) or semiconductor lasers. By way of illustration, FIG. **9** shows a semiconductor laser implementation of the present invention.

Specifically, FIG. **9** shows a semiconductor laser DAC device, generally designated **40**, constructed and operative according to the teachings of the present invention. The actuating electrode, typically implemented as a single contiguous electrode, is here subdivided into a threshold electrode **42** and M actuating electrodes **18**. The threshold electrode **42** is typically needed to reach a minimum activation current below which no significant output is generated. Actuating electrodes **18** are actuated as a function of the data bits of a digital input **12**, in this case a 4-bit data word, to generate an analog optical signal output of intensity representing the digital input.

In the particularly simple implementation illustrated here, neither L nor B is optimized. In other words, each actuating electrode **18** is part of a set interrelated with effective areas in 2:1 relation, and each electrode is actuated as a function of corresponding single bit of the input data word. The actuating current is typically roughly proportional to the area of electrodes actuated. This case is in itself believed to be patentable, and is thought to be of practical importance. Optionally, a closer approximation to a linear response can be achieved by modifying L (electrode proportions) and/or B (by including a DDC, not shown), all according to the principles discussed in detail above.

It will be appreciated that a similar device may be implemented using other semiconductor light generating devices, such as LEDs. Depending upon the details of the device used, threshold electrode **42** may not be necessary. This and any other necessary device-specific modifications will be self-evident to one ordinarily skilled in the art.

### Example IV—QAM Transmitter

Although described above in the context of devices for intensity/amplitude modulation, it should be noted that various embodiments of the present invention are also effective for modifying the phase of an optical signal, and can therefore be used as highly compact and simple QAM (Quadrature Amplitude Modulation) modulators or transmitters.

Specifically, referring back to FIG. **1**, it will be noted that, by configuring the digital-to-digital converter DDC **20** to apply different actuation patterns to the electrodes on the two branches of the Mach Zehnder Modulator (MZM), modulation of the output signal phase can be achieved. Such an implementation will now be described with specific reference to FIGS. **10-13B**.

Turning now to FIG. **10**, there is shown a modulator device, generally designated **100**, implemented as a QAM modulator. Modulator device **100** is essentially similar to the device of FIG. **1**, but has been relabeled to convey more clearly its function. Specifically, modulator device **100** has a first plurality $M_1$ of actuating electrodes **18a** deployed in operative relation to a first waveguide branch of the modulator and a second plurality $M_2$ of actuating electrodes **18b** deployed in operative relation to a second waveguide branch of the modulator. In this case, $M_1=M_2=5$. giving a total number of actuating electrodes M=10. The electrode actuating device is here shown as two distinct digital-to-digital converters **20a** and **20b**, which are configured to actuate the first and second pluralities of actuating electrodes **18a** and **18b** in response to a given input data word $D_i$ so as to additionally modulate the phase of the optical signal. Clearly, digital-to-digital converters **20a** and **20b** can alternatively be combined into a single DDC with M=10 outputs with suitable connections to the actuating electrodes on both branches of the waveguide.

It will be appreciated that modulator device **100** can serve as an optical 16-QAM transmitter based on a single multi-electrode MZM (ME-MZM). Each electrode is divided into 5 segments, separately driven by two voltage signals, 0 and V representing binary 0 and 1, respectively. The center electrode is a common ground for the active electrode segments. The role of the modulator is to generate a desired M-QAM constellation which is composed of complex optical field values. The modulator is expected to generate $2^M$ signals:

$$S_i = r_i e^{j\Theta_i}, r_i > 0, 0 \leq \theta_i \leq 2\pi, i=1, \ldots, 2^M, \qquad (10)$$

In our example of a 16-QAM with two sets of 5 electrodes, as an input, the QAM transmitter accepts an electrical 4-bit digital input word, denoted $D_i$. The input word is mapped by two Digital-to-Digital Converters (DDC) onto each of the 10 (electrode) segments, whose lengths are the vectors $L^{1,2}$. Each DDC outputs a 5-bit word, denoted as and $B_i^1$ and $B_i^2$. The output of transmitter can be written as:

$$E_{out,i} = \frac{1}{\sqrt{2}} E_{in} \exp\left\{ j2\pi \sum_{j}^{N_1} B_{ij}^1 L_j^1 \right\} + \frac{1}{\sqrt{2}} E_{in} \exp\left[ -j2\pi \sum_{j}^{N_2} B_{ij}^2 L_j^2 \right\} \qquad (11)$$

15

where $E_{in}$ the optical field amplitude entering the modulator and $N_1$, $N_2$ are the number of segments on each arm. The elements $L_j^{1,2} \in L^{1,2}$ represent normalized electrode lengths on each arm. The two-level $B_{ij}^{1,2}$ coefficients are elements of the matrices $B_i^{1,2}$ and represent whether voltage v was applied to the j-th segment, on the respective arm. The index j enumerates the electrodes, $j=\{1 \ldots N_{1,2}\}$ on each arm. The summation is normalized to span $0 \leq \Sigma_j^N B_{ij}^{1,2} L_j \leq 1$, such that each arm induces a phaseshift of $0 \leq \Delta\varphi \leq 2\pi$.

The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as "Direct Digital Driving". The modulator can be regarded as a 2D Digital-to-Analog (D/A) converter, that converts a digital word into an optical vector signal.

The design of the transmitter involves the setting of electrode lengths, $L^{1,2}$ and DDC mappings, $B_i^{1,2}$, that will generate all the required signals given in Eq. (10). An effective combination of the electrode lengths and digital mappings may be derived either by analytical methods or numerically. A simple numerical derivation will now be presented.

A ME-MZM with $N_{1,2}$ electrode segments on each arm is capable of generating $2^{(N_1+N_2)}$ signals. Thus, by choosing carefully the electrode lengths, and assuming the number of segments sufficient to generate at least $2^{(N_1+N_2)}>M$ different signals, all the required signals described by Eq. (10) can be picked out of the generated signals pool.

As an example, FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool

As an example, FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool which was generated with {5,5} electrodes. The best matched signals at the pool are marked in figure. It can be seen that there is a good match between the ideal and the best matched generated constellations.

Table 1 compares between an ideal 16-QAM constellation and a generated constellation with different combinations of number of electrodes each arm. It presents the symbol minimum distance and the root mean square error. The latter provides a measure of agreement between the ideal and generated constellations. Configurations with {2,2}, {2,3} and {3,3} electrodes provide less than 16 different signals (minimum distance of 0) and therefore cannot be used for generation of 16-QAM.

TABLE 1

| $N_1$, $N_2$ | Ideal | 4, 2 | 4, 3 | 4, 4 | 4, 5 | 5, 5 | 5, 6 | 6, 6 |
|---|---|---|---|---|---|---|---|---|
| Minimum Distance | 2 | 1.66 | 1.66 | 1.66 | 1.30 | 1.83 | 1.67 | 1.67 |
| RMSE | 0 | 4.64 | 4.64 | 4.53 | 4.42 | 4.64 | 4.52 | 4.57 |

FIG. 11B presents the Symbol Error Rate (SER) performance for a range of Signal to Noise Ratios (SNR) for an Additive White Gaussian Noise (AWGN) channel. It can be seen that when using (6,6 electrodes, the performance graph closely matches that of ideal 16-QAM constellation. Using a higher number of electrodes can lower the SER ever further toward the ideal curve. SER performance can be slightly improved by further tuning the decoding hypothesis testing at the receiver side to the generated constellation.

The electrode lengths used for the generation of FIG. 11B follow a binary sequences, $L^{1,2}=2^{-j}$. Tweaking the electrode lengths has small impact on the modulator performance. In Eq. (11), we assumed driving signals of 0 and $2V_\pi$. The high

16

driving signal can be lowered by extending the total electrode length twice its size. The opposite signs in the exponents in the two terms of Eq. (11) are already implemented by the geometry of the electrode disposition of FIG. 10, when the signs of the voltages applied are the same, since then the electric fields have opposite directions. Other electrode dispositions exist for different cuts of the electro-optic crystals, and the appropriate way of applying the voltage with the right signs should be clear to a person skilled in the art.

Referring now to FIGS. 12A-13B, it will be appreciated that the proposed modulator is capable of generating high order QAM constellations. FIG. 12A depicts the ideal 64-QAM constellation together with one generated using a {7,7} electrodes modulator, while FIG. 12B shows an ideal 256-QAM constellation together with the one generated using a {10,10} electrodes modulator. It can be seen that there is a good match between the ideal and the generated constellations. FIGS. 13A and 13B show the Symbol Error Rate performance for the generated constellations of FIGS. 12A and 12B, respectively.

A simple implementation of this embodiment described thus far generates Non-Return-to-Zero (NRZ) signals. NRZ permits constant intensity for similar consecutive bits, and is thus more susceptible to Inter-Symbol-Interference and other nonlinear propagation distortions. Return-to-Zero (RZ) format is a pulsed modulation where the signal "returns to zero" after every bit. This format provides better performance than NRZ, but usually requires additional hardware, such as a pulse carver. A transmitter based on the modulator of an embodiment of the invention can readily be extended to produce RZ pulses with minimal if any additional hardware. By adding an RZ control line to the DDC, as shown in FIG. 10, which serves as a trigger determining whether the output optical amplitude should be zero or other, the whole modulator will be capable of generating RZ signals. When the added control line is high, the DDC will map the electrode actuation pattern to the pattern corresponding to the middle point of the constellation, which is zero.

For the constellation presented in FIG. 10, $B_1=\{00010\}$ and $B_2=\{01110\}$ will output zero (or minimum) power because it will generate a phase difference of $\pi$ between the two arms of the MZM.

While the present invention has been presented as a digital-to-analog optical modulator, it should be noted that each embodiment of the invention may be modified to provide analog electrical output by use of an optical-to-electrical (O/E) converter. This option is illustrated in FIG. 1 as optional O/E converter 30. If the O/E converter itself has a non-linear response function, the present invention may advantageously be used to optimize the system parameters to linearize the electrical output rather than the (intermediate) optical output. Analogously, any nonlinearity induced by the optical medium used for transmitting the signal (e.g. optical fiber) can be compensated for by using O/E converter 30 as a linearizing device.

The present invention is applicable to substantially all applications requiring a DAC with optical or electrical output. Examples of particular interest include, but are not limited to, wireless communications systems, fiber-optic communication systems, cellular telephone networks, cable television, military applications, medical applications and hyper/super computer communications.

It will be appreciated that the above descriptions are intended only to serve as examples, and that many other embodiments are possible within the scope of the present invention as defined in the appended claims.

17
18

All publications, patents and patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present invention. To the extent that section headings are used, they should not be construed as necessarily limiting. In addition, any priority document(s) of this application is/are hereby incorporated herein by reference in its/their entirety.

What is claimed is:

1. A modulation system, the system comprising:
an input for a plurality of N digital input data bits;
an optical signal source for providing an input optical signal;
a modulator for modulating the input optical signal to output a modulation of the power of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and
a converter for:
converting, based on a digital-to-digital mapping, the plurality N digital input data bits to M digital output data bits associated with M drive voltage values, and
providing the M drive voltage values to the modulator for the modulating,
wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.

2. The modulation system of claim 1, wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of optical fibers during transmission and for distortion introduced by non-linear characteristics of the modulator.

3. The modulation system of claim 1, wherein the modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.

4. The modulation system of claim 1, wherein the converter comprises a digital to digital converter.

5. The modulation system of claim 1, wherein the converter receives the N digital input data bits and provides the M digital output data bits that enable the one or more modulated optical signal outputs to be corrected for non-linearities introduced by the modulation system.

6. The modulation system of claim 1, wherein the M digital output data bits correct non-linearities due to non-linear characteristics of the modulator and non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.

7. The modulation system of claim 1, wherein the M digital output data bits correct non-linearities in the modulated optical signal outputs due to non-linear characteristics of the modulator.

8. The modulation system of claim 1, wherein the M digital output data bits correct non-linearities in the modulated signal outputs due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.

9. The modulation system of claim 1, wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of optical fibers during transmission.

10. The modulation system of claim 1, wherein the converter is enabled to correct for distortion introduced by non-linear characteristics of the modulator.

11. A method for generating, outputting and transmitting one or more modulated optical signal outputs by a modulation system, the method comprising;
receiving N digital input data bits at a first input to the modulation system, the modulation system comprising one or more input optical signal sources, a modulator, a converter and one or more optical fibers;
converting, based on a digital-to-digital mapping, the N digital input data bits to M digital output data bits associated with M drive voltage values, wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator;
providing the M drive voltage values to the modulator;
inputting one or more input optical signals into the modulator of the modulation system from the one or more input optical signal sources;
modulating the one or more input optical signals responsive to the M drive voltages values, wherein said modulating the one or more input optical signals generates the one or more modulated optical signal outputs; and
coupling the one or more modulated optical signal outputs to one or more optical fibers for transmission.

12. The method of claim 11, wherein the modulator comprises one or more Mach-Zehnder modulators.

13. A method for converting digital inputs of N bits in parallel into modulated optical streams, comprising:
inputting into an optical modulator a digital input, wherein the digital input is one from a set of $2^N$ digital inputs that each has N bits of digital data, and wherein N>1; and
mapping, based on a digital-to-digital mapping, the digital input to a first digital output associated with M drive voltages, wherein the first digital output is one from a set of digital outputs that each has M bits of digital data, wherein the set of digital outputs comprises $2^M$ digital outputs, and wherein M>=N,
wherein the digital-to-digital mapping comprises, for each digital input included in the set of $2^N$ digital inputs, a mapping to a corresponding digital output included in the set of digital outputs,
wherein, for a first subset of successively decreasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively decreasing digital inputs in the first subset decrease, and
wherein, for a second subset of successively decreasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively decreasing digital inputs in the second subset increase.

14. The method of claim 13, wherein, for a third subset of successively decreasing digital inputs in the set of $2^N$ digital inputs, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively decreasing digital inputs in the third subset remain the same.

15. A modulation system, the system comprising:

an input for N digital input data bits;

a modulator that is a semiconductor light generating device enabled for directly generating, responsively to an input signal that is responsive to the N digital input data bits, one or more modulated optical signal outputs for transmission over one or more optical fibers; and

a converter for:

converting, based on a digital-to-digital mapping, the N digital input data bits to M digital output data bits associated with M drive voltage values, and

providing the M drive voltage values to the modulator for the generating,

wherein M>N and N>1, wherein the digital-to-digital mapping comprises, for each unique plurality of N digital input data bits, a mapping to a corresponding M digital output data bits, wherein, for a given plurality of N digital input data bits, the mapping to the corresponding M digital output data bits is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the modulator.

16. The modulation system of claim 15, wherein the converter is enabled to correct for distortion introduced in the modulator to the one or more modulated optical signal outputs.

17. The modulation system of claim 15, wherein the converter is enabled to correct for distortions introduced in transmitting the or more modulated optical signal outputs.

18. The modulation system of claim 15, wherein the M drive voltage values correct for distortion including non-linearities introduced in the one or more modulated optical signal outputs transmitted due to non-linear characteristics of the modulator and non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.

19. The modulation system of claim 15, wherein the converter comprises a digital to digital converter.

20. The modulation system of claim 15, wherein the converter receives the N digital input data bits and provides the input signals to the modulator that generates the one or more modulated optical signal outputs of variable intensity.

21. The modulation system of claim 15, wherein the M drive voltage values correct for distortion including non-linearities introduced in the one or more modulated optical signal outputs transmitted due to non-linear characteristics of the modulator.

22. The modulation system of claim 15, wherein the M drive voltage values correct for distortion including non-linearities due to non-linear characteristics of the one or more optical fibers transmitting the one or more modulated optical signal outputs.

23. A method for converting digital inputs of N bits in parallel into modulated optical streams, comprising:

inputting into an optical modulator a digital input, wherein the digital input is one from a set of $2^N$ digital inputs that each has N bits of digital data, and wherein N>1; and

mapping, based on a digital-to-digital mapping, the digital input to a first digital output associated with M drive voltages, wherein the first digital output is one from a set of digital outputs that each has M bits of digital data, wherein the set of digital outputs comprises $2^M$ digital outputs, and wherein M>=N,

wherein the digital-to-digital mapping comprises, for each digital input included in the set of $2^N$ digital inputs, a mapping to a corresponding digital output included in the set of digital outputs,

wherein, for a first subset of successively increasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively increasing digital inputs in the first subset decrease, and

wherein, for a second subset of successively increasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively increasing digital inputs in the second subset increase.

24. The method of claim 23, wherein, for a third subset of successively increasing digital inputs in the set of $2^N$ digital inputs, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively increasing digital inputs in the third subset remain the same.

25. The method of claim 23, wherein the optical modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.

26. The method of claim 23, further comprising modulating output signals, based on the M drive voltages, to correct for non-linearities due to non-linear characteristics of the optical modulator and non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.

27. The method of claim 23, wherein, for a given digital input in the set of $2^N$ digital inputs, the mapping to a corresponding digital output is determined based on a pattern for actuating drive voltages that alters the linearity of an optical response of the optical modulator.

28. The method of claim 23, wherein, for a third subset of successively decreasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively decreasing digital inputs in the third subset decrease.

29. The method of claim 23, wherein, for a fourth subset of successively decreasing digital inputs in the set of $2^N$ digital inputs specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital outputs corresponding to the successively decreasing digital inputs in the fourth subset increase.

30. The method of claim 11, wherein the one or more input optical signal sources includes a laser.

* * * * *

US011342998B2



## (12) United States Patent
### Ehrlichman et al.

(10) **Patent No.:**  **US 11,342,998 B2**
(45) **Date of Patent:**  **May 24, 2022**

(54) **LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR**

(71) Applicant: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Yossef Ehrlichman**, Nazareth Ilit (IL); **Ofer Amrani**, Tel Aviv (IL); **Shlomo Ruschin**, Herzliya (IL)

(73) Assignee: **Ramot at Tel-Aviv University Ltd.**, Tel-Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/481,904**

(22) Filed: **Sep. 22, 2021**

(65) **Prior Publication Data**

US 2022/0077936 A1  Mar. 10, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 16/532,567, filed on Aug. 6, 2019, now Pat. No. 11,133,872, which is a
(Continued)

(51) **Int. Cl.**
*H03M 3/00*  (2006.01)
*H04B 10/516*  (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... *H04B 10/516* (2013.01); *G02F 1/0121* (2013.01); *G02F 1/225* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. H04B 10/516; H04B 10/2575; H04B 10/25891; H04B 10/505; H04B 10/541;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,288,785 A | 9/1981 | Papuchon et al. | |
| 4,613,204 A | 9/1986 | Verber et al. | |
| | (Continued) | | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 602005000276 T2 | 5/2007 | |
| EP | 0 020 216 A1 | 12/1980 | |
| | (Continued) | | |

OTHER PUBLICATIONS

Yacoubian et al. "Digital-to-analog conversion using electrooptic modulators", IEEE Photonics Technology Letters, vol. 15, Jan. 2003, pp. 117-119.
(Continued)

*Primary Examiner* — Jean B Jeanglaude
(74) *Attorney, Agent, or Firm* — Artegis Law Group, LLP

(57)  **ABSTRACT**

In a system for converting digital data into a modulated optical signal, an electrically controllable device having M actuating electrodes provides and optical signal that is modulated in response to binary voltages applied to the actuating electrodes. A digital-to-digital converter provides a mapping of input data words to binary actuation vectors for M bits and supplies the binary actuation vectors as M bits of binary actuation voltages to the M actuating electrodes, where M is larger than the number of bits in each input data word. The digital-to-digital converter maps each digital input data word to a binary actuation vector by selecting a binary actuation vector from a subset of binary actuation vectors available to represent each of the input data words.

**63 Claims, 13 Drawing Sheets**



Appx123

### Related U.S. Application Data

continuation of application No. 16/386,391, filed on Apr. 17, 2019, now Pat. No. 10,461,866, which is a continuation of application No. 16/234,635, filed on Dec. 28, 2018, now Pat. No. 10,270,535, which is a continuation of application No. 15/298,373, filed on Oct. 20, 2016, now Pat. No. 10,205,527, which is a continuation of application No. 14/922,165, filed on Oct. 25, 2015, now Pat. No. 9,479,191, which is a continuation of application No. 14/662,343, filed on Mar. 19, 2015, now Pat. No. 9,203,425, which is a continuation of application No. 14/325,486, filed on Jul. 8, 2014, now Pat. No. 9,031,417, which is a continuation of application No. 13/280,371, filed on Oct. 25, 2011, now Pat. No. 8,797,198, which is a continuation of application No. 12/636,805, filed on Dec. 14, 2009, now Pat. No. 8,044,835, which is a continuation-in-part of application No. PCT/IL2008/000805, filed on Jun. 12, 2008.

(60) Provisional application No. 60/943,559, filed on Jun. 13, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G02F 1/01* | (2006.01) |
| *G02F 7/00* | (2006.01) |
| *G02F 1/225* | (2006.01) |
| *H04B 10/50* | (2013.01) |
| *H04B 10/25* | (2013.01) |
| *H04B 10/2575* | (2013.01) |
| *H04B 10/556* | (2013.01) |
| *H03M 1/70* | (2006.01) |
| *H04B 10/54* | (2013.01) |
| *H03M 1/00* | (2006.01) |
| *G02F 1/015* | (2006.01) |
| *G02F 1/21* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *G02F 7/00* (2013.01); *H03M 1/002* (2013.01); *H03M 1/70* (2013.01); *H04B 10/2575* (2013.01); *H04B 10/25891* (2020.05); *H04B 10/505* (2013.01); *H04B 10/541* (2013.01); *H04B 10/556* (2013.01); *G02F 1/015* (2013.01); *G02F 1/212* (2021.01); *G02F 2203/19* (2013.01); *H04B 10/5055* (2013.01)

(58) **Field of Classification Search**
CPC . H04B 10/556; H04B 10/5055; G02F 1/0121; G02F 1/225; G02F 7/00; G02F 1/015; G02F 1/212; G02F 2203/19; H03M 1/002; H03M 1/70
USPC ........................................ 341/143, 155, 144
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,649,505 A | | 3/1987 | Zinser, Jr. et al. |
| 5,010,346 A | * | 4/1991 | Hamilton .................. G02F 7/00 |
| | | | 250/227.12 |
| 5,137,359 A | | 8/1992 | Steele |
| 5,418,976 A | | 5/1995 | Iida |
| 5,543,952 A | | 8/1996 | Yonenaga et al. |
| 5,625,722 A | | 4/1997 | Froberg et al. |
| 5,694,504 A | | 12/1997 | Yu et al. |
| 5,724,178 A | | 3/1998 | Grandpierre et al. |
| 5,917,638 A | | 6/1999 | Franck et al. |
| 6,326,910 B1 | * | 12/2001 | Hayduk ................ H03M 1/361 |
| | | | 341/137 |

| | | | |
|---|---|---|---|
| 6,337,755 B1 | * | 1/2002 | Cao ..................... H04B 10/2572 |
| | | | 398/155 |
| 6,760,111 B1 | | 7/2004 | Mark et al. |
| 6,781,537 B1 | | 8/2004 | Taraschuk et al. |
| 6,781,741 B2 | | 8/2004 | Uesaka |
| 7,061,414 B2 | | 6/2006 | Chen et al. |
| 7,146,109 B2 | | 12/2006 | Chen et al. |
| 7,167,651 B2 | | 1/2007 | Shpantzer et al. |
| 7,203,552 B2 | | 4/2007 | Solomon |
| 7,212,292 B2 | | 5/2007 | Vanbrocklin et al. |
| 7,277,603 B1 | | 10/2007 | Roberts et al. |
| 7,308,210 B2 | | 12/2007 | Khayim et al. |
| 7,403,711 B2 | | 7/2008 | Chen et al. |
| 7,483,597 B2 | | 1/2009 | Shastri et al. |
| 7,536,112 B2 | | 5/2009 | Yonenaga et al. |
| 7,609,935 B2 | | 10/2009 | Burchfiel |
| 7,792,398 B2 | | 9/2010 | Tanaka et al. |
| 7,873,284 B2 | | 1/2011 | Chen et al. |
| 7,978,390 B2 | | 7/2011 | Kikuchi |
| 8,044,835 B2 | | 10/2011 | Ehrlichman et al. |
| 8,078,663 B2 | * | 12/2011 | Wilson ...................... G06E 3/00 |
| | | | 708/816 |
| 8,797,198 B2 | | 8/2014 | Ehrlichman et al. |
| 9,031,417 B2 | | 5/2015 | Ehrlichman et al. |
| 9,203,425 B2 | | 12/2015 | Ehrlichman et al. |
| 9,479,191 B2 | * | 10/2016 | Ehrlichman ............ G02F 1/225 |
| 9,490,902 B2 | | 11/2016 | Goodwill et al. |
| 9,991,966 B1 | | 6/2018 | Celo et al. |
| 10,033,465 B2 | * | 7/2018 | Ehrlichman ......... H04B 10/505 |
| 10,205,527 B2 | | 2/2019 | Ehrlichman et al. |
| 10,270,535 B1 | * | 4/2019 | Ehrlichman ......... H04B 10/541 |
| 10,461,866 B2 | * | 10/2019 | Ehrlichman ....... H04B 10/2575 |
| 10,635,535 B2 | | 4/2020 | Cha et al. |
| 11,133,872 B2 | * | 9/2021 | Ehrlichman ............ G02F 1/225 |
| 2003/0076570 A1 | | 4/2003 | Schemmann et al. |
| 2004/0208614 A1 | | 10/2004 | Price |
| 2004/0213170 A1 | | 10/2004 | Bremer |
| 2005/0238367 A1 | | 10/2005 | Chen et al. |
| 2007/0212076 A1 | | 9/2007 | Roberts et al. |
| 2008/0018513 A1 | | 1/2008 | Frazier et al. |
| 2008/0187015 A1 | | 8/2008 | Yoshikawa et al. |
| 2010/0156679 A1 | | 6/2010 | Ehrlichman et al. |
| 2012/0081245 A1 | | 4/2012 | Ehrlichman et al. |
| 2012/0213531 A1 | | 8/2012 | Nazarathy et al. |
| 2012/0301149 A1 | | 11/2012 | Pinguet et al. |
| 2014/0321857 A1 | | 10/2014 | Ehrlichman et al. |
| 2015/0194982 A1 | | 7/2015 | Ehrlichman et al. |
| 2016/0043732 A1 | | 2/2016 | Ehrlichman et al. |
| 2016/0269121 A1 | | 9/2016 | Lee et al. |
| 2017/0294968 A1 | * | 10/2017 | Ehrlichman ......... H04B 10/541 |
| 2017/0302291 A1 | * | 10/2017 | Ehrlichman ............ H03M 1/70 |
| 2019/0273561 A1 | * | 9/2019 | Ehrlichman ....... H04B 10/2575 |
| 2019/0363798 A1 | * | 11/2019 | Ehrlichman .............. G02F 7/00 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 957 596 A1 | 11/1999 | |
| EP | 1 036 302 A1 | 9/2000 | |
| EP | 2 896 993 A1 | 7/2015 | |
| JP | 2012-114185 A | 6/2012 | |
| KR | 10-2004-0054217 A | 6/2004 | |
| KR | 10-2018-0015630 A | 2/2008 | |
| KR | 10-1086788 B1 | 11/2011 | |
| KR | 10-1818725 B1 | 1/2018 | |
| WO | 2004/074914 A1 | 9/2004 | |
| WO | 2008/152642 A1 | 12/2008 | |
| WO | 2016/198282 A1 | 12/2016 | |

#### OTHER PUBLICATIONS

Leven et al., "A 12.5 Gsamples/s optics digital-to analog converter with 3.8 effective bits", Lasers and Electro-Optics Society, 2004. LEOS 2004, The 17th Annual Meeting of the IEEE, vol. 1, Nov. 2004, pp. 270-271.

Vawter et al., "Digital Optical Phase Control in Ridge-Waveguide Phase Modulators", IEEE Photonics Technology Letters, XP000362933, vol. 5, No. 3, Mar. 1, 1993, pp. 313-315.

(56) **References Cited**

OTHER PUBLICATIONS

Papuchon et al., "Bits Digital Druven Integrated Amplitude Modulator for Data Processing", Electronics Letters, vol. 16. No. 4, Feb. 14, 1980, pp. 142-144.

Ehrlichman et al., "Generation of M-Ary Signals Using A Single Mach Zehnder Interfrometer", SPIE Digital Library, 7218, Integrated Optics: Devices, Materials,and Technologies XIII, 72180L, Feb. 9, 2009, 5 Pages.

Ehrlichman et al., "Improved Digital-to-Analog Conversion Using Multi-Electrode Mach-Zehnder Interferometer", Journal of Lightwave Technology, vol. 26, No. 21, Nov. 1, 2008, pp. 3567-3575.

Ehrlichman et al., "Multi-Electrode Approach for Interfacing Optical Computing Devices", School of Elecliical Engineering Tel Aviv University, Israel, Published in Vienna, Austria, Aug. 28, 2008.

Ehrlichman et al., "Generation of M-Ary Signals Using a Single MZI", School of Elecliical Engineering Tel Aviv University, Israel, Presented at Photonics West, 2009, 14 Pages.

Wang et al., "Research on the Modulation Phase Distortion Error Character of Y Wave-Guide in Fiber Optic Gyroscope", Proceedings of the 2008 International Symposium on Intelligent Information Technology Applications Workshop, IIT AW'08, Shanghai, China, Dec. 21-22, 2008, pp. 847-850.

Zumbahlen, "Basic Linear Design: Digital-to-Analog Converter Architectures Intentionally Nonlinear DACs", Analog Devices Ltd., Section 6.1, 2007, pp. 6.37-6.39.

Ackerman et al., "Bias Controllers for External Modulators in Fiber-Optic Systems", Lightwave, vol. 18, No. 5, May 1, 2001, 15 pages.

Agrawal, "Optical Transmitters: Semiconductor Lasers", Fiber-Optic Communication Systems, 3rd Ed., Chaps.3, 4, 8, 2002.

Bridges et al. "Distortion in Linearized Electrooptic Modulators", IEEE Transactions on Microwave Theory and Techniques, vol. 43, No. 9, Sep. 1995, pp. 2184-2197.

Gnauck et al., "Comparison of Direct and External Modulation for CAT V Lightwave Transmission at I5 mu m Wavelength", Electronics Letters, vol. 28, No. 20, Sep. 24, 1992, pp. 1875-1876.

Ho, "Phase-Modulated Optical Communication Systems", Springer Science & Business Media, p. 2-4, 10, 14, 22, 40-41, 303-316, 430, 2005.

IEEE, "The Authoritative Dictionary of IEEE Standards Terms", The Institute of Electrical and Electronics Engineering, IEEE, Standards Information Network, 7thEdition, 2000, 11 pages.

Kaminow et al., "Optical Fiber Telecommunications", B: Systems and Networks, Chap.2 ff: 27, 34, 43, 2008.

Saleh et al., "Fundamentals of Photonics", John Wiley & Sons, p. 65-67. 240, 261, 273, 531-536, 616, 1994.

* cited by examiner



FIG. 1



FIG. 2A
(PRIOR ART)

FIG. 2B

FIG. 2C



FIG. 3A

FIG. 3B

FIG. 5

FIG. 4

| DDC Input | DDC Output |
|-----------|------------|
| 0000 | 0000 |
| 0001 | 0011 |
| 0010 | 0100 |
| 0011 | 0101 |
| 0100 | 0101 |
| 0101 | 0110 |
| 0110 | 0111 |
| 0111 | 0111 |
| 1000 | 1000 |
| 1001 | 1001 |
| 1010 | 1001 |
| 1011 | 1010 |
| 1100 | 1011 |
| 1101 | 1011 |
| 1110 | 1100 |
| 1111 | 1101 |



FIG. 6A
(PRIOR ART)

FIG. 6B

FIG. 6C



FIG. 7A

FIG. 7B



FIG. 8



FIG. 9



FIG. 10

Appx134



FIG. 11B

FIG. 11A



FIG. 12B

256-QAM

FIG. 12A

84-QAM



FIG. 13B

FIG. 13A



FIG. 14 (PRIOR ART)

## LINEARIZED OPTICAL DIGITAL-TO-ANALOG MODULATOR

### RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/532,567 filed on Aug. 6, 2019, which is a continuation of U.S. patent application Ser. No. 16/386,381, filed Apr. 17, 2019, now U.S. Pat. No. 10,461,866, which is a continuation of U.S. patent application Ser. No. 16/234, 635 filed on Dec. 28, 2018, now U.S. Pat. No. 10,270,535, which is a continuation of U.S. patent application Ser. No. 15/298,373 filed on Oct. 20, 2016, now U.S. Pat. No. 10,205,527, which is a continuation of U.S. patent application Ser. No. 14/922,165 filed on Oct. 25, 2015, now U.S. Pat. No. 9,479,191, which is a continuation of U.S. patent application Ser. No. 14/662,343 filed on Mar. 19, 2015, now U.S. Pat. No. 9,203,425, which is a continuation of U.S. patent application Ser. No. 14/325,486 filed on Jul. 8, 2014, now U.S. Pat. No. 9,031,417, which is a continuation of U.S. patent application Ser. No. 13/280,371 filed on Oct. 25, 2011, now U.S. Pat. No. 8,797,198, which is a continuation of U.S. patent application Ser. No. 12/636,805, filed on Dec. 14, 2009, now U.S. Pat. No. 8,044,835, which is a continu-ation-in-part of PCT Patent Application No. PCT/IL2008/ 000805 filed on Jun. 12, 2008, which claims the benefit of priority of U.S. Provisional Patent Application No. 60/943, 559 filed on Jun. 13, 2007. The contents of the above applications are all incorporated by reference as if fully set forth herein in their entirety.

### FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to optical modulators and, in particular, it concerns a linearized optical digital-to-analog modulator.

There is a tangible need for high-performance and large bandwidth digital to analog signal conversion. Furthermore, as the RF and digital domains converge, entirely new solutions will be needed to enable multi-GHz mixed-signal systems. Probably the most prominent area to benefit is the wireless communication industry. The ever increasing thirst for bandwidth will require data converters to deliver greatly increased performance. For example, analog signals are transmitted in cable television (CATV) via optical fibers and the demand for increasing bandwidth is driving technology to speed-up the processing of signals as well as the trans-mission. High performance digital to analog conversion is also required to address the growing demands of wireless carriers for supporting the heavy traffic expected in the base station. Additional specific areas to benefit include: the defense and government industries that concentrate on deploying multi-function, dynamically reconfigurable sys-tems (RADAR, electronic warfare, and surveillance appli-cations); medical imaging; and hyper/super-computer com-munications.

One of the most widely deployed devices for analog optics modulation is the Mach-Zehnder Interferometer modulator (MZI). For binary digital signals, it is today the preferred device for long-haul fiber-optic communication, leading to chirp-free pulses which can reach hundreds of kilometers in optical fibers without the need for regenera-tion. For analog applications, however, a serious problem is encountered due to the inherent non-linear response of the modulator. Specifically, since the modulating voltage via the electro-optic effect controls the optical phase delay in a basically linear fashion and the attenuation varies as the cosine of the phase difference between the two branches of the device, a linear variation in phase difference and thus in applied voltage results in a cosine-shaped output variation, as seen in the pattern of points in FIG. 2A. The common solutions for this problem are either the biasing of the device to a quasi linear regime coupled with reducing the modu-lation range to reduce distortion, or use of an analog pre-distortion circuit to feed the modulator. Since in prac-tically all present systems signals are processed digitally, a multi-bit Digital-to-Analog Converter (DAC) device is needed with fast processing capabilities.

A DAC based on a multi-electrode MZI modulator con-cept was proposed many years ago by Papuchon et al. and is described in U.S. Pat. No. 4,288,785. In that device, the electrodes' sectioning length followed a conventional power-of-two digital sequence, which did not solve the non-linearity problem, and thus suffered from severe limi-tation in the dynamic range, and subsequently the attainable resolution. More recently, much mom complex devices have been presented to cope with these problems: Yacoubian et al. ("Digital-to-analog conversion using electrooptic modula-tors." IEEE Photonics Technology Letters, vol. 15, pp. 117-119, January 2003), proposed the employment of one MZI modulator for each and every bit. A recently reported design by Leven et al. ("A 12.5 gsamples/s optical digital-to-analog converter with 3.8 effective bits," Lasers and Electro-Optics Society, 2004. LEOS 2004. The 17th Annual Meeting of the IEEE, vol. 1. pp. 270-271, November 2004), also the subject of U.S. Pat. No. 7,061,414 entitled "Optical Digital-To-Analog Converter" to Y K Chen et al., employs a single modulator for every 2 bits and is highly nonlinear; it yields only 3.8 effective bits for a 6 bit design.

There is therefore a need for a digital to analog converter which would offer improved linearity of response without sacrificing efficiency or dynamic range.

### SUMMARY OF THE INVENTION

The present invention is a linearized optical digital-to-analog modulator.

According to the teachings of the present invention there is provided, a modulator device for convening digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating elec-trodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating elec-trodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuating device include, a digital-to-digital con-verter.

According to a further feature of the present invention, the modulator is a modulated semiconductor light generating device. According to an alternative feature of the present invention, the modulator is an electro-absorption modulator. According to yet a further alternative, the modulator is a Mach-Zehnder modulator.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the modulator

       

includes M actuating electrodes on each of two waveguide branches of the modulator. In certain preferred cases, M is greater than N.

According to a further feature of the present invention, in the case of a Mach-Zehnder modulator, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the optical signal according to a QAM (Quadrature Amplitude Modulation) modulation scheme with at least 16 constellation points.

According to a further feature of the present invention, the electrode actuating device is configured to actuate the first and second pluralities of actuating electrodes so as to modulate the optical signal to a minimum amplitude for a return-to-zero signal between successive input data words.

According to a further feature of the present invention, the modulator has a maximum dynamic range, and wherein the electrode actuating device is configured to actuate the actuating electrodes so as to generate modulation of the optical signal spanning a majority of the dynamic range.

According to a further feature of the present invention, the electrode actuating device is configured to apply one of two common actuating voltages to the actuating electrodes.

According to a further feature of the present invention, the actuating electrodes have differing effective areas. According to one set of applications, the differing effective areas form a set, members of the set being interrelated approximately by factors of two. In other preferred cases, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, the modulator has a non-linear response, and the electrode actuating device is configured to actuate the actuating electrodes so as to generate an improved approximation to a linear modulation of the optical signal as a function of the input data word.

According to a further feature of the present invention, there is also provided an optical to electrical converter deployed so as to generate an electrical signal as a function of intensity of the modulated optical signal.

There is also provided according to a further feature of the present invention, an apparatus comprising a digital-to-analog converter, the converter comprising: (a) an electronic input for receiving an input data word of N bits; (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the electrode actuating device actuates at least one of the actuating electrodes as a function of values of more than one bit of the input data word.

There is also provided according to the teachings of the present invention, a method for converting a digital data input word of N bits into an analog signal comprising: (a) processing the digital data input word to generate an electrode actuation vector of M values where M≥N; and (b) applying M voltage values corresponding to the actuation vector values to M actuating electrodes of an electrically controllable modulator for modulating the intensity of an optical signal, wherein at least one value of the actuation vector varies as a function of values of more than one bit of the input data word.

According to a further feature of the present invention, the electrode actuation vector is a binary vector, and wherein the M voltage values are selected from two voltage levels according to the M binary values.

According to a further feature of the present invention, the processing is performed by a digital-to-digital converter.

According to a further feature of the present invention, an electrical output is generated as a function of the intensity of the modulated optical signal.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits; (b) a semiconductor light generating device for generating an optical signal of variable intensity, the semiconductor light generating device including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the semiconductor light generating device, the electrode actuating device being responsive to the input data word to supply an actuating voltage w the actuating electrodes, thereby generating an output intensity corresponding substantially to the input data word.

According to a further feature of the present invention, the actuating electrodes have differing effective areas.

According to a further feature of the present invention, the differing effective areas form a set, members of the set being interrelated approximately by factors of two.

According to a further feature of the present invention, the differing effective areas form a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

According to a further feature of the present invention, M=N.

According to a further feature of the present invention, the semiconductor light generating device is a semiconductor laser.

According to a further feature of the present invention, the semiconductor laser further includes a threshold electrode configured to provide a threshold actuation current.

According to a further feature of the present invention, the semiconductor light generating device is a light emitting diode.

There is also provided according to the teachings of the present invention, a modulator device for converting digital data into analog modulation of the power of an optical signal, the modulator device comprising: (a) an electronic input for receiving an input data word of N bits (b) an electrically controllable modulator for modulating the intensity of an optical signal, the modulator including M actuating electrodes where M≥N; and (c) an electrode actuating device associated with the electronic input and the modulator, the electrode actuating device being responsive to the input data word to supply an actuating voltage to the actuating electrodes, wherein the actuating electrodes have differing effective areas, the differing effective areas forming a set, the set including at least one effective area which is not interrelated to others of the set by factors of two.

At this point, it will be useful to define various terminology as used herein in the description and claims. The terms "digital" and "analog" are used in their normal senses as common in the field. Specifically, "digital" refers to a form of data where values are stored or processed numerically, typically broken up into bits of a binary number for machine processing, whereas "analog" refers to a form of data in which values are represented by different levels within a range of values of an essentially continuously variable parameter.

5

The phrase "digital-to-digital converter" is used to refer to a device which maps a set of possible digital input values to a set of possible digital output values, where the input and output values are non-identical. The "digital-to-digital converter" employed by certain embodiments of the present invention is a non-trivial converter in which there is typically not a one-to-one mapping between bits of the input data and bits of the output data, as will be clear from the description following.

The term "binary" is used to refer to values, voltages or other parameters which assume one or other of only two possible values, and modes of operation which use such parameters. In this context, voltage levels are referred to as "common" to a number of electrodes if activation of the electrodes is performed by switching connection of each of the electrodes between the voltage values in question.

The term "electrode" is used to refer to the electrical connections of an optical modulator device through which the device is controlled. In the case of an electrode which applies an electric field to affect the optical properties of an adjacent material, reference is made to an "effective area" which is used as an indication of the relative influence of the electrode compared to that of other electrodes on the optical properties of the underlying waveguide if actuated by a similar voltage. In many cases, the actuating electrodes are all of the same effective width, for example where they overlie a long narrow waveguide. The "effective area" may then be referred to as an "effective length", corresponding to the length of waveguide overlaid by the corresponding electrode and related to the "effective area" by a constant scaling factor. This scaling factor will vary according to variations in shape, width, waveguide properties or other design parameters. Any part of the electrode not overlying the active part of the modulator device or otherwise ineffective for generating modulation of an optical signal is not included in the "effective area".

The term "modulator" is used to refer to any device which outputs an optical signal with controlled variation of intensity, whether the variation is induced during production of the signal (such as in a semiconductor laser) or whether a signal input from another source is modified.

The term "optical power" is used to refer to the quantitative manifestation of the analog optical signal.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

The invention is herein described, by way of example only, with reference to the accompanying drawings, wherein:

FIG. 1 is a schematic representation of a modulator device, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical or electrical signal;

FIG. 2A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing four electrodes with lengths interrelated by factors of two and driven directly by corresponding bits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 2B is a graph showing an intensity output generated according to an implementation of the present invention employing a full-range Mach-Zehnder modulator with four electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

6

FIG. 2C is a graph similar to FIG. 2B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 3A is a graph showing the intensity output achieved by the modulator of the present invention implemented with live actuating electrodes for a four bit input word, where the five electrodes have lengths interrelated by factors of two:

FIG. 3B is a graph similar to FIG. 3A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 4 is a table illustrating a digital-to-digital convener input and output where the input corresponds to the input data word and the output corresponds to the electrode actuation pattern for generating the outputs of FIGS. 2B and 2C;

FIG. 5 is a table illustrating unoptimized and optimized normalized electrode lengths for cases on input words of 4 and 8 bits and numbers of electrodes of 4, 5, 8, 9 and 10;

FIG. 6A is a graph showing the intensity output generated by an unmodified Mach-Zehnder modulator employing eight electrodes with lengths interrelated by factors of two and driven directly by corresponding hits of a digital input word, the output being shown relative to a line corresponding to an ideal linear response;

FIG. 6B is a graph showing an intensity output generated according to an implementation of the present invention employing a Mach-Zehnder modulator with eight electrodes of lengths interrelated by factors of two driven according to the teachings of the present invention;

FIG. 6C is a graph similar to FIG. 6B showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 7A is a graph showing the intensity output achieved by the modulator of the present invention implemented with nine actuating electrodes for an eight bit input word, where the nine electrodes have lengths interrelated by factors of two;

FIG. 7B is a graph similar to FIG. 7A showing the intensity output achieved by further modifying electrode lengths according to a further aspect of the present invention;

FIG. 8 is a schematic representation of an alternative implementation of the present invention based upon an electro-absorption modulator (EAM):

FIG. 9 is a schematic representation of yet another alternative implementation of the present invention based upon a semiconductor laser,

FIG. 10 is a schematic representation of a modulator device, similar to the dev ice of FIG. 1, implemented as a 16-QAM modulator;

FIG. 11A is a constellation diagram for the device of FIG. 10 illustrating a choice of constellation points, and corresponding electrode actuation patterns, for implementing a 16-QAM modulator;

FIG. 11B is a graph showing the symbol error rate performance for the devices of FIG. 12A implemented with different numbers of electrodes:

FIGS. 12A and 128 are simplified constellation diagrams showing only closest matching points for implementation of a 64-QAM using two sets of 7 electrodes and a 256-QAM using two sets of 10 electrodes, respectively;

FIGS. 13A and 13B are graphs showing the symbol error rate performance for the devices of FIGS. 12A and 12B, respectively; and

7

FIG. **14** is a schematic representation of a prior art Mach-Zehnder modulator configured as a DAC.

## DESCRIPTION OF SPECIFIC EMBODIMENTS OF THE INVENTION

The present invention is a modulator device for converting digital data into analog modulation of an optical signal.

The principles and operation of modulator devices according to the present invention may be better understood with reference to the drawings and the accompanying description.

Referring now to the drawings, FIG. **1** shows schematically a modulator device, generally designated **10**, constructed and operative according to the teachings of the present invention, for converting digital data into analog modulation of an optical signal. Generally speaking, modulator device **10** has an electronic input **12** for receiving an input data word D of N bits and an electrically controllable modulator **14** for modulating the intensity of an optical signal represented by arrow **16**. Modulator **14** includes M actuating electrodes **18** where M≥N. Modulator device **10** also includes an electrode actuating device **20** responsive to the input data word D to supply an actuating voltage to the actuating electrodes **18**. It is a particular feature of a first aspect of the present invention that electrode actuating device **20** actuates at least one of actuating electrodes **18** as a function of values of more than one bit of the input data word D. In other words, at least one of the electrodes is actuated in a manner differing from a simple one-to-one mapping of data hits to electrode voltage, thereby providing freedom to choose the electrode actuation pattern which best approximates a desired ideal output for the given input. According to a second complementary, or alternative, aspect of the present invention, the effective areas of actuating electrodes are optimized so that at least some of the electrode effective areas differ from a simple factor-of-two series.

The basic operation of a first preferred implementation of modulator device **10** will be understood with reference to FIGS. **2**A and **2**B. FIG. **2**A shows the output intensity values which would be obtained by supplying a voltage sufficient to generate full dynamic range modulation to a set of four electrodes according to a direct mapping of each bit of a 4-bit input data word to a corresponding electrode. The full range of input values 0000 through 1111 and the corresponding output intensities have been normalized to the range 0-1. The marked deviation from linearity in the form of a cosine variation is clearly visible. In contrast. FIG. **2**B shows die output intensity using the same four electrodes after the input data has been mapped according to the teachings of the present invention to a pattern of electrode actuation approximating more closely to a linear response. In other words, for each input value, the output value from FIG. **2**A most closely approximating the corresponding theoretical linear response is determined, and the corresponding pattern of electrode actuation is applied. By way of example, in FIG. **2**A, it will be noted that output point **22** corresponding to an input of 0011 is higher than desired for the ideal linear response. The outputs generated by electrode actuation patterns corresponding to value 0100 (point **24**) is closer to the required value, and 0101 (point **26**) is even closer. An output pattern of 0101 is thus chosen to correspond to an input of 0011. The overall result is an output which much more closely approximates to a linear response as shown.

Most preferably, electrode actuating device **20** includes a digital-to-digital converter. It will be appreciated that such a

8

converter may be implemented from very straightforward and high-speed logic components which make it feasible to employ the present invention in high frequency systems. Electronic input **12** may be simply the input pins of digital-to-digital converter **20**. FIG. **4** illustrates a preferred implementation of the digital-to-digital mapping employed to generate the output of FIG. **2**B. A digital-to-digital converter suitable for implementing the various embodiments of the present invention may readily be implemented using commercially available high-speed Application Specific Integrated Circuits ("ASIC"), as will be clear to one ordinarily skilled in the art.

The first implementation described thus far features N=M=4 with lengths of the electrodes retaining the conventional ratios of factors of two and employing simple on-off level voltage switching of a common actuating voltage to all currently actuated actuating electrodes. While such an implementation offers markedly improved linearity of response compared to the unmodified response of FIG. **2**A, it should be noted that the output intensity is not uniquely defined for each input value. Where uniqueness of the output values is required, or where a higher degree of linearity is needed, further modification may be required. Various forms of further modification may be employed including, but not limited to: use of multiple actuating voltage levels; use of modified electrode lengths; and addition of additional electrodes (i.e., M>N). These different options will be discussed below.

One option for further modification of the output is to modify the actuating voltage applied to each electrode, such as by switching between different distinct voltage levels.

An alternative preferred option for modifying the output to achieve a better approximation to a linear output is modification of the electrode lengths relative to the factor of two series assumed above. A non-limiting example of an approach for determining preferred electrode proportions will be presented below in the context of a Mach-Zehnder modulator. A corresponding practical example of electrode length values for N=M=4 is shown in the second column of FIG. **5**. FIG. **2**C illustrates the intensity output employing electrodes with lengths in the proportions listed. A comparison of the root-mean-square error from linearity for FIGS. **2**B and **2**C shows that the adjustment of electrode lengths results in an additional slight improvement to linearity.

A further option for modifying the performance of modulator device **10** is the addition of one or more additional electrodes, i.e., M>N. This provides an additional degree of freedom for correcting non-linearity of the response. In the case of unmodified electrode dimensions related by factors of two, each additional electrode is typically half the dimension of the previously smallest electrode. Where the electrode dimensions are further modified, the additional electrode dimension is preferably included within an optimization process in order to determine a preferred dimension for the additional electrode(s) along with the other electrodes. FIGS. **3**A and **3**B show outputs from the device of the present invention for an example of N=4 and M=5, with and without modification of the electrode dimensions, respectively. The electrode lengths are shown for the unmodified series in the first column of FIG. **5** and for the optimized length electrodes in the third column of FIG. **5**.

Parenthetically, although the present invention is described herein in the context of a preferred example of linearization of a modulator device which inherently has a non-linear response, the principles of the present invention may equally be applied to any case where a natural response of a modulator provides a first function and a desired

response is a different second function which may be linear or non-linear. Thus, the present invention may be employed to convert a digital input into an analog output approximating to any desired response curve within the dynamic range of the modulator. Non-limiting examples include where a desired output response curve is sinusoidal or exponential, or where it is desired to increase the resolution or "contrast" of the output within a specific range of input values.

Clearly, the present invention is not limited to applications with 4-bit data input, and can be implemented with substantially any number of data bits commensurable with other limitations of the system, such as signal-to-noise requirements. By way of example, FIGS. **6A-6C**. **7A** and **7B** illustrate a number of implementations with 8-bit input data words. Specifically, for purpose of reference, FIG. **6A** shows the unmodified output of an 8-bit arrangement where each data bit is applied directly to a corresponding electrode, again showing the underlying cosine response of the modulator. FIG. **6B** illustrates the output of an implementation according to the teachings of the present invention with N=M=8 and standard lengths of electrodes interrelated by factors of 2, as in the fourth column of FIG. **5**. FIG. **6C** shows output for a similar device where the electrode lengths have been modified according to the values shown in the fifth column of FIG. **5**. FIGS. **7A** and **7B** show the output of similar devices for N=8 but with an extra electrode, i.e., M=9. In the case of FIG. **7A**, the device has unmodified electrode lengths as shown in the fourth column of FIG. **5**, while in the device of FIG. **7B**, the electrode lengths are modified according to the proportions shown in the sixth column of FIG. **5**.

### Example I—Mach-Zehnder Modulator

By way of example, there will now be presented a theoretical treatment of one particularly preferred example of modulator device **10** implemented using a Mach-Zehnder modulator, also referred to as a Mach-Zehnder Interferometer or "MZI". This theoretical treatment is presented to facilitate an understanding of the present invention and as a suggested technique for calculating certain parameters. However, it should be noted that the invention as described above has been found to be effective, independent of the accuracy or otherwise of this theoretical treatment.

The Mach-Zehnder modulator is an active integrated waveguide device consisting of a higher index guide region that splits into two paths which are combined again after a certain distance. Each of these paths is referred to as a leg or branch. When used as a switch, the MZI may be turned "off" by raising or lowering the index of refraction in one of the legs. This is achieved by employing the electro-optic effect to produce a 180-degree change in phase by means of optical-path length. Intermediate optical attenuation levels can be obtained by inducing changes other than 180 degrees.

In the case described above of FIG. **1**, a 4-bit Digital-to-Analog Converter, based on a Multi-Electrode (ME) Mach-Zehnder Interferometer, is presented. The input to the device consists of 4 bits. Using the Digital-to-Digital converter, which may be thought of as a look-up table, the 4 data bits are mapped to 5 electrodes as this realization is equipped with a single excess electrode. According to one option, if an electrical rather than optical output is desired, the optical signal at the output is detected and converted to an electrical (analog) signal.

It should be noted that, in the context of a MZI, it is common to split the electrodes to act in an opposite manner on the two legs of the device, for example, one side raising and the other lowering the refractive index of the material, thereby reducing the actuation voltage required. In such cases, the value M is the number of actuating electrodes on each of the two waveguide branches of the modulator.

Mathematical Description

The properties of the MZI may be described mathematically as follows. Let I denote a vector of electrode lengths. The number of elements in I is M. Also let V denote a corresponding vector (of length M) of electrode control-voltages. When applying a voltage $V_j$ only to electrode $e_j$, whose length is $l_j$, the phase of light propagating in the modulating leg, shifts by

$$\pi \frac{V_j \cdot l_j}{v_\pi \cdot l_\pi},$$

where $V_\pi \cdot l_\pi$ corresponds to the voltage-length product leading to a $\pi$ shift in the phase. It is used as a merit figure of the MZI modulator. We define new normalized electrode length by:

$$L_j = \frac{l_j}{l_\pi} \tag{1}$$

Gathering the total contribution from all electrodes, the following transmission function of the MZI is obtained:

$$T(V, L) = \cos^2\left(\frac{\pi}{2} \frac{V \cdot L^T}{v_\pi}\right), \tag{2}$$

where the superscript T denotes transposition. The contribution from each electrode $e_j$, j=1, 2, ... M, to the total phase shift, is permitted by applying some non-zero voltage $V_j=v$. We chose to work with binary values for all electrode voltages $V_j=0$, v, a clearly desirable requirement which, moreover, makes the design simpler as discussed next. Note that by setting the lower voltage to a value greater than zero, the maximum output level of the MZI is decreased thus reducing the dynamic range. Let $D_i$ denote a digital binary input vector of length N, where i=1, ..., $2^N$. For each digital vector $D_i$, the DDC component in FIG. **1** produces a corresponding binary vector $B_i$, of length M. $B_i$ multiplied by v, represents the actual (internal) vector of voltages controlling the M electrodes. When multiplying a real number, $B_i$ should be interpreted as binary vector whose elements are the real numbers {0,1}. With respect to (2), this means that when $V_j=v$, then $B_{ij}=1$, and when $V_j=0$, $B_{ij}=0$; $B_{ij}$ being the j-th element of the control vector $B_i$. At this time we define B to be a matrix of size $2^N \times M$ whose rows consist of the set of binary control vectors $B_i$, each of length M. Hence, (2) can be rewritten as

$$T(B_i, L) = \cos^2\left(\frac{\pi}{2} \frac{v}{v_\pi} \sum_{j=1}^M B_{ij} L_j\right) \tag{3}$$

Without loss of generality $V=V_\pi$ will be assumed henceforth. (Preferably $V_j=v_\pi$ to ensure full coverage of the modulating range and efficient use of the input optical power.) When the number of electrodes equals the number

                  

of data bits, i.e. when M=N, an implementation in a standard approach according to the system of FIG. **10** while trying to exploit the dynamic range of the transfer function (3) to its fullest results in high nonlinearity errors. This is demonstrated in FIG. **2A** for M=N=4. For this demonstration it is assumed that an unoptimized straightforward selection is made, where B is the set of all 16 binary 4-tuples, i.e. $B^T = \{0000, \ldots, 1111\}$ and L is taken as $\{0.5, 0.25, 0.125, 0.0625\}$. In the next section, one suggested approach to optimizing L and B will be proposed.

Optimization of B and L

In order to improve the linearity as well as the dynamic range of the conversion process, we propose that the lengths of the elements of L and the control vectors B be optimized. As described above, it is possible to optimize one or both of B and L. In practice, optimization of L alone may provide a non-monotonic variation of output together with some improvement in linearity and dynamic range. This may be sufficient for applications in which the non-linearity is relatively small, such as the semiconductor laser embodiments to be discussed below. For more significantly non-linear devices, the options of optimized B with unoptimized L. and optimized B and L are typically more suitable.

We consider these options separately since their implementation require different hardware. An unoptimized set of electrode lengths L consists of $L_j = 2^{-j}$, with j=1 . . . M. An unoptimized matrix B will consist of all $2^N$ binary N-tuples. In that case, with a slight abuse of notations we have that $B_i = D_i$; i=0, 1, 2, . . . $2^N - 1$. Hence, designs with optimized B require Digital-to-Digital conversion while designs with optimized L only do not. Whenever B is optimized, and for any number of electrodes M; M≥N, it is understood that a binary input data vector $D_i$ has to be mapped to a control vector $B_i$, yet $B_1 \cdot D_1$. The DDC, implemented as all-electronic, shall perform this mapping operation.

As the optimization criterion we shall use the root mean square error (RMSE) between an ideal output, represented by a straight line, and the converter output. Lei

$$U_i = \frac{i}{2^N}$$

denote the ideal analog value required for representing the digital input $D_i$. The RMSE is defined as follows:

$$g(B, L) = \sqrt{\frac{1}{2^N} \sum_{i=1}^{2^N} \left[ U_i - \cos^2\left(\frac{\pi}{2} \sum_{j=1}^{M} B_{ij} L_j\right) \right]^2} \tag{4}$$

The optimization problem can now be formulated as minimizing the values of g(B,L) for all possible values of the matrix B and the vector L.

Note that this optimum solution is aimed at minimizing the average (squared) deviation between the desired output and the convener output. Clearly, this is only one non-limiting example, and various other linearity measures may equally be used. Similarly, as mentioned earlier, the desired output response function itself may take any desired form, and for each function, a suitable optimization criterion must be selected.

Approaching (4) as a global optimization problem with an order of $O(2^N \times M)$ variables, is quite involved, especially since the variables are of mixed type, B is binary while L is real. (h is related to a nonlinear mixed integer zero-one optimization problem.) It is therefore typically preferred to employ a near-optimum two-step approach. First, B is determined assuming an unoptimized set of electrodes L, $L_j = 2^{-j}$, with j=1 . . . M. The obtained matrix is denoted by $\hat{B}$. Then, given $\hat{B}$, L is obtained such that (4) is minimized.

If L is an unoptimized set of electrodes. $L_j = 2^{-j}$. Then, the output of the convener as given by (3) is a function of the control $B_i$ only. Since one aims at obtaining a straight line, whose quantized values are given by $U_i$, then it is not difficult to verify that the best approximated selection of $\hat{B}_i$ is given by

$$\hat{B}_i = Dec2Bin_M\left(\frac{2}{\pi}\arccos\left(\sqrt{U_i}\right)\right), \tag{5}$$

where the function $Dec2Bin_M(x)$ maps a real value x, $0 < x \leq 1$, to its closest M-bit binary representation. Note that this, in effect quantization, process may result in several input data vectors having the same analog representation. In applications in which this duplicate representation is considered problematic, it is effectively mitigated by choosing M>N.

Given $\hat{B}$, we proceed to optimize L. Assuming there exists a set of electrodes L such that

$$\cos^2\left(\frac{\pi}{2}\sum_{j=1}^{M} \hat{B}_{ij} L_j\right) \approx U_i; \forall i,$$

then as an alternative to (4), we may define an equivalent cost function, which is easier to handle mathematically:

$$h(L) = \left\{ \sum_{i=1}^{2^N} \left[ \frac{2}{\pi}\arccos\left(\sqrt{U_i}\right) - \sum_{j=1}^{M} \hat{B}_{ij} L_j \right]^2 \right\}. \tag{6}$$

To minimize this cost function, one needs to differentiate h(L) with respect to L and equate to 0:

$$\frac{\partial h}{\partial L_k} = 2\left\{ \sum_{i=1}^{2^N} \hat{B}_{ik}\left[ \frac{2}{\pi}\arccos\left(\sqrt{U_i}\right) - \sum_{j=1}^{M} \hat{B}_{ij} L_j \right] \right\} = 0; \forall k. \tag{7}$$

The following equation (more precisely set of equations) is obtained

$$\sum_{i=1}^{2^N} \sum_{j=1}^{M} \hat{B}_{ik} \hat{B}_{ij} L_j = \sum_{i=1}^{2^N} \hat{B}_{ik} = \frac{2}{\pi}\arccos\left(\sqrt{U_i}\right), \tag{8}$$

where k=1, 2 . . . M. In matrix notation the set of equation translates to a simple expression

$$L = \left(\hat{B}^T \hat{B}\right)^{-1} \frac{2}{\pi}\left[\arccos\left(\sqrt{U}\right)\hat{B}\right]^T, \tag{9}$$

13

14

where $\sqrt{U}$ amounts to a component-wise square root. The solution above grants us an optimized vector of lengths L.

## Example II—Electro-Absorption Modulator

As mentioned earlier, the present invention is not limited to implementations based on Mach-Zehnder modulators, and can be implemented using any device which modulates light intensity as a function of applied voltage. By way of one additional non-limiting implementation. FIG. **8** shows an analogous implementation of the present invention using an electro-absorption modulator.

An electro-absorption modulator (EAM) is a semiconductor device which allows control of the intensity of a laser beam via an electric voltage. Its operational principle is typically based on the Franz-Keldysh effect, i.e., a change of the absorption spectrum caused by an applied electric field, which usually does not involve the excitation of carriers by the electric field.

By realizing N or more electrodes we can use the EAM as a high speed electro-optical Digital-to-Analog converter, in a similar fashion as we used the MZI. As in modulator device **10** described above, this device includes an electronic input **12** for receiving an input data word D of N bits and an electrically controllable modulator **14** with M electrodes for modulating the intensity of an optical signal represented by arrow **16**. An electrode actuating device **20** is responsive to the input data word P to supply an actuating voltage to the actuating electrodes **18**.

Here too, to mitigate the non-linear behavior of the device, electrode actuating device **20** serves as a Digital-To-Digital Converter is employed to map an N bit input to a set of M electrodes, determining which of the M electrodes is actuated for each input value. The particular mapping varies according to the response characteristic of the particular modulator, but the principles of operation are fully analogous to those described above in the context of the Mach-Zehnder modulator implementation.

## Example III—Modulated Light Generation Device

The present invention is applicable also to other devices where digital information carried by voltage or current is translated into analog optical signals in the form of optical power. This includes also light generation devices like Light Emitting Diodes (LED) or semiconductor lasers. By way of illustration, FIG. **9** shows a semiconductor laser implementation of the present invention.

Specifically, FIG. **9** shows a semiconductor laser DAC device, generally designated **40**, constructed and operative according to the teachings of the present invention. The actuating electrode, typically implemented as a single contiguous electrode, is here subdivided into a threshold electrode **42** and M actuating electrodes **18**. The threshold electrode **42** is typically needed to reach a minimum activation current below which no significant output is generated. Actuating electrodes **18** are actuated as a function of the data hits of a digital input **12**, in this case a 4-bit data word, to generate an analog optical signal output of intensity representing the digital input.

In the particularly simple implementation illustrated here, neither L nor B is optimized. In other words, each actuating electrode **18** is part of a set interrelated with effective areas in 2:1 relation, and each electrode is actuated as a function of corresponding single bit of the input data word. The actuating current is typically roughly proportional to the area of electrodes actuated. This case is in itself believed to be patentable, and is thought to be of practical importance. Optionally, a closer approximation to a linear response can be achieved by modifying L (electrode proportions) and/or B (by including a DDC, not shown), all according to the principles discussed in detail above.

It will be appreciated that a similar device may be implemented using other semiconductor light generating devices, such as LEDs. Depending upon the details of the device used, threshold electrode **42** may not be necessary. This and any other necessary device-specific modifications will be self-evident to one ordinarily skilled in the art.

## Example IV—QAM Transmitter

Although described above in the context of devices for intensity/amplitude modulation, it should be noted that various embodiments of the present invention are also effective for modifying the phase of an optical signal, and can therefore be used as highly compact and simple QAM (Quadrature Amplitude Modulation) modulators or transmitters.

Specifically, referring back to FIG. **1**, it will be noted that, by configuring the digital-to-digital converter DDC **20** to apply different actuation patterns to the electrodes on the two branches of the Mach Zehnder Modulator (MZM), modulation of the output signal phase can be achieved. Such an implementation will now be described with specific reference to FIGS. **10-13B**.

Turning now to FIG. **10**, there is shown a modulator device, generally designated **100**, implemented as a QAM modulator. Modulator device **100** is essentially similar to the device of FIG. **1**, but has been relabeled to convey mom clearly its function. Specifically, modulator device **100** has a first plurality $M_1$ of actuating electrodes **18a** deployed in operative relation to a first waveguide branch of the modulator and a second plurality $M_2$ of actuating electrodes **18b** deployed in operative relation to a second waveguide branch of the modulator. In this case, $M_1=M_2=5$, giving a total number of actuating electrodes M=10. The electrode actuating device is here shown as two distinct digital-to-digital converters **20a** and **20b**, which am configured to actuate the first and second pluralities of actuating electrodes **18a** and **18b** in response to a given input data word $D_i$ so as to additionally modulate the phase of the optical signal. Clearly, digital-to-digital converters **20a** and **20b** can alternatively be combined into a single DDC with M=10 outputs with suitable connections to the actuating electrodes on both branches of the waveguide.

It will be appreciated that modulator device **100** can serve as an optical 16-QAM transmitter based on a single multi-electrode MZM (ME-MZM). Each electrode is divided into 5 segments, separately driven by two voltage signals, 0 and V representing binary 0 and 1, respectively. The center electrode is a common ground for the active electrode segments. The role of the modulator is to generate a desired M-QAM constellation which is composed of complex optical field values. The modulator is expected to generate $2^M$ signals:

$$s_i = r_i e^{j\theta_i}, \; r_i > 0, \; 0 \le \theta_i \le 2\pi, \; i=1, \ldots, 2^M, \tag{10}$$

In our example of a 16-QAM with two sets of 5 electrodes, as an input, the QAM transmitter accepts an electrical 4-bit digital input word, denoted $D_i$. The input word is mapped by two Digital-to-Digital Converters (DDC) onto each of the 10 (electrode) segments, whose lengths are the vectors $L^{1,2}$. Each DDC outputs a 5-bit word, denoted as $B_i^1$ and $B_i^2$. The output of transmitter can be written as:

$$E_{out,i} = \frac{1}{\sqrt{2}} E_{in} \exp\left\{ j2\pi \sum_j^{N_1} B_{ij}^1 L_j^1 \right\} + \frac{1}{\sqrt{2}} E_{in} \exp\left\{ -j2\pi \sum_j^{N_2} B_{ij}^2 L_j^2 \right\} \qquad (11)$$

where $E_{in}$ the optical field amplitude entering the modulator and $N_1$, $N_2$ are the number of segments on each arm. The elements $L_j^{1,2} \in L^{1,2}$ represent normalized electrode lengths on each arm. The two-level $B_{ij}^{1,2}$ coefficients are elements of the matrices $B_i^{1,2}$ and represent whether voltage v was applied to the j-th segment, on the respective arm. The index j enumerates the electrodes, $j=\{1 \ldots N_{1,2}\}$ on each arm. The summation is normalized to span $0 \leq \Sigma_j^N B_{ij}^{1,2} L_j \leq 1$, such that each arm induces a phaseshift of $0 \leq \Delta\varphi \leq 2\pi$.

The application of the electrical signals is preferably directly upon the modulator without any mediating circuits, referred to herein as "Direct Digital Driving". The modulator can be regarded as a 2D Digital-to-Analog (D/A) convener, that converts a digital word into an optical vector signal.

The design of the transmitter involves the setting of electrode lengths, $L^{1,2}$ and DDC mappings. $B_i^{1,2}$, that will generate all the required signals given in Eq. (10). An effective combination of the electrode lengths and digital mappings may be derived either by analytical methods or numerically. A simple numerical derivation will now be presented.

A ME-MZM with $N_{1,2}$ electrode segments on each arm is capable of generating $2^{(N_1+N_2)}$ signals. Thus, by choosing carefully the electrode lengths, and assuming the number of segments sufficient to generate at least $2^{(N_1+N_2)} > M$ different signals, all the required signals described by Eq. 10) can be picked out of the generated signals pool.

As an example. FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool

As an example. FIG. 11A shows the an ideal Square-16-QAM constellation, which is the required signal constellation, and a signal pool which was generated with [5,5] electrodes. The best matched signals at the pool are marked in figure. It can be seen that there is a good match between the ideal and the best matched generated constellations.

Table 1 compares between an ideal 16-QAM constellation and a generated constellation with different combinations of number of electrodes each arm. It presents the symbol minimum distance and the root mean square error. The latter provides a measure of agreement between the ideal and the generated constellations. Configurations with [2,2], [2,3] and [3,3] electrodes provide less than 16 different signals (minimum distance of 0) and therefore cannot be used for generation of 16-QAM.

TABLE 1

| $N_1$, $N_2$ | Ideal | 4.2 | 4.3 | 4.4 | 4.5 | 5.5 | 5.6 | 6.6 |
|---|---|---|---|---|---|---|---|---|
| Minimum Disiance | 2 | 1.66 | 1.66 | 1.66 | 1.30 | 1.83 | 1.67 | 1.67 |
| RMSE | 0 | 4.64 | 4.64 | 4.53 | 4.42 | 4.64 | 4.52 | 4.57 |

FIG. 11B presents the Symbol Error Rate (SER) performance for a range of Signal to Noise Ratios (SNR) for an Additive White Gaussian Noise (AWGN) channel. It can be seen that when using [6,6] electrodes, the performance graph closely matches that of ideal 16-QAM constellation. Using a higher number of electrodes can lower the SER ever further toward the ideal curve. SER performance can be slightly improved by further tuning the decoding hypothesis testing at the receiver side to the generated constellation.

The electrode lengths used for the generation of FIG. 11B follow a binary sequences, $L^{1,2} = 2^{-j}$. Tweaking the electrode lengths has small impact on the modulator performance. In Eq. (11), we assumed driving signals of 0 and $2V_\pi$. The high driving signal can be lowered by extending the total electrode length twice its size. The opposite signs in the exponents in the two terms of Eq. (11) are already implemented by the geometry of the electrode disposition of FIG. 10, when the signs of the voltages applied are the same, since then the electric fields have opposite directions. Other electrode dispositions exist for different cuts of the electro-optic crystals, and the appropriate way of applying the voltage with the right signs should be clear to a person skilled in the an.

Referring now to FIGS. 12A-13B, it will be appreciated that the proposed modulator is capable of generating high order QAM constellations. FIG. 12A depicts the ideal 64-QAM constellation together with one generated using a [7,7] electrodes modulator, while FIG. 12B shows an ideal 256-QAM constellation together with the one generated using a [10,10] electrodes modulator. It can be seen that there is a good match between the ideal and the generated constellations. FIGS. 13A and 13B show the Symbol Error Rate performance for the generated constellations of FIGS. 12A and 12B, respectively.

A simple implementation of this embodiment described thus far generates Non-Return-to-Zero (NRZ) signals. NRZ permits constant intensity for similar consecutive bits, and is thus more susceptible to Inter-Symbol-Interference and other nonlinear propagation distortions. Return-to-Zero (RZ) format is a pulsed modulation where the signal "returns to zero" after every bit. This format provides better performance than NRZ, but usually requires additional hardware, such as a pulse carver. A transmitter based on the modulator of an embodiment of the invention can readily be extended to produce RZ pulses with minimal if any additional hardware. By adding an RZ control line to the DDC, as shown in FIG. 10, which serves as a trigger determining whether the output optical amplitude should be zero or other, the whole modulator will be capable of generating RZ signals. When the added control line is high, the DDC will map the electrode actuation pattern to the pattern corresponding to the middle point of the constellation, which is zero.

For the constellation presented in FIG. 10, $B_1 = [00010]$ and $B_2 = [01110]$ will output zero (or minimum) power because it will generate a phase difference of $\pi$ between the two arms of the MZM.

While the present invention has been presented as a digital-to-analog optical modulator, it should be noted that each embodiment of the invention may be modified to provide analog electrical output by use of an optical-to-electrical (O/E) converter. This option is illustrated in FIG. 1 as optional O/E converter 30. If the O/E convener itself has a non-linear response function, the present invention may advantageously be used to optimize the system parameter to linearize the electrical output rather than the (intermediate) optical output. Analogously, any nonlinearity induced by the optical medium used for transmitting the signal (e.g. optical fiber) can be compensated for by using O/E converter 30 as a linearizing device.

The present invention is applicable to substantially all applications requiring a DAC with optical or electrical output. Examples of particular interest include, but are not limited to, wireless communications systems, fiber-optic communication systems, cellular telephone networks, cable

17

television, military applications, medical applications and hyper/super computer communications.

It will be appreciated that the above descriptions are intended only to serve as examples, and that many other embodiments are possible within the scope of the present invention as defined in the appended claims.

All publications, patents and patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present invention. To the extent that section headings are used, they should not be construed as necessarily limiting. In addition, any priority document(s) of this application is/are hereby incorporated herein by reference in if/their entirety.

The invention claimed is:

1. An optical modulation system, the system comprising:
an input for a plurality of N digital input data bits;
an input optical signal;
a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and
wherein a digital-to-digital mapping maps the plurality of N digital input data bits to a set of M digital output data bits associated with a plurality of voltage values;
wherein the input optical signal is modulated based on the plurality of voltage values;
wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values;
wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease; and
wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase.

2. The optical modulation system of claim 1:
wherein, within the digital-to-digital mapping, for a third subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively decreasing digital input values in the third subset, decrease, and
wherein, within the digital-to-digital mapping, for a fourth subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs

18

in the set of digital outputs corresponding respectively to the successively decreasing digital input values in the fourth subset, increase.

3. The optical modulation system of claim 1, wherein, within the digital-to-digital mapping, for a third subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital output values corresponding to the successively increasing or decreasing digital input values in the third subset, remain the same.

4. The optical modulation system of claim 1, wherein one or more electrodes of the modulator are driven based on the plurality of voltage values to modulate the input optical signal, thereby generating the one or more modulated optical signal outputs.

5. The optical modulation system of claim 1, wherein one or more electrodes of the modulator are driven directly responsive to the plurality of voltage values to modulate the input optical signal, thereby generating the one or more modulated optical signal outputs.

6. The optical modulation system of claim 1, wherein the modulator comprises a plurality of waveguide branches that are enabled to modulate the input optical signal, and wherein a first set of the plurality of voltage values drives a first of the plurality of waveguide branches, a second set of the plurality of voltage values drives a second of the plurality of waveguide branches, and wherein outputs of the first and second waveguide branches are joined to provide at least part of the one or more modulated optical signal outputs.

7. The optical modulation system of claim 1, wherein the modulating comprises one of phase modulation, amplitude modulation, or phase and amplitude modulation.

8. The optical modulation system of claim 1, wherein the one or more modulated optical signal outputs vary in intensity responsive to the input.

9. The optical modulation system of claim 1, wherein the one or more modulated optical signal outputs vary in amplitude responsive to the input.

10. The optical modulation system of claim 1, wherein the one or more modulated optical signal outputs vary in phase responsive to the input.

11. The optical modulation system of claim 1, wherein the modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.

12. The optical modulation system of claim 1, wherein the one or more modulated optical signal outputs are corrected for non-linearities due to non-linear characteristics of the optical modulator or non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.

13. The optical modulation system of claim 1, wherein, for a given digital input value, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of the modulator.

14. The optical modulation system of claim 1, wherein at least some of the first subset of successively increasing digital input values are specified in the digital-to-digital mapping non-contiguously, and wherein at least some of the second subset of successively increasing digital input values are specified in the digital-to-digital mapping non-contiguously.

15. The optical modulation system of claim 1, wherein the input optical signal is provided by an optical signal source.

16. An optical modulation system, the system comprising:
an input for a plurality of N digital input data bits;

an input optical signal;

a modulator for modulating the input optical signal responsively to the plurality of N digital input data bits to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers; and

wherein a digital-to-digital mapping maps the plurality of N digital input data bits to M digital output data bits associated with a plurality of voltage values;

wherein the input optical signal is modulated based on the plurality of voltage values;

wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of corresponding digital output values from a set of possible digital output values;

wherein, within the digital-to-digital mapping, for a first subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively decreasing digital input values in the first subset, decrease; and

wherein, within the digital-to-digital mapping, for a second subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively decreasing digital input values in the second subset, increase.

17. The optical modulation system of claim 16:

wherein, within the digital-to-digital mapping, for a third subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively increasing digital input values in the third subset decrease, and

wherein, within the digital-to-digital mapping, for a fourth subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively increasing digital input values in the fourth subset, increase.

18. The optical modulation system of claim 16, wherein, within the digital-to-digital mapping, for a third subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital output values corresponding to the successively increasing or decreasing digital input values in the third subset, remain the same.

19. The optical modulation system of claim 16, wherein one or more electrodes of the modulator are driven based on the plurality of voltage values to modulate the input optical signal, thereby generating the one or more modulated optical signal outputs.

20. The optical modulation system of claim 16, wherein one or more electrodes of the modulator are driven directly responsive to the plurality of voltage values to modulate the input optical signal, thereby generating the one or more modulated optical signal outputs.

21. The optical modulation system of claim 16, wherein the modulator comprises a plurality of waveguide branches that are enabled to modulate the input optical signal, and

wherein a first set of voltage values modulates the input optical signal associated with a first of the plurality of waveguide branches, a second set of voltage values modulates the input optical signal associated with a second of the plurality of waveguide branches, and wherein outputs of the first and second of the plurality of waveguide branches are joined to provide at least part of the one or more modulated optical signal outputs.

22. The optical modulation system of claim 21, wherein a phase of the input optical signal associated with each waveguide branch is modulated by the respective set of voltage values applied to one or more electrodes of the waveguide branch.

23. The optical modulation system of claim 16, wherein the modulating comprises one of phase modulation, amplitude modulation, or phase and amplitude modulation.

24. The optical modulation system of claim 16, wherein the one or more modulated optical signal outputs vary in intensity responsive to the input.

25. The optical modulation system of claim 16, wherein the one or more modulated optical signal outputs vary in amplitude responsive to the input.

26. The optical modulation system of claim 16, wherein the one or more modulated optical signal outputs vary in phase responsive to the input.

27. The optical modulation system of claim 16, wherein the optical modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.

28. The optical modulation system of claim 16, wherein one or more modulated optical signal outputs are corrected for non-linearities due to non-linear characteristics of the optical modulator or non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.

29. The optical modulation system of claim 16, wherein, for a given digital input value, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of the optical modulator.

30. The optical modulation system of claim 16, wherein at least some of the first subset of successively decreasing digital input values are specified in the digital-to-digital mapping non-contiguously, and wherein at least some of the second subset of successively decreasing digital input values are specified in the digital-to-digital mapping non-contiguously.

31. The optical modulation system of claim 16, wherein the input optical signal is provided by an optical signal source.

32. An optical modulation system for converting a plurality of input digital data words into a modulated optical output stream for transmission over an optical fiber, the modulation system comprising:

an input configured to receive an input digital data word having N bits, where N>1;

an input optical signal;

an electrically controllable electro-optic modulator comprising a plurality of waveguide branches, each waveguide branch configured to receive the input optical signal;

wherein the N bits of the N bit digital input data word are mapped to a set of M output bits corresponding to a set of voltage values;

wherein the input digital data word is one from a set of $2^N$ input data words, the M output bits are from a set of $2^M$

M output bits, wherein each M output bits in the set of $2^M$ M output bits corresponds to a different set of voltage values;

wherein the input optical signal received by each of the waveguide branches of the modulator is modulated based on at least a subset of the set of voltage values to generate a corresponding modulated optical signal; wherein an output of the modulator combines the modulated optical signals corresponding to the plurality of waveguide branches to generate a modulated output signal varying in one or more of intensity, amplitude, and phase responsive to the input digital data word; and

wherein the modulated optical signal is transmitted as a portion of the modulated output optical stream.

33. The optical modulation system of claim 32, wherein the N bits of the N bit digital input data word are mapped to M output bits based on a digital-to-digital mapping that comprises, for each digital input from a set of possible digital inputs, a corresponding output from a set of possible digital outputs;

wherein, for a first subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing or decreasing digital input values in the first subset, decrease; and

wherein, for a second subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing or decreasing digital input values in the second subset, increase.

34. The optical modulation system of claim 33, wherein at least some of the first subset of successively increasing or decreasing digital input values are specified in the digital-to-digital mapping non-contiguously, and wherein at least some of the second subset of successively increasing or decreasing digital input values are specified in the digital-to-digital mapping non-contiguously.

35. The optical modulation system of claim 32, wherein the digital-to-digital mapping further comprises, for a third subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital output values corresponding respectively to the successively increasing or decreasing digital input values in the third subset, remain the same.

36. The optical modulation system of claim 32, wherein, for a given digital input value, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of the optical modulator.

37. The optical modulation system of claim 32, wherein the modulated output optical stream is one of phase modulated, amplitude modulated, or phase and amplitude modulated output.

38. The optical modulation system of claim 32, wherein the modulated output optical stream varies in intensity responsive to the input.

39. The optical modulation system of claim 32, wherein the one or more modulated optical signal outputs vary in amplitude responsive to the input.

40. The optical modulation system of claim 32, wherein the one or more modulated optical signal outputs vary in phase responsive to the input.

41. The optical modulation system of claim 32, wherein the optical modulator comprises one or more Mach-Zehnder interferometer (MZI) based modulators.

42. The optical modulation system of claim 32, wherein the modulated output optical stream is corrected for non-linearities due to non-linear characteristics of the optical modulator or non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.

43. The optical modulation system of claim 32, wherein, for a given digital input, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of the optical modulator.

44. The optical modulation system of claim 32, wherein the input optical signal is provided by an optical signal source.

45. An optical modulation system for converting a plurality of input digital data words into a modulated optical output stream for transmission over an optical fiber, the modulation system comprising:

an input configured to receive an input digital data word having N bits, where N>1;

one or more electro-absorption signal generation devices, each configured for generating an optical signal output;

wherein the N bits of the N bit digital input data word are mapped to a set of M output bits corresponding to a set of voltage values;

wherein the input digital data word is one from a set of $2^N$ input data words, the set of M output bits are each from a set of $2^M$ M output bits, wherein each M output bits in the set of $2^M$ M output bits corresponds to a different set of voltage values;

wherein each of the optical signal output generated by the electro-absorption signal generation device is modulated based on at least a subset of the set of voltage values to generate a corresponding modulated optical signal; and

an output configured to combine the modulated optical signals from the one or more electro-absorption signal generation devices to generate a modulated output signal varying in intensity responsive to the input digital data word.

46. The optical modulation system of claim 45, wherein the N bits of the N bit digital input data word are mapped to the set of M output bits based on a digital-to-digital mapping that comprises, for each digital input from a set of possible digital inputs, a corresponding output from a set of possible digital outputs;

wherein, for a first subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing or decreasing digital input values in the first subset, decrease; and

wherein, for a second subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing or decreasing digital input values in the second subset, increase.

**23**

47. The optical modulation system of claim **46**, wherein at least some of the first subset of successively increasing or decreasing digital input values are specified in the digital-to-digital mapping non-contiguously, and wherein at least some of the second subset of successively increasing or decreasing digital input values are specified in the digital-to-digital mapping non-contiguously.

48. The optical modulation system of claim **45**, wherein the digital-to-digital mapping further comprises, for a third subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital output values corresponding respectively to the successively increasing or decreasing digital input values in the third subset, remain the same.

49. The optical modulation system of claim **45**, wherein, for a given digital input value, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of an optical modulator.

50. The optical modulation system of claim **49**, wherein the optical modulator comprises one or more electro-absorption based modulators.

51. The optical modulation system of claim **45**, wherein the modulated output optical stream is one of phase modulated, amplitude modulated, or phase and amplitude modulated output.

52. The optical modulation system of claim **45**, wherein the modulated output optical stream varies in intensity responsive to the input.

53. The optical modulation system of claim **45**, wherein the one or more modulated optical signal outputs vary in amplitude responsive to the input.

54. The optical modulation system of claim **45**, wherein the one or more modulated optical signal outputs vary in phase responsive to the input.

55. The optical modulation system of claim **45**, wherein the modulated output optical stream is corrected for non-linearities due to non-linear characteristics of an optical modulator or non-linearities due to non-linear characteristics of one or more optical fibers transmitting modulated optical signal outputs.

56. The optical modulation system of claim **45**, wherein, for a given digital input, the mapping to a corresponding digital output value is determined based on a pattern for actuating drive voltages that alters a linearity of an optical response of an optical modulator.

57. The optical modulation system of claim **45**, wherein the input digital data word is provided by a signal source.

58. An optical modulation system, the system comprising:
an input for a plurality of N digital input data bits;
an input optical signal;
wherein a digital-to-digital mapping maps the plurality of N digital input data bits to M digital output data bits;
wherein the digital-to-digital mapping comprises, for each digital input value included in a set of possible digital input values for the plurality of N digital input data bits, a set of M corresponding digital output values from a set of possible digital output values;

**24**

wherein, within the digital-to-digital mapping, for a first subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the first subset, decrease; and

wherein, within the digital-to-digital mapping, for a second subset of successively increasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital output values corresponding respectively to the successively increasing digital input values in the second subset, increase; and

wherein the optical modulation system further comprises a modulator for modulating the input optical signal responsively to the M digital output data bits, to output a modulation of the input optical signal, thereby generating one or more modulated optical signal outputs for transmission over one or more optical fibers.

59. The optical modulation system of claim **58**:

wherein, within the digital-to-digital mapping, for a third subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively decreasing digital input values in the third subset decrease, and

wherein, within the digital-to-digital mapping, for a fourth subset of successively decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of successive digital outputs in the set of digital outputs corresponding respectively to the successively decreasing digital input values in the fourth subset increase.

60. The optical modulation system of claim **58**, wherein, within the digital-to-digital mapping, for a third subset of successively increasing or decreasing digital input values specified in the digital-to-digital mapping, deltas between numerical values of digital outputs in the set of digital output values corresponding to the successively increasing or decreasing digital input values in the third subset, remain the same.

61. The optical modulation system of claim **58**, where in the modulator comprises one or more branches that receive the input optical signal.

62. The optical modulation system of claim **58**, wherein modulating the input optical signal responsively to the M digital output data bits outputs a modulation of the input optical signal that is one or a combination of: a pulse modulated: an amplitude modulated: or a phase modulated output signal.

63. The optical modulation system of claim **58**, wherein at least some of the first subset of successively increasing digital input values are specified in the digital-to-digital mapping non-contiguously, and wherein at least some of the second subset of successively increasing digital input values are specified in the digital-to-digital mapping non-contiguously.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  Nos. 26-1277, 26-1280

**Short Case Caption:**  Ramot at Tel Aviv University  Ltd. v. Cisco Systems, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ___13909___ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _05/22/2026_

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

Save for Filing